**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01966-SKC

Lacey Ganzy, on behalf of J.G. and N.G, minor children;
Jon and Misty Martin, on behalf of C.M., a minor child;
Nadarian and Alexis Clark, on behalf of D.C., a minor child

        Plaintiffs,

v.

Douglas County School District RE-1, a school district;
Board of Education for Douglas County School District RE-1, a government body;
John Veit, in his official and individual capacity

        Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs J.G., N.G., C.M., and D.C.,[1] by and through counsel Iris Halpern, Crist Whitney, and Matthew J. Cron of RATHOD | MOHAMEDBHAI LLC, respectfully allege in their Complaint and Jury Demand as follows:

### INTRODUCTION

Of all the suffering in the world, the most tragic is that imposed on children. It is even more tragic when such suffering robs them of the opportunity to reach their full potential, haunting them for life. This case concerns serial violations of the rights of minority children to enjoy equal access to educational opportunities, and all the

---

[1] Pursuant to Federal Rule of Evidence 5.2, Plaintiffs' initials are being used to protect their privacy and because they are minors.

1

consequences of that deprivation to their futures. Plaintiffs J.G., N.G., C.M., and D.C. are and were some of the few Black or biracial students at Douglas County High School and Castle Rock Middle School. Harkening back to the early days of school desegregation, these students were regularly called the N-word, threatened with violence like lynchings and shootings, subjected to various racial and ethnic cleansing jokes, repeatedly called monkey and similar degrading epithets, exposed to ridicule and other forms of harassment by their peers, and made by teachers to argue the benefits of Jim Crow laws. More than a hundred students joined a Snapchat group spewing hate and violence against racial minorities and other historically marginalized communities, paralleling increasingly virulent backlash against these same communities across Douglas County schools.

Despite explicit knowledge of the widespread hostile environment faced by the few minority students at their schools, Defendants Douglas County School District RE-1 ("DCSD" or the "School District") and the Board of Education for Douglas County School District RE-1 ("Board of Education") acted with callous indifference of that knowledge and made virtually no effort to mitigate the racist hostilities, leaving these children to fend for themselves. Indeed, in a glaring act of callousness, the School District and Board of Education have yet to take formal action in their entity capacities, and many individual Board Members have yet to condemn these well-documented injustices. The indifference of School District leaders explains how such levels of hate and racism were permitted to fester.

Plaintiffs J.G., N.G., C.M., and D.C. turn to the courts, after internal recourse in the School District has utterly failed them, to vindicate their rights under Title VI of the Civil Rights Act of 1964, 42 U.SC. §2000(d) et. seq., and 42 U.S.C. §§ 1983 and 1986 for violations of their Fourteenth Amendment rights and action for neglect to prevent a conspiracy within the meaning of 42 U.S.C. § 1985 to interfere with their civil rights respectively. Defendants should be held accountable so that no other child in the School District should ever have to suffer the same way.

## I.      PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff J.G. is a minor, a citizen of the United States, and is a resident of the State of Colorado.

2.      Plaintiff N.G. is a minor, a citizen of the United States, and is a resident of the State of Colorado.

3.      Plaintiff C.M. is a minor, a citizen of the United States, and is a resident of the State of Colorado.

4.      Plaintiff D.C. is a minor, a citizen of the United States, and a resident of the State of Colorado.

5.      Douglas County School District RE-1 is a public school district that serves Douglas County, Colorado.

6.      The Board of Education for Douglas County School District RE-1 is a public governmental body operating in Douglas County, Colorado with its principal place of business at 620 Wilcox Street, Castle Rock, Colorado.

7.     Defendant John Veit is a citizen of the United States, and a resident of the State of Colorado. At all times relevant to this case, Defendant Veit served as the Principal of Castle Rock Middle School on behalf of Defendant DCSD.

8.     This action arises under the Constitution and laws of the United States and the State of Colorado. The claims raised under the United States Constitution are brought pursuant to 42 U.S.C. §§ 1983 and 1986.

9.     The Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 and 1367(a). Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events and omissions alleged herein occurred within the State of Colorado, and all the defendants reside in this district.

## II.     <u>FACTUAL ALLEGATIONS</u>

### Demographics and Structure of the Douglas County School District

11.     Douglas County is a predominately White suburban and rural county in Colorado, located south of Denver.

12.     The Douglas County School District serves over 64,000 students and employs over 8,000 people, making it the third largest school district in Colorado.

13.     Douglas County School District students are 71.9% White and only 1.3% Black.

14.     As of 2020, DCSD had only one Black principal and around sixty Black teachers out of the 4,440 licensed educators within the district.

15.     DCSD is governed by the publicly elected Douglas County School Board of Education RE-1. It is comprised of seven members.

16.     The seven Board of Education members are elected to four-year terms, and elections are held on a staggered basis.

17.     Douglas County High School ("DCHS") is part of the Douglas County School District.

18.     DCHS is located at 2842 Front St., Castle Rock, Colorado.

19.     DCHS serves ninth, tenth, eleventh, and twelfth grade students.

20.     Castle Rock Middle School ("CRMS") is part of the Douglas County School District.

21.     CRMS is located at 2575 Meadows Blvd, Castle Rock, Colorado.

22.     CRMS serves seventh and eighth grade students.

**The Douglas County School District's History of Underserving Minority Students**

23.     Historically, Black students in the DCSD reported suffering from a racially hostile learning environment. Such reports included that racial slurs regularly appeared scrawled on restroom stalls, cavalier use of the N-word by White classmates, and feelings of isolation.

24.     Students have complained to the School District in the past about the hatred they have experienced, including in public forums.

25.     For example, on June 9, 2020, after the death of George Floyd, students spoke at a public meeting before the Board of Education noting that "[o]ur communities

lack of racial diversity often limits the perspectives that students develop in the classroom which contributes to racial hostilities and microaggressions."

26.    Students further "implore[d] the board of education to take action to dismantle overt and covert racism in our community."

27.    Before that point in time, DCSD did not have a comprehensive equity policy in place.

28.    Students requested that the Board of Education take active steps by: (1) adding diversity and inclusion as a priority agenda item at the next board meeting; (2) creating an ongoing committee to review and improve curriculum; (3) requiring all teachers and administrators undergo implicit bias and anti-racism training so they are equipped to facilitate conversations about race and to offer equitable educational experiences; (4) mandating teachers and administrators address issues of racism and systemic injustice on a regular basis; (5) offering tactical resources for students to recognize and address racial injustice.

29.     As a result of student concerns and its own internal assessment, and with the help of a newly formed Equity Action Team, the School District adopted a comprehensive plan to address racism against minority students and staff, including the Board of Education's adoption of a three-page Educational Equity Policy.

30.    The Educational Equity Policy aimed to "create, implement, and enforce" important equity initiatives.

31.    Through the Educational Equity Policy, DCSD aimed "to establish an inclusive culture to ensure all students, staff, and community members feel safe and

valued by increasing and embedding authentic and relevant learning opportunities and experiences involving inclusion, diversity, equity, and accessibility."

32.     In addition to other objectives, the Educational Equity Policy manifested an intent to address and eradicate racism and ameliorate past harms, specifically stating:

The Board of Education recognizes the need for criteria and indicators to address successful growth toward equity, inclusion, diversity, and accessibility.

