**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 23-cv-01966-JLK

LACEY GANZY, on behalf of J.G. and N.G, minor children;
JON and MISTY MARTIN, on behalf of C.M., a minor child;
NADARIAN and ALEXIS CLARK, on behalf of D.C., a minor child

        Plaintiffs,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1, a school district;
JOHN VEIT, in his official and individual capacity;

        Defendants.

---

## RESPONSE TO DEFENDANT VEIT'S PARTIAL MOTION TO DISMISS

---

Plaintiffs, Black and biracial middle school children of color, were serially deprived of equal access to educational opportunities while attending the Douglas County School District ("DCSD"), a violation of their rights striking at the heart of future economic and social mobility. Plaintiff students were continuously racially harassed and profiled by teachers and students, culminating in an online chat group of well over one hundred of their peers calling them "monkey" and "niggah," threatening to "lynch" them and pepper them with "buckshot," and calling for their death amidst nostalgic propaganda for the Holocaust. Defendant John Veit, the principal of DCSD's Castle Rock Middle School ("CRMS"), which Plaintiffs attended, knew of the long history of pervasive peer-on-peer harassment, acknowledging as much in an email, but made no

1

effort to intercede and stop the unlawful conspiracy to discriminate, despite his power and authority to do so.

Plaintiffs assert three claims for relief based upon racial discrimination in their Complaint: (1) Title VI of the Civil Rights Act against Defendant DCSD; (2) a 42 U.S.C. § 1983 equal protection claim against Defendants DCSD and Veit; and (3) a 42 U.S.C. § 1986 claim for failure to prevent a racially motivated conspiracy to deprive a person of equal protection of the laws against Defendant Veit. Defendant John Veit moves for partial summary judgment on only one claim – Plaintiffs' 42 U.S.C. § 1986 claim. Such a request must be rejected. Notwithstanding his power to prevent or aid in preventing the commission of such transgressions against Plaintiffs, Defendant Veit neglected or refused to do so, and for that he must be held accountable.

## I.      RELEVANT FACTUAL ALLEGATIONS

Defendant DCSD is a public school district serving Douglas County. Amended Complaint, ¶ 5 [ECF No. 9]. CRMS is a middle school within DCSD. *Id.* at ¶ 20. Defendant Veit was the principal of CRMS. *Id.* at ¶ 8. Plaintiffs J.G., C.M. and D.C. were eighth grade students during the 2022-2023 school year at CRMS. *Id.* at ¶¶ 82-84. They were the only Black or biracial students in their pod, a system of organizing the school into smaller clusters of students. *Id.* at ¶ 85. Throughout the school year, peer students subjected J.G., C.M., and D.C. to racially discriminatory harassment including "verbal insults, racist jokes, and threats of violence." *Id.* at ¶¶ 86-87. Ultimately, "over one hundred students participated in a Snapchat chatgroup where racially offensive comments and threat of killings were commonplace." *Id.* at ¶ 88. Plaintiffs J.G., C.M., and D.C. were routinely referred to as "niggers," and "niggahs," "monkeys," "cotton-pickers," and were subjected to humiliating racist tropes and memes and images of Black students. *Id.* at ¶ 89.

All three adolescent men attempted to complain at various points in time. *Id*. at ¶ 90. Several years before, in the 2019/2020 school year, N.G., J.G.'s older sister, complained of the racial discrimination she faced from her peers and the school's staff while a student at CRMS but testified that her complaints were "swept under the rug." *Id*. at ¶ 195.

Plaintiff D.C. reported being called a "monkey boy" to his teacher, who in response asked him to document what had occurred in writing so that she could report to the CRMS administration. *Id*. at ¶ 110. Following D.C.'s written report, Defendant Veit facilitated a conversation between D.C. and the female student who called him "monkey boy," but CRMS "never informed D.C.'s parents." *Id*. at ¶ 111. In fact, J.G.'s, C.M.'s, and D.C.'s parents "were never informed of any of the harassment experienced and reported by their children even though their children were minors." *Id*. at ¶ 112. Despite the warnings that J.G., C.M., and D.C. "frequently raised about racist harassment at CRMS," the level of impunity with which their peers operated continued unabated. *Id*. at ¶ 114.