The Board of Education shall NOT condone, by its staff, students, leadership, or any other community member representing School District interests:

A) Biased, inequitable, racist, or exclusive practices
B) Discriminatory behaviors that disproportionately impact any particular group or groups of individuals based on aspect of their collective identity
C) Practices that promote inequality or inequity
D) Deficit-focused instructional or operational implementation frameworks
E) Perpetuation of racism or discrimination
F) Policies and resolutions that support exclusion or intolerance

The School District will create and implement a targeted system to identify any of the above practices, frameworks, systems, behaviors, and/or policies. The School District will also develop, in conjunction with school and School District leaders, a restorative process to address the identified concern, repair harm to the community, and to eradicate any future inequities.

33.     The Educational Equity Policy was originally intended to support underserved and historically targeted minority communities in Douglas County.

**Challenger Board of Education Candidates Foment Hate Against Minorities**

34.     In 2021, four members of the Douglas County Board of Education were up for re-election.

35.     In that election cycle, candidates Michael Peterson, Becky Myers, Christy Williams, and Kaylee Winegar (collectively the "Challengers" or "Majority Board Members") contested the incumbents for those four positions.

36.     A significant part of their campaign was spent dog whistling[2] about the dangers of including or empowering communities of color at the expense of White hegemony.

37.     On the campaign trail, the Challengers attacked the Educational Equity Policy as purportedly racist itself in suggesting that racial inequities be recognized and addressed.

38.     For example, when discussing the School District's Educational Equity Policy, which was created to foster "an inclusive culture to ensure all students, staff, and community members feel safe and valued by increasing and embedding authentic and relevant learning opportunities and experiences involving inclusion, diversity, equity, and accessibility," Peterson, the leader of the four-candidate slate and current Board President, made the following statements:

    a. Peterson blamed the Board for adopting a widely used sociology textbook because it "promotes Karl Marx's theories,[3] and includes chapters on White Supremacy, Microaggressions, and all other elements of CRT."

    b. Peterson lamented that, "DSCD *[sic]* brought in consultants for $37K to push CRT on our teachers. They [the consultants] defined 'the system' as

---

[2] Dog whistling is a rhetorical and political strategy that seeks to cloak potentially offensive messaging or objectives with more neutral or positive sounding goals to garner additional support for ideas that might otherwise be rejected while still sending coded messages to a certain audience about one's true intentions once in power. A prominent example of dog whistling was Richard Nixon's "Southern Strategy," which relied on racial tensions that arose with the demise of Jim Crow and the burgeoning civil rights movement.

[3] It is a timeworn tradition for those opposing racial equality to link advocates for civil rights with Marxism or Communism. For instance, avowed segregationist and staunch opponent of anti-civil rights legislation, Senator Strom Thurmond from South Carolina, quoting former FBI Director J. Edgar Hoover, argued that the "passage of [the Civil Rights Act of 1964, including Title VII] will visit the heel of oppression on all the people… because 'the approximate 20 million Negroes in the United States today constitute the largest and most important racial target of the Communist Party, U.S.A… We do know that Communist influence does exist in the Negro movement and it is this influence which is vitally important. It can be the means through which large masses are caused to lose perspective on the issues involved and, without realizing it, succumb to the party's propaganda lures.'"

racist and 'White, male, able, Christian, and straight'… set[ting] up the false oppressor/victims paradigm based solely on race and urged collective action against the system."

c.  Peterson complained about the Board's "radical agenda in practice – one based on division, equal (low) outcomes, and race-based policies that are discriminatory and will only set our kids up for failure."

d.  Peterson inveighed that CRT[4] would teach his own children that, "their father…is an oppressor based on historical actions of others and [that] two of them are permanent victims that cannot improve their station in life."

e.  Peterson complained that an equity keynote speech "should scare the hell out of you," particularly when "combin[ed]... with the [No Place for Hate] push,[5] the adoption of CRT-based sociology textbook at the last board meeting and the draft Equity Policy in work." According to him, these actions showed a "strong push . . . to move from education to indoctrination."

f.  Peterson accused the keynote speech of promoting the idea that "America is systematically racist so the system needs to be destroyed" which he alleged was "divisive and nothing but a power grab by elites to change our culture and nation."

g.  Peterson stated that, "equality of outcome (equity) is deleterious to preparing our kids to succeed in life."

---

[4] CRT is an acronym for "critical race theory" - a cannon of inquiry developed by scholars decades ago interrogating how slavery and other racist practices such as Jim Crow laws have impacted modern society, for example, resulting in continuing housing segregation or disparate wealth attainment. In the current political climate. However, use of the phrase CRT today is invoked to vilify any mention of the broader existence or impact of racism on communities of color and is frequently characterized as an attack on White individuals. The fear tactic of using CRT to claim persecution by a White majority is a modern spin on the same tactic used by White supremacists during the civil rights movement. Senator Thurmond asserted that, "The white people of the South are the greatest minority in this nation. They deserve consideration and understanding instead of persecution of twisted propaganda." Orval E. Faubus, the Governor of Arkansas who sought to block the integration of the Little Rock Schools by the Little Rock Nine infamously opined, "to you who oppose the great majority of Arkansas people in this fight [against integration], I urge you to think…you destroy also the very principles of government that enable you…to rear your children under the high standards of living and freedom which prevail in this state and nation." In today's parlance, critics of CRT have invoked it as something akin to a White cultural genocide. For example, Enrique Tarrio, leader of hate group Proud Boys, while protesting CRT and mask requirements outside of Miami-Dade County Schools, claimed, "CRT= Marxism, Marxism → Genocide Every time."

[5] "No Place for Hate" is a program developed by the Anti-Defamation League ("ADL"), a non-profit organization that aims "to stop the defamation of the Jewish people and to secure justice and fair treatment to all." The ADL's "No Place for Hate" program is a self-directed program with the goal of helping school communities create a more equitable and inclusive climate by combating bias and bullying.

39.     During his campaign, Peterson made countless comments attacking "CRT" and condemning racially explicit awareness or trainings, including an implicit bias and race consciousness training:

a.  Peterson sent a letter to Board member David Ray insisting that the Board needs to "rebuild trust with our parents who are vocally opposed to the implementation of Educational Equity Policy."

b.  Peterson stated that "[o]ur friends in D49 have drafted a resolution to ban Critical Race Theory (CRT) implementation in their school district – in professional development training and classroom curriculum. We will closely monitor their progress . . . [because] there has been umbrage expressed with regard to textbooks, speakers, and professional development sessions that clearly do not align with stated policy and, some parents believe, closer reflect divisive and deleterious elements of CRT."

c.  Peterson responded to one supporter that, "[t]here is great opportunity here, if the district does it right, to bring different perspectives together and build trust in an apolitical way. [But] [t]hen again, they also have an opportunity to widen the gap and distrust if the council is stacked with people who all share the same views going in – especially if those views are aligned with Gemini Group[6] (equal outcomes, oppressor/victim groups by race, intersectionality score, etc.) or the No Place For Hate suggestion to 'move on from kindness to social justice' activism."

d.  Peterson told another supporter that, "[w]e need to reevaluate our priorities for Professional Development (PD) sessions [and not] push divisive agendas (like the racist theories of intersectionality and victim/oppressor groups advocated by the Gemini Group earlier this year)…"[7]

e.  Further speaking about the Gemini Group, Peterson complained that "when you look at their teachings they don't align with the stated policy and tend toward CRT and Marxism (intent doesn't matter; judge people based on their skin color; the system is white, male, straight, Christian, and able;

---

[6]The Gemini Group is a professional consulting firm, frequently hired by corporations, government entities, and non-profit organizations to identify, address, and eliminate racial inequalities in the organizations. The Gemini Group is, notably, also run by two African American trainers.