During the beginning of March 2023, some of J.G.'s peers invited him to a Snapchat group in which "well over one hundred students" participated. *Id*. at ¶ 115. On the group chat, students engaged in a "continuous stream of racially derogatory and offensive comments, many of them violent, and many of them tagging their few Black fellow students so that they would be sure to see the vile messages." *Id*. at ¶ 116. On March 23, 2023, J.G. authored an email to Defendant DCSD describing the racial discrimination he was facing. *Id*. at ¶ 120. The email was forwarded to Defendant Veit the following day by DCSD Communications Officer Stacy Rader. *Id*. at ¶ 121. Defendant Veit responded to Rader's email by "confirming prior knowledge" of the racially hostile educational environment and stating that, "**it is unfortunate to hear. We are working on this,**

**but I have a feeling it will be a long-term project for us.**'" *Id*. at ¶ 122. Plaintiff J.G. never received a response to his email. *Id*. at ¶ 123. Neither Mr. Veit nor anyone else at CRMS ever informed J.G.'s mother or took any further action in response to this email. *See id*. at ¶¶ 147-150. In May of 2023, the school initially denied his mother's open records request for the complaint and school's response. *Id*. at ¶ 124.

Notwithstanding his email, J.G., C.M., and D.C. continued to be subjected to racial hostility and disparate treatment by their peers.[1] *Id*. at ¶ 125. On April 19, 2023, Plaintiffs J.G. and D.C. were called to Assistant Principal Russell Loucks' office where he asked them "if they'd heard about a White supremacy group or been harassed by its members. Apparently, students had formed the group and were threatening to lynch a Black student." *Id*. at ¶¶ 143-145. Plaintiff J.G. disclosed additional details to Loucks about the racial harassment and told him that he had reported the harassment to his teachers, bus driver and authored an email to Defendant DCSD seeking help, "to no avail." *Id*. at ¶¶ 146-147. After this meeting, no school administrators contacted J.G.'s mother. *Id*. at ¶ 148-149. As such, J.G.'s mother showed up at CRMS on April 20, 2023, demanding a meeting with administrators. *Id*. at ¶ 152.

On April 20, 2023, Plaintiff J.G.'s mother met with Assistant Principal Loucks and indicated that she wanted "students to be punished" because she felt that J.G. was a "victim of hate crimes." *Id*. at ¶ 154. Then, J.G. entered the office and showed Assistant Principal Loucks the live Snapchat containing racist, antisemitic, and homophobic comments. *Id*. at ¶ 155. Assistant

---

[1] Although not part of the conspiracy underlying Plaintiffs' § 1986 claim, clearly a bitter, debilitating racism permeated CRMS's culture, as teachers and even some administrators also engaged in racial profiling and other discriminatory behaviors as alleged by Plaintiffs in the Complaint.

Principal Loucks indicated that he was "backed up against the wall" and that "there was nothing more he could do because of how the student handbook was written." *Id*. at ¶ 158.

Later that day, J.G.'s mother went to Defendant DCSD's administration building to report the racial harassment of her son and the student Snapchat feed. *Id*. at ¶ 161. At this point, she got the attention of Human Resources Officer Amanda Thompson and Deputy Superintendent Danelle Hiatt. *Id*. at ¶ 162. Hiatt indicated that the school could not disclose information regarding the discipline of students. *Id*. at ¶ 166.  J.G.'s mother later received a phone call from Defendant Veit and the School Resources Officer informing "that students would be disciplined, but he would not tell her anything more." *Id*. at ¶ 167. That said, no students were disciplined until much later, "and only because J.G. and N.G. went public with their stories." *Id*. at ¶ 168. Upon information and belief, "only one student was ever placed on a very short suspension as a result of making racist posts." *Id*. at ¶ 170. Upon information and belief, "no other students who participated in or made racist comments in the Snapchat feed were disciplined at all." *Id*. at ¶ 171.

During her April 20, 2023, phone conversation with Defendant Veit, J.G.'s mother expressed that "she found the messages about her son threatening and feared for his safety" and asked if the children in the Snapchat group had been disciplined and "how CRMS intended to keep her son safe given the violent nature of the posts." *Id*. at ¶¶ 175-176.  Defendant Veit "said nothing other than that she could press charges if she believed a hate crime had occurred" and "expressed no concrete measures to protect J.G." *Id*. at ¶¶ 177-178.

On April 24, 2023, Defendant Veit called Plaintiff J.G.'s mother with a vague plan of action. *Id*. at ¶ 180. "He simply asked J.G.'s mother if he wanted to send him to another school in the district, finish the year remotely, or try to go back to in-person learning at CRMS." *Id*. Although

J.G.'s mother preferred that he go back to in-person learning at CRMS, "she wanted to make sure he could return to school safely and wanted to hear about any proactive measures DCSD planned to implement so he could do so." *Id*. at ¶ 181. Defendant Veit "promised to work on it and call back with a more detailed plan" *Id*. at ¶ 182. However, he never did so. *Id*. at ¶ 183.