[7] The training for educators was not mandatory or required for staff to attend, and it was also grant funded. The training was recorded and posted online making it accessible to the public.

system must be torn down brick by brick, policy by policy, etc.). There are much better messengers and programs that can be used to deal with conversations regarding race and other controversial issues . . . - just don't divide us by race and other immutable factors."

f.  Peterson complained that the Equity Policy "is an intentional euphemistic word salad designed to green light CRT implementation under the guise of plausible deniability. We know that based on the original policy that included 'systemic racism' and the 'myth of meritocracy' and based on CORA communications that show their hubris and intent to push this policy regardless of what parents want."

g.  Peterson drew the attention of his supporters to the fact that, "School District 49 (Northeast CO Springs in El Paso County) will vote on a resolution to ban Critical Race Theory in their district on August 12 . . . do we need to consider a similar resolution to avoid misalignment between Intent and Implementation (like we saw with the Gemini Group)?"

h.  Peterson claimed, "[w]e need to offer MORE choices than top-down driven CRT and other dictated Leftist curriculum . . . [i]ts just too fatiguing and polarizing for our students, parents, and teachers . . . Our parents don't want Leftist indoctrination – they want education."

i.  In speaking with press, Peterson described the Board's contract with the Gemini Group for equity training a major reason he ran for office, stating that, "Gemini was probably the one thing where I looked at that and said, 'Alright, we've crossed the Rubicon.' This is off the rails if this is what teachers are being told is appropriate in the schools."

j.  Peterson furthermore expressed outrage at "significant incidents of CRT or extreme political philosophy being pushed in the classrooms," and urged his followers that "if you disagree with the implementation of CRT and other issues, continue to speak out/ If you agree with and support a proposed policy, you also need to speak out – it [is] the only way to remain principled but also build trust. If we build trust on the in-person learning issue, we will be better able to influence the "equity/CRT" issue as a group. . . ."

40.  Other candidates expressed similar hostility toward racial minorities, hiding behind equally coded language. For example:

a.  Myers told one potential voter that, "[m]yself and my fellow candidates do not support the district equity policy as written in its entirety. We believe

11

CRT has no place in Douglas County and do not feel Adult Politics or Social Justice Issues have any place within the classroom."

b. Myers has also said, "I do not want the 'Educational Equity Policy' in DC (Douglas County). We do not need adult politics in school unless appropriate to the class and then there must be balance. Both sides presented".

c. Winegar said during a Board of Education meeting that she opposed the equity policy because it has led to "shaming and retaliation against teachers, students and staff who express views and opinions that are counter to others' views and opinions."

d. Winegar also stated during one meeting that "I and others in our community were concerned with connotations around the word 'equity' and some concerning instances that have occurred in our school district." She characterized empathy exercises as giving rise to "feelings of shame and guilt."

41.     The Challengers also touted endorsements they received from the 1776 Project Political Action Committee, a PAC that formed to elect candidates for public office that promise to "abolish critical race theory." The PAC erroneously claims that "[c]ritical race theory is a radical belief that pushes the idea that America is an inherently racist country and white Americans are stained with the original sin of racism for which they can never be cleansed."

42.     Likewise, the Challengers collaborated with FAIR Douglas County – another organization launched in April of 2021 to advocate against "CRT" and for the teaching of a so-called "honest history," which "rejects learned helplessness and grievance" and "harmful divisiveness and illiberal ideologies." Until recently, the organization's website claimed that teaching about racial atrocities placed a "dehumanizing emphasis on racial difference."

43.     FAIR leadership critiqued the School District's racial awareness training as "regressive ideology seeping into our school district," and claimed an anti-bullying training aimed at building awareness of how LGBTQ+ youth, youth of color, or religious minority youth can be harmed caused "shame or guilt" in students.

44.     FAIR critiqued the Educational Equity Policy based on the "experience of seeing the terms 'inclusive' and 'equitable' used to not only establish racially exclusionary groups, but to curtail other students' speech, institute microaggression policies, justify racial stereotyping, etc."

45.     FAIR leadership complained in email messages to DCSD that the non-partisan Anti-Defamation League's "No Place for Hate Program" programing should be eliminated because it was "partisan/activist."

46.     FAIR took issue with the below sign in a classroom, characterizing it as a "politically-charged message":



47.     Given the intolerant rhetoric preached by the Challengers, their supporters increasingly began voicing angry and aggressive screeds against "CRT" and the addressing of or confronting racism against racial minorities in general, dominating public Board of Education meetings and sharing increasingly vitriolic online comments about

"BLM" and "CRT," to which the Challengers often responded positively, and indeed exhorted individuals to turn out in force to voice such opinions.

48.     At their encouragement, supporters called for the end of teaching "CRT," demanded an end to the School District's equity and inclusion policies and expressed opprobrium for diversity trainings.

49.     One supporter, for example, equated those opposing changes or recission of the Educational Equity Policy of engaging in "BLM and ANTIFA like tactics."

50.     Another accused equity and inclusion proponents of perpetuating "the psychological harming of children within our country…[and] teach[ing] destructive values."

51.     A third advocated for "get[ting] rid of the Equity Advisory Counsel. It is not needed."

52.     After campaigning against equity for racial minorities and other historically marginalized and in the vast numeric minority students, the Challengers won the elections against incumbent board members on November 2, 2021.

53.     The Challengers took their oaths of office on November 29, 2021.

**Students of Color in DCSD Schools Suffer Severe and Pervasive Racist Hostilities**

54.     Although widespread racism against students of color who attend DCSD schools has persisted throughout the years, racial hostility increased dramatically after the elections.

55.     One parent reported that the bullying of her biracial children became so bad that police became involved after other students threatened to kill her son because of his skin color.

56.     Another of her children was routinely called the N-word because of her hairstyle.

**N.G.'s Racially Hostile Educational Environment at Douglas County High School**

57.      J.G. and N.G. are siblings. Both are biracial and easily identifiable as having Black or mixed heritage parentage.

58.     N.G. attended Douglas County High School ("DCHS") briefly during the 2022-2023 school year.

59.     N.G. was sixteen years of age at the time.

60.     The Principal at Douglas County High School during the duration of her attendance to present was Tony Kappas.

61.     Teachers regularly subjected N.G. to a hostile educational environment.

62.     For example, one female teacher at DCHS chastised N.G. for dressing inappropriately.

63.     N.G. was wearing a tee shirt and a pair of Nike athletic shorts, similar to what many of her White peers wore.

64.     The female teacher who chastised her nevertheless informed her that her outfit was a violation of the school's dress code.

65.     When N.G. asked the teacher what was wrong with her outfit and pointed at a White female student walking by wearing the exact same pair of Nike athletic shorts,

the teacher simply told her that "she was not built like the other girls," thus rendering the shorts inappropriate only on her.