"In response to the complaints of racist behavior by students, CRMS called a pod meeting during which the teachers organized the students in groups to talk about incidents at school." *Id*. at ¶ 184. Plaintiff C.M. and D.C. attended, but J.G. did not. *Id*. at ¶ 185. "D.C. had mixed feelings about sharing his experiences at CRMS, but teachers made him feel obligated to share." *Id*. at ¶ 189. On or around this time, D.C.'s parents also met with Defendant Veit after they found out D.C.'s peers "consistently called him a 'monkey' and that the administration had never reached out to them about the incident report he authored." *Id*. at ¶ 191. Shortly after the pod meeting, C.M. was removed from in-person learning due to his anxiety at school. *Id*. at ¶ 192.

## II.  LEGAL STANDARD OF REVIEW

Courts apply "a strong presumption against granting a motion to dismiss for failure to state a claim" under Rule 12(b)(6). *Shepherd v. U.S. Olympic Comm.*, 464 F. Supp. 2d 1072, 1089 (D. Colo. 2006). "[G]ranting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). Courts must treat all well-pleaded allegations in the complaint as true, and any reasonable inferences arising from them must be construed in the light most favorable to the plaintiff. *Id*.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. A plaintiff must nudge their claims across the line from conceivable to plausible to survive a motion to dismiss. *Id*. at 570.

Defendant argues that the Plaintiffs have no right to hold Defendant Veit responsible for failing to prevent an alleged § 1985 conspiracy by Plaintiffs' peers without asserting a § 1985 claim because no Supreme Court or Tenth Circuit decision states as much. *See* Def.'s Mot. to Dismiss, at 6 [ECF No. 19]. Additionally, Defendant argues that the Plaintiffs have not plausibly alleged a conspiracy contemplated by § 1985. *Id*. at 7. Both such arguments must fail. First, Plaintiffs have the right to assert a § 1986 claim against Defendant Veit because the statute only requires a § 1986 defendant to have knowledge that any wrongs mentioned in § 1985 are about to be committed and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so. 42 U.S.C. § 1986. Here Defendant Veit, for the reasons stated above, had knowledge of the conspiracy and made no effort to prevent the commission of the conspiracy. Second, Plaintiffs have plausibly alleged a conspiracy contemplated by § 1985 for the reasons stated below. Therefore, Defendant's Motion to Dismiss Plaintiff's § 1986 claim must be denied.

## A.  Defendant Veit is Not Entitled to Qualified Immunity.

Defendant Veit argues he is isolated from liability from Plaintiffs' 42 U.S.C. § 1986 claim on two bases, one being that Plaintiffs have not alleged in their Amended Complaint a § 1985 claim. Unlike at summary judgment, "district courts may grant a motion to dismiss based on qualified immunity, but '[a]sserting a qualified immunity defense via a Rule 12(b)(6) motion ...

subjects the defendant to a more challenging standard of review than would apply on summary judgment.'" *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (*quoting Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) (questioned for other reasons). Qualified immunity is an affirmative defense that creates a presumption that the defendant is immune from suit. *Id.* To survive a motion to dismiss, the plaintiff must allege sufficient facts that: (i) the defendant's actions violated his or her constitutional or statutory rights; and (ii) the right was clearly established at the time of the alleged unlawful activity. *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (internal quotation marks omitted). In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that his actions violated that right. *See Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007). At the motion to dismiss stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (brackets and internal quotation marks omitted).

Importantly, whether the plaintiff can make such a showing is "not a scavenger hunt for prior cases with precisely the same facts." *Truman*, 1 F. 4th at 1235 (*quoting Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020)). "A prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Id.* Likewise, [t]here can also be 'the rare obvious case, where the unlawfulness of the [ ] [official's] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Id.* (*quoting D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018)).