66.    In another example, N.G.'s social studies teacher made students debate the pros and cons of Jim Crow laws.

67.    Jim Crow was a legal regime that relegated Black Americans to second class citizens, depriving them of the most basic rights, benefits, and privileges of citizenship following the Civil War through the mid nineteenth century, notwithstanding emancipation and ratification of the Fourteenth Amendment of the United States guaranteeing all citizens equal protection of law.

68.    Under Jim Crow, African Americans were systematically excluded from all but the most physical and menial of jobs, refused equal compensation, denied access to public facilities such as libraries, pools, and transportation, subjected to voting restrictions, and precluded from owning property, patronizing the same hotels, restaurants, and other establishments as Whites, and denied access to schools, just because of their race.

69.    It was not until the 1954 case *Brown v. Board of Education*, (notably, an equal access to education case), that the Supreme Court of the United States struck down the "separate but equal" legal doctrine upon which Jim Crow was predicated.

70.    It is beyond dispute that the Jim Crow regime, a vast network of laws and the state-sanctioned violence used to enforce them, was a racist system designed to perpetuate White supremacy and oppress Black citizens. There is no reasonable educational purpose served by having students argue for the "pros" of Jim Crow.

71.     But even more offensive, N.G., the only Black student in her class, was assigned by the teacher to argue in favor of the Jim Crow regime.[8]

72.     The teacher informed her that the performance in the debate would be a big part of N.G.'s grade for the course.

73.     Despite N.G.'s protests that she did not want to debate in favor of Jim Crow, the teacher would not allow her to switch sides.

74.     Instead, the teacher told her she would receive a failing grade if she did not participate in the debate.

75.     Finally, the day before the debate, after N.G. objected all week and begged to switch sides, the teacher finally relented, leaving N.G. with less than twenty-four hours to prepare, ultimately affecting her performance.

76.     DCHS students also tormented N.G.

77.     White students referred to her as a "fat cotton picker," reducing her to a slave like or share-cropper status, and routinely used the N-word around her.

78.     Some of these comments took place in front of adults.

79.     For example, when one student called N.G. a "fat cotton picker," the physical education teacher overheard the comments and reported them to the administration.

---

[8] Apparently, this same teacher deemed it a creditable project to require students to debate Black Lives Matter vs. Blue Lives Matter in another class.

80.     However, even after having learned of the remarks, administrators including Principal Kappas told N.G. and her mother that the school would not be taking action against the student who made them.

81.     After a month at DCHS, N.G.'s mother removed N.G. from the school and enrolled her at another school to protect her daughter from further race discrimination and its destructive effects.

**Harassment Against J.G., C.M, and D.C. Continues at Castle Rock Middle School**

82.     During the 2022-2023 school year, J.G. began the eighth grade at CRMS at the age of thirteen. He turned fourteen during the school year.

83.     During the 2022-2023 school year, C.M. began the eighth grade at CRMS at the age of fourteen. He turned fifteen during the school year.

84.     During the 2022-2023 school year, D.C. began the eighth grade at CRMS at the age of thirteen. He turned fourteen during the school year.

85.     J.G., C.M., and D.C. were the only Black or biracial students in their pod, a system of organizing the school into smaller clusters of classmates who shared teachers and classes with each other.

86.     Throughout the year, their peer students subjected J.G., C.M., and D.C. to varying degrees of hate, expressing overt hostility towards their race.

87.     The racially discriminatory harassment included verbal insults, racist jokes, and threats of violence.

88.     Ultimately, over one hundred students participated in a Snapchat chatgroup where racially offensive comments and threat of killings were commonplace.

89.    Throughout the year, various students made comments to J.G., C.M., and D.C., including the following non-exhaustive list:

    a.  J.G., D.C., and C.M., routinely heard their peers referring to "niggers" and "niggahs."

        i.  One female told four other students in front of C.M. that she hoped another Black student wouldn't join the class because "we already have one nigger in this class."

        ii.  Another time in gym class after knocking into a different female student during a game, she called C.M. a "nigger" to his face.

        iii.  Some of C.M.'s fellow students asked him for a "N-word pass," meaning a free pass by which they could use the N-word around him with impunity.

        iv.  Similarly, students told D.C. that they could use the n-word because they had a "pass" based on knowing someone who was Black or had a Black friend.

    b.  Peers regularly referred to J.G., C.M., and D.C. as "monkeys," a racist epithet long used to deride Black individuals as lazy or foolish and more akin to apes than persons.

        i.  A student made up and called C.M. the racist moniker "Monkey M."[9] enmeshing his last name with the derogatory epithet Monkey and continuously using it.

        ii.  One student called D.C. "monkey boy" as other students laughed along. She continued to call him "monkey boy" after that even though she knew it had upset him and he asked her to stop.

        iii.  Another student showed D.C. a meme of C.M. on social media calling him "Monkey M." and tried to get him to laugh at it despite D.C.'s obvious aversion and distress.

    c.  Classmates also revived the racist reference to "cotton-pickers," making fun of J.G., C.M., and D.C. by reducing them to enslaved persons or

---

[9] Only the first letter of C.M.'s name is being used in the Complaint to protect his privacy and because of his minor status, however, the racist moniker used his full last name.

sharecroppers and laughing at the painful past of slavery and racial discrimination and exploitation.

    i. One student told C.M. to "go back to the plantation you cotton-picking monkey."

    ii. Students asked J.G. whether he picked the cotton his shirt was spun from.

    iii. Another student threw cotton balls at J.G., laughing at him.

    iv. Another student physically grabbed J.G. by his shirt while using the epithet, trying to insult him and goad him into fighting.

d. Classmates circulated humiliating racist tropes and memes and images of Black students, particularly C.M.

    i. Students took pictures of C.M. while he was using the restroom without his knowledge and circulated it widely on the internet.

    ii. Other students began to create racist memes of C.M. invoking the moniker "Monkey M." and circulating them.

e. Racist bullying became appreciably worse during Black History Month, as students used it as an opportunity not to learn about Black History but instead to ridicule Black students.

    i. At the end of Black History Month, a student approached J.G. and told him that his month was over, and he could go back to wherever he came from.

    ii. Another student ridiculed Black accomplishments in general, laughing at J.G. and asking him why Black people needed their own month at all.

90. These incidents and others of racist harassment pervaded the school year. All three young men attempted to complain at various points in time.

91. C.M. reported the female student who called him "nigger" to the gym teacher and the Assistant Principal of the Seventh Grade, Russell Loucks.

92.     After that, he became a target of relentless retaliation by other students, who took every opportunity to humiliate or express anger at him for reporting the incident.

93.     Students cornered C.M., attempted to trip and push him, and taunted him for reporting the misconduct.

94.     They continued to call him racist names.

95.     C.M. sometimes fought back, resulting in discipline against him, usually disproportionate as his harassers would face little to no serious consequences.

96.     At one point, CRMS administrators informed C.M.'s parents that it had imposed a mutual no-contact order to protect C.M. from harassment by his peers, which, if imposed, proved utterly ineffective.

97.     It is likely, however, that the no-contact order was never imposed or enforced, given that a copy obtained by C.M.'s parents in a subsequent records request showed it was neither signed nor dated.

98.     The harassment by his peers became so relentless that the Assistant Principal for Eighth Graders at CRMS, Kristine Streander, spoke on the phone with C.M.'s parents and suggested a safety plan which included keeping C.M. after class and dismissing him when the halls were empty.