In this case, Principal Veit's actions and/or inactions violated the Plaintiffs' equal protection rights under the United States Constitution, hence, under any theory of liability, qualified immunity is inappropriate. No shortage of statutes enshrines, and no shortage of case law recognizes, the clearly established right of students to be free from pervasive racially discriminatory harassment. *See, e.g., Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK*, 334 F.3d 928, 932 (10th Cir. 2003) ("[i]t does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.") (quoting *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022) (9th Cir. 1998); *see also T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 368 (S.D.N.Y. 2014) (recognizing that Jewish school district sufficiently reported anti-Semitic harassing incidents such that summary judgment for § 1983 claims against school officials was unwarranted because a "a jury to find the actual notice requirement satisfied with respect to these Defendants."). Importantly, Defendant Veit does not claim ignorance of the underlying violation of Plaintiffs' civil rights, only ambiguity as to whether a § 1985 must be simultaneously alleged in a complaint if a claim under § 1986 is to be sustained.

Qualified immunity is not dependent on which statute a plaintiff pursues, but rather, the core of the qualified immunity doctrine is whether a government official was on notice that his conduct violated a fundamental right, regardless of the statute under which redress is sought: "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th

Cir. 2020) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "The dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.'" *Id.*

Unquestionably, the law recognizes that Black and biracial students must be protected from racial harassment in schools which rises to the level of interfering with their enjoyment of equal educational opportunities. *See* Title VI, 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); Colorado Safe Schools Act, C.R.S. § 22-32-109.1 (2)(b)(IV) (school officials required to report behavior that is detrimental to the welfare or safety of other students or school personnel); *Bryant*, 334 F.3d at 932, *supra*; *Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d at 368, *supra*. Furthermore, it is widely recognized that the principal of a school is responsible for ensuring the protection of students of color from racial harassment. *See Murrell v. School District No. 1, Denver, Colo.*, 186 F.3d 1238, 127-48 (10th Cir.1999) ("We find little room for doubt that the highest-ranking administrator at [the high school] exercised substantial control of [defendant] and the [ ]school environment during school hours, and so her knowledge may be charged to the School District."); *see also Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020) (the court held that parents alleged reckless conduct by principal and assistant principal, barring governmental immunity for failure to inform parents about prior threats, fail to discipline the student assailants). Notably, Defendant Veit fails to seek to dismissal of the action against him under § 1983. This is because, based on the facts alleged in Plaintiffs' Amended Complaint, Mr. Veit has plausibly violated the Plaintiffs' constitutional rights hence a motion to dismiss based on

qualified immunity under § 1983 would fail. This omission is telling, Defendant Veit is not entitled to qualified immunity.

The laws of the United States provide that "[e]very person who, having knowledge that any wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured…for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented…". 42 U.S.C. § 1986. In the Amended Complaint, Plaintiffs adequately alleged the existence of a conspiracy by their peers that "sought to deprive them, and succeeded in so doing, of educational opportunities because of their race." Amended Complaint, ¶ 246. Plaintiffs assert a 42 U.S.C. § 1986 claim against Defendant Veit on the basis that he "encouraged such deprivation by means of his statements, acts and omissions" and that he "had, and continues to have, the power to prevent, or aid in the preventing, the commission of past and ongoing wrongful acts, but has neglected to make such efforts." *Id.* at ¶¶ 247-248. The fact that Defendant Veit had actual knowledge of the conspiracy and that he failed to prevent or aid in preventing the wrongful acts is sufficient to assert liability for damages under 42 U.S.C. § 1986.

### i.     No Court Has Required a Plaintiff to Plead a Section 1985 Claim in Order to Proceed with a Section 1986 Claim.

As referenced above, Defendant Veit argues that he is subject to qualified immunity because Plaintiffs did not concurrently bring a 42 U.S.C. § 1985 claim against their peers when bringing their § 1986 claim against Defendant Veit. Section 1986 constitutes an additional safeguard for those rights protected under 42 U.S.C. § 1985, and "transgressions of § 1986 by definition depend on a preexisting violation of §1985…". *Clark v. Clabaugh*, 20 F.3d 1290, 1295-

96 (3d Cir. 1994) (*citing Rogin v. Bensalem Township*, 616 F.2d 680, 696 (3d Cir.1980), *cert. denied*, 450 U.S. 1029 (1981)). Additionally, a plaintiff alleging a violation of § 1986 must show that: (1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed. *Id*. (*citing Perez v. Cucci*, 725 F. Supp. 209, 254 (D.N.J. 1989)) (citations omitted), *aff'd*, 898 F.2d 142 (3d Cir. 1990).