99.     Assistant Principal Loucks admitted to C.M.'s parents that students were targeting C.M. because of his race and for reporting the racism.

100.    The stress from the non-stop racial discrimination and the alleged no-contact order resulted in C.M.'s parents taking him to the emergency room after C.M. experienced excruciating pain in his abdomen.

101.    After the no-contact order supposedly lifted, students continued to call C.M. a "monkey."

102.    After he defended himself against one student who did so, C.M. received an in-school suspension. The school would not tell C.M.'s parents, however, if the other student was disciplined at all.

103.    Another student told C.M. to "[g]o back to the plantation you cotton picking monkey."

104.    C.M. got into an altercation with that student as well and received another in school suspension. The school implied that it disciplined the other student but refused to tell C.M.'s parents the extent of the discipline.

105.    Assistant Principal Streander informed C.M. and his parents that he could press charges after other students took a picture of him using the restroom and circulated it on social media and in group chats, but DCSD took no action against the students who engaged in this misconduct.

106.    After students posted the picture of him using the restroom, C.M. refused to use the school bathrooms ever again, causing him significant stress, discomfort, and damage to his health.

107.    J.G. reached out to his social studies teacher and the school bus driver on several occasions.

108.    Furthermore, other students reported racism, which J.G. was questioned about it by Assistant Principal Streander before the winter break.

109.    Some of the harassment J.G.'s peers engaged in was observed by teachers or administrators.

110.    Similarly, D.C. reported being called a "monkey boy" to his teacher, who in response asked him to document in writing what had occurred so that she could communicate it to the CRMS administration.

111.    After that, the Principal of CRMS, John Veit, facilitated a conversation between D.C. and the female student who called him "monkey boy," but never informed D.C.'s parents.

112.    In fact, J.G.'s, C.M.'s, and D.C.'s parents were never informed of any of the harassment experienced and reported by their children even though their sons were minors.

113.    The student D.C. reported continued to call D.C. "monkey boy" even after the meeting, and even after D.C. repeatedly asked her to stop.

114.    Despite the warnings that J.G., C.M, and D.C. frequently raised about racist harassment at CRMS, the level of impunity with which their peers operated continued unabated.

115.    At the beginning of March 2023, some of J.G.'s peers invited J.G. to a Snapchat group in which almost all the students in his class participated. This figure included well over one hundred students, although the exact number is hard to confirm given that the Snapchat group has since been disbanded.

116.    On the group chat, fellow students engaged in a continuous stream of racially derogatory and offensive comments, many of them violent, and many of them

tagging their few Black fellow students so that they would be sure to see the vile messages. A non-exhaustive summary of the posts and videos posted to the feed include:

    a.  A female student made a video of herself manipulating her voice and saying the word "nigger" in digitized tones multiple times, and then eyeballing the camera while stating she was "smoking the za[10] right now."

    b.  A male student stated, "i love negges," "I hate niggers," posted a question about "who wants to rob a vape store" with a meme picture of a Black male jacking off and the captions "U JUST GOT CUMMED ON." He also stated "I HATE NIGGERS," and "n to the l to the g to the g to the e to the r."

    c.  Another male student posted "I'm a big truck driver trump supporter get me a buckshot and shoot me a nigger  "

    d.  Another student posted an emoji morphing a Black person with the cartoon character "piglet" from Winnie the Pooh, calling the meme a "niglet":



    e.  Two students spoke about eliminating African Americans from the planet, with one proclaiming that "we should j remove blacks from this planet bring back toho *[sic]* holocaust…" and the other indicating in response that Black people should just kill themselves and reposting a monkey/banana meme from another student in response agreeing:



---

[10] "Za" is a slang term for marijuana.

117.    Many of the other comments made by their peers are no longer immediately available because the chatgroup content has been deleted. These examples are but a few that J.G.'s and N.G.'s mother captured before the group disbanded.

118.    Law enforcement has issued over ninety warrants on Snap, Inc. to preserve data from the Snapchat feed, so additional messages may be recoverable eventually.

**J.G. Reports Discrimination to DCSD**

119.    After facing the routine racist abuse by his peers as described above, J.G. took it upon himself to author a written complaint about discrimination because his efforts to report discrimination within CRMS had been unavailing.

120.    On March 10, 2023, J.G. authored an email to DCSD describing the racial discrimination he was facing. To communicate his message, J.G. used DCSD's District Feedback Form and email address, denoting that his message related to student safety:

Hello, I am a student at Castle Rock Middle School Recently, I have experienced many instances and suspicions of racial discrimination from students and teachers, and I feel it's starting to become a problem across the school district for me and many others. I have constantly been racially profiled and offended by students at CRMS. They often use racial slurs near me and many others thinking it's funny, and it makes me feel uncomfortable and unwanted in my school. I have asked multiple times for them stop to no avail. It comes from everyone, and I've been hearing slurs and stereotypes from other kids who go to schools in the area as well. It's a problem that the school is also aware of, as I've heard from teachers that a meeting was held on the subject. They still have yet to talk to students about it. I raised suspicion today toward staff at a assembly we held. We were holding a school competition, and many students had their phones out to record the event, including me. Someone next me was scrolling through social media, and I was recording one of the contestants. This was put to a stop when a teacher angrily asked me to give them my phone. I complied, but I was shocked and confused as to why it was a problem that I was recording, just like the rest. Our school, along with many others, has a no cell phone policy, and I understand that and comply to those rules. But I don't understand why I was a problem when others were doing the same. I felt singled out. It's no one in particular, it's everyone. It wasn't just today, it's everyday. There will even be times when staff will be in the area when

25

such discrimination takes place. Nothing is done about the matter. I obviously cant control what students say or do, as it is not in my power to obstruct their rights. But on school grounds, it is expected, as stated on your webpage, that "the Douglas County School District RE-1 does not unlawfully discriminate against otherwise qualified students, employees, applicants for employment, or members of the public on the basis of disability, race, creed, color, sex, sexual orientation, marital status, national origin, religion, ancestry, or need for special education services," and I feel students, and mainly students, should follow these rules at all times in school to make schools a safer and more welcoming environment for everyone. I feel that our school, along with many others, could use some redirection on how we treat fellow students. I'm just disappointed that this happens so often, and if it keeps coming from students, it's paving a path for students in previous grades, and may never be fixed. I just ask that hate speech be punished and taken more seriously in our district to make the environment more welcoming for students now, and in the future. Thank you.

121.    Stacy Rader, the Communications Officer for DCSD, forwarded J.G.'s email complaint to Principal Veit the following day.

122.    Principal Veit responded to Rader's email by confirming prior knowledge of the hostile educational environment for students of color, stating, "[i]t is unfortunate to hear. We are working on this, but I have a feeling it will be a long project for us."

123.    J.G. never received a response to his email.

124.    In May of 2023, the school initially denied his mother's open records request for the complaint and school's response.

**J.G. Shares His Story with His Mother Who Escalates Notice of the Abuse**

125.    Not only did their peers subject J.G., C.M., and D.C. to racial hostility, so did a number of teachers and administrators. Disparate treatment was commonplace.

126.    For example, during one student assembly, J.G., as well as nearly every other student, took out their phones to record a school competition.

127.    A teacher approached J.G. and angrily demanded that he stop recording and hand over his phone.

128.    J.G. complied with the teacher's demands even though White students sitting beside him had their phones out and were recording, but the teacher did not chastise them or demand their phones.