Contrary to Defendant Veit's assertions, no court has stated that a plaintiff must prosecute a § 1985 claim in order to sustain a § 1986 claim. *See Rogin*, 616 F.2d at 696 (reinforcing that § 1986 constitutes an additional safeguard for those rights protected under 42 U.S.C. § 1985 and simply acknowledging that "transgressions of § 1986 by definition depend on a preexisting violation of § 1985"). To the contrary, although plaintiffs as matter of course often do so, an examination of the historical context and legislative history of §§ 1985 and 1986 is useful in determining the answer to this question. To combat the racial terror perpetrated by the supremacist hate organizations against previously enslaved, newly emancipated Black citizens following the Civil War, Congress enacted the Ku Klux Klan Act of 1871. Linda E. Fisher, *Anatomy of an Affirmative Duty to Protect: 42 U.S.C. Section 1986*, 56 Wash. & Lee L. Rev. 461, 471 (1999) (hereinafter "Anatomy of a Duty"). The Act included 42 U.S.C. §§ 1985 and 1986. Congress intended for this Act to enforce the provisions of the Fourteenth Amendment to the United States Constitution, in particular, the equal rights provisions. *Id*. at 472.

Following the Civil War, slaveholders and their white-supremacist allies utilized widespread private violence to dominate free Black Americans. *Id*. at 473. The general purpose of

the Ku Klux Klan was to force newly emancipated Black Americans into relative servitude and maintain the White-supremacist structure that existed in America. As one Republican member of the Reconstruction Congresses explained, "I thought when I voted for the amendment to abolish slavery that I was aiding to give real freedom to the men who had so long been groaning in bondage." Cong. Globe, 39th Cong., 1st Sess. 1151 (1866) (statement of Rep. Thayer).[2] Congress, in response to state-legislated "Black Codes" intended to force free Blacks Americans into servitude, adopted the Enforcement Acts of 1870 and 1871 (Enforcement Act, Ch. 114, 16 Stat. 140 (1870)), to provide a federal civil cause of action for civil rights violations committed by state actors, and also authorized criminal penalties and civil remedies for conspiracies by private individuals to deprive a person of federally protected civil rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 205 (1970) ("Stirred to action by the wholesale breakdown of protection of civil rights in the South, Congress carried to completion the creation of a comprehensive scheme of remedies — civil, criminal, and military — for the protection of constitutional rights from all major inference.").

Sadly, and in reality, private White citizens often collaborated with state actors to deprive free Black citizens of their civil rights following the Civil War; but private White citizens also acted on their own as agents of purely private racial terrorism. *See, e.g., Brown v. Mississippi*, 297 U.S. 278 (1936) (where three Black men accused of murder were coerced into confessions by police officers and a group of angry White men by repeatedly hanging them from a tree and beating them). On March 16, 1871, Senator John Sherman said:

> Organized bands of desperate and lawless men, mainly comprised of soldiers of the
> late rebel armies, armed, disciplined, and disguised, and bound by oaths and secret

---

[2] https://harvardlawreview.org/wp-content/uploads/2023/02/136-Harv.-L.-Rev.-F.-251.pdf at 261

> obligations, have, by force, terror, and violence, subverted all civil authority in large parts of the late insurrectionary State, thus utterly overthrowing the safety of person and property, and all those rights which are the primary basis and object of all civil government and which are expressly guaranteed by the Constitution of the United States to all its citizens.

CONG. GLOBE, 42nd Cong., 1st Sess. 153 (1871) (statement of Sen. John Sherman). Thus, §§ 1985 and 1986 respectively were intended to impose liability upon persons who were engaged in private conspiracies and the state actors who had the power to intervene and failed to. *See Rogin*, 616 F.2d at 696.

Following the Civil War, Ku Klux Klan (and other White supremacy organization) members would ride at night, often in disguise, to terrorize Black citizens. With the anonymity provided by their disguises, they would arm themselves and raid the homes of Black citizens to spread fear and racial terror. William M. Carter, Jr., *The Anti-Klan Act in the Twenty-First Century*, 136 Harvard L.R. 251, 271 (2023) (hereinafter "The Anti-Klan Act"). The Ku Klux Klan had a political purpose, and this purpose was carried out "by murders, whippings, intimidation, and violence against its opponents." CONG. GLOBE, 42d Cong., 1st Sess., 320 (1871).[3] Furthermore, the purpose of the disguises and the secrecy was nothing more than to protect them against conviction and punishment. *Id.*

The legislative intent behind § 1985(3) was to prevent two or more persons who conspire or go **"in disguise"** on the highway to deprive any person of the equal protection of the law.[4] *Id.*

---

[3] Statement of Rep. Stoughton ("The evidence taken before the Senate committee. . . establishes . . . [t]hat this organization has sought to carry out its purposes by murders, whippings, intimidation, and violence against its opponents."). https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=4404&context=clr at 758.