129.    In another incident, two White students shared a meme and began to laugh. The teacher in the classroom reprimanded C.M. and J.G. for the disruption even though the two of them had not been laughing.

130.    The teacher then seized J.G.'s computer and instructed C.M. and J.G. that they could no longer sit near each other.

131.    Another teacher consistently asked J.G. and C.M. to take out the trash, do dishes, and fold laundry. She delegated these tasks exclusively to J.G. and C.M. and did not ask White students to complete these tasks, even when other students volunteered to do so.

132.    In another example, and one that ultimately led J.G. to disclose the abuse he had been facing to his mother, the school bookkeeper pulled J.G. into the administrative office and accused him of stealing a water bottle.

133.    This encounter took place on April 11, 2023, about six weeks after J.G. had emailed DCSD to report discriminatory harassment.

134.    J.G. explained to the bookkeeper that he owned the water bottle, but she would not believe him, interrogating him about where he had purchased it.

135.    J.G. had purchased the water bottle at Walmart.

136.    When he told the bookkeeper as much, she asserted that Walmart did not sell that type of water bottle.

137.    J.G. googled the water bottle to show her that Walmart did, in fact, sell that type of water bottle.

138.    Nevertheless, the bookkeeper continued to accuse J.G. of stealing the water bottle and questioned him about where he obtained the money to purchase the product.

139.    At that time, J.G. was employed. He used his wages to purchase the water bottle, which was fairly inexpensive.

140.    When he explained this to the bookkeeper, she called him a liar and told him that he was too young to work. He then told her that he had a work permit.

141.    She still did not believe him and warned him that she would call his mother.

142.    J.G. did not inform his mother about the water bottle incident or the harassment he had been enduring at school because his mother was grieving for a terminally ill aunt and uncle, and J.G. did not want to add to the stress in her life.

143.    However, approximately one week after the water bottle incident, J.G. and D.C. were called to the office of Assistant Principal Loucks.

144.    Assistant Principal Loucks asked them if they'd heard about a White supremacy group or been harassed by its members. Apparently, students had formed the group and were threatening to lynch a Black student.

145.    This meeting took place on April 19, 2023.

146.   J.G. disclosed additional details to Loucks about all the racial harassment he had suffered.

147.   He also told Loucks that he had reported the harassment to his teachers, the bus driver, and authored an email to the School District seeking help, but to no avail.

148.   Later that day, when he returned home, J.G. tried to ascertain if the school had called his mother.

149.   No school administrators had.

150.   That is when J.G. disclosed to his mother the water bottle incident and some of the harassment he had suffered throughout the school year.

151.   He also described the fear he felt viewing the violent Snapchat posts.

152.   On April 20, 2023, the following morning, J.G.'s and N.G.'s mother showed up at CRMS, insisting on meeting with administrators.

153.   She had to wait nearly an hour to meet with any administrators. She met with Assistant Principal Loucks in his office.

154.   She told Loucks that she wanted the students to be punished because she felt J.G. was a victim of hate crimes. She further demanded that the harassment be recognized as a hate crime and not just classified as bullying.

155.   While the two of them were talking, J.G. entered the office and showed his mother and Assistant Principal Loucks the live Snapchat feed containing racist, antisemitic, and homophobic comments.

156.    All together, they reviewed the Snapchat chatgroup where students demonized people of color as well as other historically marginalized groups, including people of the Jewish faith and LGBTQ+ individuals.

157.    Assistant Principal Loucks told J.G.'s mother that she needed to report her concerns to the Board of Education and go to the media to protect her son.

158.    He further clarified that he was "backed up against a wall" and that there "was nothing more he could do because of how the student handbook was written."

159.    He disclosed that he had been reaching out to students on his own because racism and hate crimes were so prevalent, but that he was doing so against the direction of the School District.

160.    He described how he had been trying to investigate the White supremacy group on his own because the School District wanted to sweep the allegations under the rug.

161.    Later that afternoon, J.G.'s and N.G.'s mother went to the Douglas County School Administration Building to report the racial harassment of her son and the student Snapchat feed.

162.    Once she mentioned a hate crime, J.G.'s mother finally got the attention of an administrator, Human Resources Representative Amanda Thompson, who took her to a back office and told her they could better keep things private in back. She was joined by Deputy Superintendent Danelle Hiatt.

163.    Hiatt asked J.G.'s mother to hold off going to the press, indicating that even though she had the right to do so, there might be "an impact of course…[and]...unintended impacts."

164.    She also asked J.G.'s mother for time for the School District to respond.

165.    Although his mother agreed, DCSD never did get back to her and respond.

166.    When J.G.'s mother inquired about the discipline of students who seemed to be the ringleaders of the racist threads on Snapchat, Hiatt told her that the school could not disclose that information.

167.    She later received a phone call from Principal Veit and the School Resources Officer informing her that the students would be disciplined, but he would not tell her anything more.

168.    However, no students were disciplined until much later, and only because J.G. and N.G. went public with their stories.

169.    Upon information and belief, only one student was ever placed on a very short suspension as a result of making racist posts.

170.    Upon information and belief, the other student was not given any suspension as a result of making racist posts.

171.    Upon information and belief, no other students who participated in or made racist comments in the Snapchat feed were disciplined at all.

**Students Show Lack of Remorse or Understanding of the Harm They Caused**

172.    Meanwhile, students at CRMS showed little remorse about the racist vitriol visited on J.G., C.M., and D.C.

173.   On April 20, 2023, in the moments before the group's end, J.G.'s mother screenshotted part of the conversation as students fled the platform.

174.   The following conversation on the chat for all to see:

Student 1 [F.T][11]: WHOEVER THE FUCK SENT THOSE SCREENSHOTS TO THE SCHOOL FUCK YOU I HAVE NOTHING
Student 2: What?
Student 1: I AM FUCKED BEYOND BELIEF
Student 2: What happened
Student 1: MY WHOLE LIFE IS RUINED MY BLOOD IS ON YOUR FUCKING HANDS
Student 2: The fuck are you talking about
Student 3: [F.T.][12] what r u talkin bout
Student 1: THE FUCKING SCREENSHOTS OF ALL THE RACIAL SLURS
Student 4: ITS [J.G.]
Student 5: wtf [J.G.] that's fucked up
Student 2: He did take a bunch of screenshots, but it might not be [J.G.]
Student 4: [J.G.] has taken like 5 ss in the last Ohhhhhh
Student 5: [F.T.] are u playin
Student 4: How is it not [J.G.]
Student 1: I AM NOT FUCKING PLAYING DUDE IM SO FUCKED
Student 4: He's the only one that has taken ss
Student 5: wym your fucked What they gonna do
Student 2: What can the school do to you
Student 4: He finna get expelled That's hardassment
Student 1: THIS IS GOING ON MY RECORD, TO THE COURT IM NOT GONNA BE ABLE TO GET ANY COLLEGES I MIGHT BE FUCKING EXPELLED
Student 4: Expelled.
Student 4: He's not sayin anything
Student 5: bro thats actually so fucked up [J.G.]
Student 3: Real.
Student 6: Ay [F.T.] we don't talk a lot but bro I feel so bad for you
Student 2: If you can defend yourself [J.G.], do it
Student 5: Nigger Explain this [F.T.]
Student 1: we all fucking know we were joking around
Student 3: Blud don't know the lorax
Student 6: #free[F.T.]
Student 4: [J.G.] don't 💀Blud don't the lorax 💀 💀

---

[11] Identities are being withheld out of respect for the minor status of the perpetrators and the victims.