[4] Tellingly few if any other conspiracy statutes require alleging claims against all conspirators. For example, in Colorado, "[t]o establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of

On its face, the intent of § 1986 was also to impose liability upon any state actor who knew of the potential harm but failed to prevent the harm regardless of whether that actor participated in planning or causing the harm. *Id*. Given its obvious nod to "**disguise**," Congress recognized that groups like the Klan concealed their identity and moved in secret and darkness and therefore were unidentifiable. *The Anti-Klan Act*, 136 Harvard L.R. at 271. However, city officials could be found liable on the § 1986 claim for knowledge of the conspiracy so as to help prevent the widespread deprivation of rights. *See Clark*, 20 F.3d 1290 (3d Cir. 1994). Given the history and context of the passage of the Ku Klux Klan Act in the 1870s, it does not follow that a Plaintiff would have to bring a claim against the conspirators in order to hold a § 1986 defendant liable. For precisely this reason, the drafters of § 1986 only require persons having knowledge of the conspiracy and having the power to prevent or aid in its protection to be held liable. Hence, while it is true that § 1986 only provides a cause of action in the existence of a § 1985(3) conspiracy, the statute does not require that a defendant under § 1986 participate in that conspiracy or share in the discriminatory animus with members of the conspiracy. *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997) (reiterating that § 1986 liability does not require that the defendants themselves participate in the conspiracy or share in the discriminatory animus with members of the conspiracy). Section 1986 *only* requires a defendant knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so. *Id*.

Although caselaw under § 1986 is sparse, *Clark v. Clabaugh* is instructive, bringing together the specific historical context of the passage of the Ku Klux Klan Act of 1871 and the

---

action; (4) an unlawful overt act; and (5) damages as to the proximate result." *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995).

realities of the violence that informed that era and animates the enforcement of the Act today. *Anatomy of a Duty*, 56 Wash. & Lee L. Rev. at 484. In *Clark*, members of an interracial youth group claimed numerous violations of their civil rights by public officials when the members were attacked by a White motorcycle group and townspeople in a racial riot in 1991. *Clark*, 20 F.3d at 1292. Before the attacks which gave rise to the § 1986 cause of action took place, rumor circulated about town for two weeks, including mention that White bikers were conspiring to assemble at the town square to drive out the interracial group. *Id*. at 1293. In fact, the interracial group peacefully assembled in the square before the White bikers accompanied by over five hundred townspeople engaged in vigilante tactics and physically attacked the interracial group. *Id*. In all, hundreds of townspeople assisted in the commission of the § 1985 violation, yet over five hundred of these individuals were not named as defendants in the subsequent civil rights lawsuit.

Likewise, in this case, while the group of students conspiring to discriminate against Plaintiffs grew to over one hundred students, Plaintiffs wish to hold those with the most responsibility and power for their safety and equal educational opportunities accountable. It is both impracticable and undesirable to bring an action against such a large number of minors for a § 1985(3) conspiracy, although one took place within the meaning of the Act. Nor do Plaintiffs imagine that the DCSD actually wishes or wants to encourage Plaintiffs to file a lawsuit against such large number of the school district's own students just to avoid liability for one claim against a principal whose central task was to ensure equal access to education for Plaintiffs over which he had authority and control.

The *Clark* plaintiffs relied "almost exclusively" on a Pennsylvania State Police report ("PSP report") generated from a state police investigation conducted into the circumstances of the

racial disturbances, to establish the elements of their claims. *Id*. at 1292. Similarly, Plaintiffs here rely upon Defendant Veit's knowledge of a longstanding conspiracy at CRMS to deprive Plaintiffs of their rights to equal educational opportunities notwithstanding their race, at the very least no later than J.G.'s email regarding the racial discrimination he had suffered at the hands of his peers and as early as the 2019/2020 school year when N.G. complained of racial discrimination from her peers and the school's staff. The report in *Clark* raised a genuine issue of material fact as to 42 U.S.C. § 1986 liability even at the more stringent summary judgment phase. *Id*. The allegations by Plaintiffs in their Complaint make no less of a threshold showing of liability.