[12] Initials are being used because the perpetrators and victims are minors.

Student 3: Hold to reply or save
Student 5: wait [F.T.] what did they say to u and why did u even say it in the gc
Student 1: im suspened for the next week but I cannot explain how unbelievably fucked I am
Student 2: Did they say they would expel you
Student 7: He still don't know the Lorax
Student 8: what the fuck happened
Student 7: He was racist
Student 5: honestly, u brought this upon yourself, only you make it right [F.T.] Do better [T.]
Student 7: A [@J.G.] ss I think idk
Student 4: Yeah You can see where it said he screenshot we
Student 1: [T.] I actually fucking hate you with all my guts your only my friend because I gave you free wed you're the fakest person I know
Student 9 [T.]: Huhhh
Student 9: That was forever. Ago.
Student 5: stop adding people damn
Student 6: Let's be honest nobody ever stopped [F.T.] we all know it was a just a joke
Student 9: And my mom hates u not my fault
Student 4: Stop adding people damn He wanted to know 🫣

175.    That same day, on April 20, 2023, J.G.'s mother spoke with Principal Veit by phone. She found the messages about her son threatening and feared for his safety.

176.    She asked Principal Veit if the children in the Snapchat group had been disciplined and how CRMS intended to keep her son safe given the violent nature of the posts.

177.    Principal Veit said nothing other than that she could press charges if she believed a hate crime had occurred.

178.    After this conversation in which Principal Veit expressed no concrete measures to protect J.G., his mother determined to pull J.G. out of school.

179.    Principal Veit promised to call J.G.'s mother back with a plan of action.

180.    When he did so on April 24, 2023, his plans were vague. He simply asked J.G.'s mother if he wanted to send him to another school in the district, finish the year remotely, or try to go back to in-person learning in CRMS.

181.    J.G.'s mother said she preferred to go back to in-person learning at CRMS, because by transferring him or requiring him to finish the year remotely, it felt like the school was punishing him, rather than his harassers. However, she wanted to make sure he could return to school safely and wanted to hear about any proactive measures DCSD planned to implement so that he could do so.

182.    Principal Veit promised to work on it and call back with a more detailed plan.

183.    He never did so however, and J.G. finished the school year remotely learning.

184.    In response to the complaints of racist behavior by students, CRMS called a pod meeting during which teachers organized the students in groups to talk about the racist incidents at school.

185.    C.M. and D.C. attended but J.G. did not.

186.    C.M. and D.C. sat in silence as other students admitted to making racist jokes, remarks, and comments.

187.    C.M. and D.C. were then placed under the spotlight and required to discuss incidents of racial harassment they had suffered and to share their feelings publicly.

188.    C.M. could not express how he felt and would not speak.

189.    D.C. had mixed feelings about sharing his experiences at CRMS, but teachers made him feel obligated to share.

190.   CRMS never notified D.C.'s parents before he was made to share his experiences in front of the whole pod.

191.   On or around this time, D.C.'s parents also met with Principal Veit after they found out their son's peers consistently called him a "monkey" and that the administration had never reached out to them about the incident report he authored.

192.   Shortly after the pod meeting, because of C.M.'s anxiety at school, C.M.'s parents removed him from in-person schooling, and he finished the year remotely.

**J.G. and N.G. Publicly Share Their Experiences with Discrimination**

193.   On April 25, 2023, J.G., N.G. and their mother attended a Board of Education meeting.

194.   J.G. and N.G. described publicly their experiences as Black/biracial students in DCSD schools.

195.   N.G. described publicly how "[w]hile attending Castle Rock Middle School I not only got this discrimination from students but from staff as well. I went to the principal and any adult that could help me give these students the needed guidance, I was told that these students would have consequences and they were never given but rather brushed under the rug."

196.   J.G. explained that "[r]ather than being a stable and respectful learning environment, schools are becoming places of hate and the use of derogatory slurs, stereotypes, and terms are rising among the students. We are very disappointed with this behavior in our townspeople. In schools I've heard too much racial discrimination, online,

in schools, and across town, from multiple people and this needs to come to light to be treated as more than a joke."

197.    Their mother also shared her feelings publicly, stating, "I ask for what I hope is the very last time. When is enough enough? When will this community recognize there's no clear definition between bullying and a hate crime in your handbook? When I sit before the administrators and they talk about bullying, it is not clear that a hate crime is going to be convicted. Douglas County, how do children have empathy for something they're not educated on?"

198.    None of the Majority Board Members have reached out to apologize or otherwise support J.G., N.G., C.M., or D.C., even after the public disclosure of what they suffered.

199.    Nor have any of the Majority Board Members expressed any condemnation of what happened.

200.    On May 23, 2023, at the public Board of Education meeting one month after J.G. and N.G. had publicly shared their stories, Deputy Superintendent Hiatt testified that she had been invited after the April meeting to listen to a "small group of students and teachers to listen to their story about Castle Rock Middle School and how they feel supported and responded to in terms of their needs and issues when they face them with the administration." She furthermore lamented that "they're really concerned that the story being told about Castle Rock Middle School may not be indicative of their story about Castle Rock Middle School and they wanted an opportunity to share with me that their particular individual story."

201.    Deputy Superintendent Hiatt neglected to mention that she did not speak with any Black students.

202.    Deputy Superintendent Hiatt never spoke with or interviewed J.G., C.M., or D.C., the only three Black and biracial students in their pod.

203.    At the May 23, 2023, board meeting, Board Member Elizabeth Hanson abruptly resigned, in part because of J.G.'s experience and the fact that the Board of Education majority had no plans to address it, or the racism faced by other students of color in the School District.

204.    In departing, she stated: "we have a problem in our district, and this is a time to dig in and if anything, strengthen the policies that have in place...[J.G.] is not the only student in this district that has experienced disgusting acts of racism, of antisemitism, of homophobic, and of transphobic acts."

205.    Her refence to "policies" in her statement of resignation referred to the DCSD Educational Equity Policy. Instead of expressing concern or empathy, on May 23, 2023, the Majority Board Members worked until 2:00 in the morning to revise the Educational Equity Policy, so that, in the words of Board Member Winegar, make clear that "we as a district do not intend to elevate certain ideals and beliefs over others."

206.    Board Member Winegar confirmed in statements to the press that she had always wanted to repeal and replace the Educational Equity Policy, expressing that it did "more harm than good."

207.    During the May 23, 2023, board meeting, Board Member Susan Meek brought up the disproportionate rates of discipline in DCSD, where 41% of Black students

are disciplined and only 16% of White students. She questioned Superintendent Erin Kane about the disparity and asked why it had not been identified by the DCSD as an area of concern.

208.   In response to this question, Kane argued that the data was from 2021 and failed to answer Meek's question.

209.   When asked by Board Member Meek, "what type of training is occurring in our district to prevent racism from occurring and to alleviate systemic racism," Kane tacitly conceded that none had been taking place, responding that, "we haven't had a discussion about that when we presented a ADB-R and part of our implementation plan was to ensure that we are looking at training for all staff. So, those are things that we are working through. It's a multiyear implementation plan and our team is working through all of those details. I don't have those details available right now."