Plaintiffs have properly alleged a preexisting violation of § 1985 which Defendant Veit had knowledge of, no later than, and seemingly long before, he received Plaintiff J.G.'s email from DCSD Communications Officer Stacy Rader. Amended Complaint, ¶ 121. Notwithstanding his knowledge of the conspiracy, Defendant Veit never responded to Plaintiff J.G.'s email or took any action to prevent or aid in preventing the commission of a § 1985 violation. In response to J.G.'s email Mr. Veit wrote, "**it is unfortunate to hear. We are working on this, but I have a feeling it will be a long-term project for us.**" *Id*. at ¶ 122. This quote indicates that he had prior knowledge. Additionally, in the 2019/2020 school year, N.G. complained of racial discrimination from her peers and the school's staff. She reported the racial discrimination to the principal, but it was swept under the rug. *Id*. at ¶ 195. It is sufficient that Plaintiffs have alleged a preexisting violation of § 1985 as there is no clear requirement that factual allegations regarding the § 1985 violation must be in the form of a separate cause of action when a § 1986 claim is asserted. In fact, such a position would negate the basic function of §1986 to serve as an "additional safeguard" for the rights protected by § 1985. Moreover, § 1986 explicitly imposes liability for damages that a

defendant "by reasonable diligence could have prevented." *Clark v. Clabaugh*, 20 F.3d 1290, 1298 (3d Cir. 1994). Defendant Veit is liable for the damages caused by his failure to prevent the conspiracy to deprive students of color equal access to education opportunities.

ii.    **Plaintiffs Properly Allege a Conspiracy as Contemplated by § 1985.**

Defendant Veit also argues that even if Plaintiffs need not pursue a § 1985 claim, because § 1986 is predicated on the existence of a § 1985 conspiracy, Defendant Veit still qualifies for immunity because Plaintiffs have failed to allege sufficient facts to establish the underlying § 1985 elements. As discussed above, in order to maintain a cause of action under § 1986, a plaintiff must show the existence of a § 1985 conspiracy. *Rogin*, 616 F.2d at 696. To prove a conspiracy under § 1985(3), the plaintiff must show (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation of rights, and, because statute is only to protect against deprivations of equal protection, plaintiff must also show (5) some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action; and (6) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment.  *O'Handley v. Padilla*, 579 F.Supp.3d 1163, 1185 (N.D. Cal. 2022).

Plaintiffs have adequately alleged the existence of a § 1985(3) conspiracy in their Amended Complaint. Because the underlying § 1985(3) conspiracy consists of private individuals not acting under the color of law, the conspiracy analysis is more nuanced. In order to prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff must show, inter alia, "(1) that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the

conspirators' action," *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971), and (2) that the conspiracy "aimed at interfering with rights" that are "protected against private, as well as official, encroachment," *United Brotherhood of Carpenters & Joiners of Am. L. 610 AFL-CIO v. Scott*, 463 U.S. 825, 833 (1983); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993).

Plaintiffs have alleged a § 1985 conspiracy with enough factual specificity to survive a motion to dismiss. First, Plaintiffs have demonstrated there is more than one actor to meet the first element. Plaintiffs have alleged that well over one hundred students had participated in the Snapchat group. *See* Amended Complaint, ¶ 115. Second, Plaintiffs have demonstrated that the conspiracy was for the purpose of depriving the Plaintiffs of the equal protection of the laws. Plaintiffs have alleged that Plaintiffs' peers sought to deprive them, and succeeded in so doing, of equal educational opportunities because of their race. *Id*. at ¶¶ 116, 246. Third, Plaintiffs have demonstrated that the students took actions in furtherance of the conspiracy. Plaintiffs have alleged that the students not only created the Snapchat group to spew racially derogatory and offensive comments, but also tagged the Plaintiffs so they would be sure to see the vile messages. *Id*. at ¶¶ 115, 116. Fourth, Plaintiffs have demonstrated an injury or deprivation of rights. Plaintiffs have alleged that the conspirators' harassment had created a hostile learning environment and J.G. and C.M.'s parents removed them from school because of the violent and racist comments. *Id*. at ¶¶ 181-183, 192; *see also Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Okla.*, 334 F.3d 928, 934 (10th Cir. 2003) ("public school administrators who have a duty to provide a non-discriminatory educational environment for their charges can be liable when they are "made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing"). Fifth, Plaintiffs have demonstrated that some racial, or perhaps otherwise class-based,

invidiously discriminatory animus lay behind the conspirators' action. Plaintiffs have specifically alleged the racial animus behind the conspirators' action by detailing and producing in the Amended Complaint the continuous stream of racially derogatory and offensive comments and the lack of remorse displayed by the conspirators. *Id*. at ¶¶ 116, 174. Finally, Plaintiffs have demonstrated that the conspiracy was aimed at interfering with rights that are protected against private, as well as official, encroachment. Plaintiffs have alleged that the conspirators interfered with their right to an education by creating a hostile educational environment for students of color. *Id*. at ¶¶ 89, 114-116, 122.

Plaintiffs have alleged a § 1985 conspiracy with enough factual specificity to carry their claims across the line from conceivable to plausible to survive a motion to dismiss. Given the scope of the violation and details alleged, it can hardly be argued at this early stage that Plaintiffs have failed to sufficiently plead the existence of an underlying conspiracy.

**B.  PLAINTIFFS SHALL SEEK LEAVE TO AMEND THE PLEADINGS IN THE EVENT THAT SEPARATE § 1985(3) CAUSE OF ACTION IS REQUIRED.**

Finally, if the District Court believes that Plaintiffs must either plead more conspiracy facts or explicitly bring a § 1985 claim in their Complaint in order to sustain their § 1986 claim against Defendant Veit, then Plaintiffs should be granted the requisite leave to amend. "A district court should refuse leave to amend "only [upon] a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010) (*quoting Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300 (10th Cir. 2005). Practically speaking, the party opposing a motion to amend bears the burden to demonstrate

why the amendment should not be permitted. *Gomez v. Epic Landscape Prods., L.C.*, Civ. No. 22-2198, 2023 WL 2610266, at *1 (D. Kan. Mar. 23, 2023).

None of the factors tending against leave to amend exist here. Plaintiffs just recently filed their lawsuit, and a scheduling order has not yet been entered in this case. Defendants will not be prejudiced by the leave to amend given that discovery has yet to occur, and furthermore, Defendant Veit has not moved to dismiss the 42 U.S.C. § 1983 brought against him. *See* Amended Complaint, at 40-43 (bringing § 1983 claim against all Defendants). As a result, he will be a defendant in this litigation from its inception one way or another. Furthermore, such amendment is not brought in bad faith, but is simply an attempt to cure any deficiencies identified by the Court based on Defendant Veit's novel argument that Plaintiffs must bring a § 1985 claim in order to sustain their § 1986 claim, an argument for which there is no conclusive Tenth Circuit precedence. To the contrary, Plaintiffs good faith is apparent in their lack of desire to bring an additional claim against the one hundred or more students who conspired to deprive Plaintiffs of their rights to be free from discriminatory harassment and abuse and to enjoy equal access to educational opportunities because the students are minors. Plaintiffs have not failed to cure deficiencies through prior amendment and futility is not alleged by Defendant Veit here.

It is not Plaintiffs preference to amend their Amended Complaint to bring a § 1985(3) claim against as many as a hundred of their peers. This will not only embroil countless numbers of young students in litigation but will make it well-neigh impossible for two of the Plaintiffs who remain in the school district to attend school without fear of significant retribution. Where minors are involved, particularly those as young as the ones implicated here, it is preferable to hold accountable the adults and institutions that have failed all these children, rather than embroil yet

more of them in significant, highly public, litigation. However, in the alternative, if that is what Defendant Veit and DCSD insist must be Plaintiffs course of action, and in the event that Court opines that Plaintiffs must assert a separate § 1985(3) cause of action to maintain their § 1986 claim against Defendant Veit, Plaintiffs respectfully seek leave of this Court to file a motion to amend their Amended Complaint.

## CONCLUSION

Defendant Veit does not deny that Plaintiffs had a right to equal educational opportunities notwithstanding their race, and that the harassment they alleged denied them that right. As such, Defendant Jon Veit's motion to dismiss the § 1986 claim against him must be denied. He is not entitled to qualified immunity, and nothing he argues at this stage indicates otherwise. Furthermore, Plaintiffs have pleaded sufficient facts to warrant liability. The Court should deny the Motion to Dismiss and allow Plaintiffs to proceed to discovery. In the event the Court deems otherwise, and although Plaintiffs are reticent, Plaintiffs should be allowed leave to amend, given that such outcomes are what Defendants appear to desire.

DATED: October 30, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern
Crist Whitney
Andrea Mohamedbhai
Matthew J. Cron
2701 Lawrence Street,
Denver, CO 80205
(303) 578-4400
ih@rmlawyers.com
cw@rmlawyers.com
am@rmlawyers.com
mc@rmlawyers.com