210.   To this day, Majority Board Members employ rhetoric harmful to minority students, and DCSD has failed to implement antidiscrimination trainings.

211.   Black and biracial students and parents, and discussions about racism against historically marginalized communities, continue to be portrayed as a problem and dismissed, resulting in an environment ripe for racial harassment and abuse of students.

## III.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Title VI of the Civil Rights Act of 1964**
**42 U.S.C. § 2000d**
**(Against Defendant Douglas County School District RE-1)**

212.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully stated herein.

213.    Title VI provides, in relevant part, that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

214.    At all relevant times, Defendants DCSD received federal financial assistance.

215.    Peers and teachers subjected Plaintiffs to abuse and harassment that was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities or benefits provided by the School District.

216.    Defendant DCSD and its officials had actual knowledge of the racist harassment and that it posed a substantial risk to Black and biracial students.

217.    Defendant DCSD and its officials possessed the authority to take appropriate remedial action to prevent, deter, mitigate, and/or eradicate the racist harassment to Black and biracial students, including Defendant Veit.

218.    By failing to adequately investigate, discipline, supervise, or take minimally sufficient remedial steps after receiving actual knowledge of the racially hostile educational environment faced by Black and biracial students in its schools, Defendant DCSD's response to that knowledge was clearly unreasonable in light of the known circumstances.

219.    By failing to take immediate, effective remedial steps to resolve the racial discrimination and harassment by fellow students and teachers, Defendant DCSD exhibited deliberate indifference to the racist abuse and harassment of Plaintiffs.

220.    Defendant DCSD's failure to promptly and appropriately respond to the racist harassment resulted in Plaintiffs, on the basis of their race, being excluded from participation in DCSD's education program in violation of Title VI.

221.    As a direct result of DCSD's unlawful conduct, Plaintiffs sustained actual physical and economic injuries in an amount to be proven at trial.

222.    Plaintiffs have been and continue to be damaged by Defendant DCSD's violation of Title VI.

**SECOND CLAIM FOR RELIEF**
**Fourteenth Amendment - Equal Protection of Law**
**42 U.S.C. § 1983**
**(Against All Defendants)**

223.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully stated herein.

224.    Plaintiffs' equal protection claims are brought under the Fourteenth Amendment to the United States Constitution through 42 U.S.C. § 1983.

225.    To hold a government entity responsible under Section 1983, Plaintiffs may establish a constitutional violation of their equal protection rights by showing the implementation or execution of a policy, regulation, or decision adopted and promulgated by the body's officers causing their injury. *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978).

226.    "The inadequacy of [ ] training may serve as the basis for § 1983 liability …where the failure to train amounts to deliberate indifference to the rights of persons with whom [government agents] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference in turn is satisfied "when the [government entity]

40

has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Furthermore, "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a [government entity's] action." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002).

227.   At all relevant times, Defendants DCSD and the Board of Education promulgated and implemented policies, failed to train, and/or acted with deliberate indifference to the rights of Plaintiffs, despite constructive and actual knowledge of the racially hostile educational environment flourishing in their schools.

228.   At all relevant times, final policymakers for Defendants ratified policies, practices, and procedures that resulted in depriving Plaintiffs of equal protection.

229.   At all relevant times, Defendant John Veit was acting under the color of state law in his capacity as a DCSD employee.

230.   At all relevant times, Defendant Veit failed to train and acted with deliberate indifference to severe and pervasive harassment and abuse of Black and biracial students.

231.   At all relevant times, Defendant Veit had actual notice that students were harassing their Black and biracial peers. Defendant Veit had the authority to take corrective action. However, Defendant Veit failed to take action to prevent further racist harassment and abuse, allowing and facilitating its proliferation.

232.     Defendant Veit's conduct was objectively unreasonable, willful and wanton, outrageous, and shocking to the conscious.

233.     The actions and omissions of Defendant Veit were engaged in pursuant to the customs, policies, and practices of Defendants DCSD and the Board of Education.

234.     Defendants DCSD and the Board of Education were deliberately indifferent to the constitutional rights of their students, including Plaintiffs, by failing to properly train, monitor, supervise, and discipline teachers and students with respect to racist harassment and abuse or to investigate and respond to such allegations. Defendants DCSD and the Board of Education should have pursued reasonable methods of training, monitoring, supervising, and disciplining teachers and students.

235.     Defendants DCSD's and the Board of Education's failures were a custom, policy, or practice of the bodies and a driving force behind the constitutional violations described herein.

236.     The acts and omissions of Defendants were the legal and proximate cause of Plaintiffs' damages.

237.     As a direct result of Defendants' unconstitutional conduct, Plaintiffs sustained actual physical, emotional, and economic injuries in an amount to be proven at trial.

238.     The actions of Defendant Veit, as described above, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiffs. As a result of this intentional

conduct, Plaintiffs are entitled to punitive damages in an amount sufficient to punish Defendant and to deter others from like conduct.

239.    The conduct of Defendants violated Plaintiffs' clearly established interests to enjoy equal protection of the law.

240.    Plaintiffs have been and continue to be damaged by Defendants' violation of their federally protected interests.

241.    Defendant Veit's conduct violated clearly established rights belonging to Plaintiffs of which reasonable public-school officials in his position knew or should have known.  As such, he is not entitled to qualified immunity.

**THIRD CLAIMS FOR RELIEF**
**Action for Neglect to Prevent**
**42 U.S.C. § 1986**
**(Against Defendant Veit)**

242.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully stated herein.

243.    The laws of the United States make it unlawful for two or more persons to conspire for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or deprive them of having and exercising any right or privilege of a citizen of the United States. *See* 42 U.S.C. § 1985(3).

244.    Commonly referred to as the Ku Klux Klan Act (Enforcement Act of 1871), 42 U.S.C. § 1985 is a further vehicle by which victims of racial harassment and discrimination enforce their rights to enjoy the same rights as White citizens. *See* 42 U.S.C. § 1981.

245.    The laws of the United States further state that "[e]very person, who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured…for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented…" 42 U.S.C. § 1986.

246.    Plaintiffs have alleged a conspiracy to deprive them of their rights within the meaning of 41 U.S.C. § 1985. Plaintiffs' peers sought to deprive them, and succeeded in so doing, of equal educational opportunities because of their race.

247.    Defendant Veit encouraged such deprivation by means of his statements, acts, and omissions.

248.    Defendant Veit had, and continues to have, the power to prevent, or aid in preventing, the commission of past and ongoing unlawful acts, but has neglected to make such efforts.

249.    As such, Defendant Veit is liable for the damages caused by his neglect to Plaintiffs.

## IV.      PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully requests that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including but not limited to the following:

1. An injunction ordering Defendants to cease and desist from engaging in unlawful practices that deprive themselves and other students of color from accessing equal educational opportunities.

2. Actual economic damages as established at trial;

3. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

4. Punitive damages for all claims as allowed by law for all such claims where applicable;

5. Prejudgment and post-judgment interest at the highest lawful rate;

6. Appropriate tax off-set;

7. Attorneys' fees and costs; and

8. Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: August 4, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern
Crist Whitney
Matthew J. Cron
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
ih@rmlawyers.com
cw@rmlawyers.com
mc@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS