**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 23-cv-01966-JLK

LACEY GANZY, on behalf of J.G. and N.G., minor children;
JON and MISTY MARTIN, on behalf of C.M., a minor child; and
NADARIAN and ALEXIS CLARK, on behalf of D.C., a minor child

      Plaintiffs,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1; and
JOHN VEIT, in his official and individual capacities

      Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF 53)**

---

Defendants' motion for summary judgment, ECF No. 53, ignores evidence contrary to their position as they attempt to obscure disputes of material fact. In doing so, Defendants ask this Court to engage in a rote incident-by-incident assessment of the evidence rather than examining the overall hostile environment Plaintiffs J.G., N.G., C.M., and D.C. faced at school. The Court should decline this invitation. The record substantiates that Plaintiffs were repeatedly and without reprieve called some of the most offensive and inhumane racial slurs and tropes imaginable by their peers. Slurs, like the reviled N-word and wistful references to slavery, were commonplace in these children's halls of learning. Even adults employed by the District targeted Black students with racist tropes and stereotypes. Plaintiffs and their families sought protection from Defendants. Yet, Defendants repeatedly met these requests with the same insufficient responses. As a result, Defendants allowed a racially hostile environment to flourish, and Plaintiffs suffered egregious

1

and unlawful deprivations of their educational opportunities. Plaintiffs respectfully request that this Court deny Defendants' motion in its entirety.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS (RSUMF)

**Facts Regarding Douglas County School District (DCSD or the District), Castle Rock Middle School (CRMS), and Douglas County High School (DCHS)**

1.      Admitted in part and denied in part. Admit that DCSD maintains policies on nondiscrimination/equal opportunity, educational equity, and bullying applicable to student harassment and/or discrimination on the basis of race. Deny that the policies are effectively implemented or enforced. Ex. 1, Franklin Decl. at ¶ 31 (CRMS school social worker testifying that she reported "racial slurs to Assistant Principal Streander and Assistant Principal Loucks on several occasions, yet they failed to take any action to respond to the racial slurs or prevent future instances of racial bullying"); *compare* Ex. 2, AC-R-1 Policy at 2 (District's non-discrimination policy requiring that "[a]ll reports received by teachers, counselors, principals or other district employees shall be promptly forwarded to the compliance officer") *with* RSUMF 111 (Principal Veit did not forward J.G.'s March 10, 2023 harassment complaint to the compliance officer). Moreover, Defendants did not train students or parents on any of the policies during the relevant time period. Ex. 3, Veit Depo. Tr. at 33:15-34:8 (no training or presentations for parents at CRMS on how to report racial harassment); Ex. 4, T.E. Depo. Tr. at 21:14-22:1; Ex. 5, O.M. Depo. Tr. at 42:23-25; Ex. 6, S.T. Depo. Tr. at 84:16-24.

2.      Admitted in part and denied in part. Admit that the policies were updated in August 2020. *See* Ex. 2, AC-R-1 Policy at 5; Ex. 7, JBA Policy at 3. Deny that any policies were reviewed or updated in response to or in reflection of the events that took place underlying this litigation. Defendants specifically testified that no policy reviews or changes took place in response to

2

knowledge of the racial harassment exposed in this case. Ex. 3, Veit Depo. Tr. at 42:3-12; Ex. 8, Kane Depo. Tr. at 87:5-15.

3.    Admitted in part and denied in part. Admit that pursuant to the District's written policy, District employees are expected to report incidents of harassment or discrimination to the compliance officer. *See* Ex. 2, AC-R-1 Policy at 2. Deny that the District trains all employees about this expectation. Garcelle Franklin, the school social worker at CRMS from February 2022 until December 2022, did not "receiv[e] any training on DCSD's policies or procedures for reporting harassment or discrimination." Ex. 1, Franklin Decl. at ¶¶ 8, 17. After the Board of Education revised the Educational Equity Policy, Board Member David Ray received concerns from a high school psychologist that there was "[n]o staff training to clarify what behavior or student[] actions trigger stepping into the policy." Ex. 9, Ray Decl. at ¶ 61. This litigation is replete with examples of District employees failing to report complaints of harassment or discrimination to the Compliance Office. *See, e.g.*, RSUMF 111, ASF 89.

4.    Admit.

5.    Admit.

6.    Admitted in part and denied in part. Admit that the Compliance Office has a guidebook. Deny that the Compliance Office provides effective training to all school administrators on racial harassment. Ex. 3, Veit Depo. Tr. at 53:6-23, 56:12-18 (Principal Veit did not learn what words would constitute a racial slur during the District's online "self-paced class"); Ex. 9, Ray Decl. at ¶ 61 (noting that school principals in the District are "uncertain about their responsibilities" in addressing "racial harassment and hate speech.").

7.    Admitted in part and denied in part. Admit that the Compliance Office's *role* is to work with school administrators on investigations, supportive measures, and potential discipline.

Deny that the Compliance Office actually investigated, provided supportive measures, or helped with discipline in most of the events underlying this case. *See* Ex. 3, Veit Depo. Tr. at 30:23-31:14 (noting that the compliance officer only investigated harassment at CRMS when events "happened outside of school"); *see also* RSUMF 111 (Compliance Office not involved in J.G.'s March 10, 2023 complaint).

8.      Admitted with clarification. Admit that the District approved the Everfi program (at an unknown date), the Second Step program in the 2021-2022 school year, and the Wayfinder program in the 2023-2024 school year to support general anti-bullying work in schools. Ex. 10, 30(b)(6) Depo. Tr. at 124:1-8, 146:1-4. Clarify that none of these programs specifically address racial harassment. *See, e.g.*, Ex. 1, Franklin Decl. at ¶ 43 (the "social emotional learning curriculum that CRMS provided to students did not address race or racism."); Ex. 11, Email to DCSD Assistant Superintendent Danny Windsor, dated 12/7/2023 ("the unit on bullying and harassment from Second Step . . . is more of a high level, general bullying and harassment. . . . [T]his was not specific enough to the racial element of the situation thus not the best resource to use."); *see generally* Ex. 12, Second Step Program.

9.      Admitted with objections as to vagueness. Admit that the District maintains bullying prevention and education resources online. Defendants' factual allegation, however, does not specify whether the resources mentioned are targeted to students and parents, or whether they are internal resources for teachers and administrators.

10.     Admitted in part and denied in part. Admit that the District complies with Colorado Academic Standards. Deny that the District incorporates anti-racist pedagogies into its curriculums. Defendants' factual allegation emphasizes that Colorado Academic Standards *"may"* include or otherwise support anti-racist pedagogies but provide no evidence that they did so here.

Comprehensive school and district-based interventions and programing, which are known to reduce or eliminate racial hostility in educational environments, are available, but Defendants did not use them. Ex. 13, Shaw Expert Report at 41-42; *see also* Ex. 9, Ray Decl. at ¶ 51 (noting that when Board Member Ray visited a classroom, a teacher "expressed fear that discussing slavery could result in disciplinary action against her.").

11.    Admitted in part and denied in part. Admit that the Superintendent's "Checklist" for textbook and instructional materials selection – which was revised on April 29, 2025 after the incidents at issue in this case – includes an evaluation of whether the textbook respects "racial uniqueness," "similarities and interdependence," and whether a text contributes to an "inclusive culture for all students." *See* Ex. 14, Superintendent's Checklist at 6, 9, 19. Deny that the District's Textbook Selection Policy specifically addresses those topics. Ex. 15, IJ Policy on Textbook Selection at 1-2. Deny that the District's employees adopt instructional materials that respect racial uniqueness or contribute to an inclusive culture for students of color. *See* RSUMF 10, 32.

12.    Admitted in part and denied in part. Admit that the District provides anti-discrimination and anti-bullying training to school administrators at the start of the school year. Deny that anti-discrimination and anti-bullying training is provided to all students and staff at each DCSD school. Ex. 1, Franklin Decl. at ¶¶ 8, 17 (CRMS social worker did not receive training on DCSD's policies for reporting harassment or discrimination). CRMS students never received any training on racial harassment, and teachers and administrators at CRMS did not talk to students about racism. Ex. 4, T.E. Depo. Tr. at 21:14-22:1; Ex. 5, O.M. Depo. Tr. at 42:23-25; Ex. 6, S.T. Depo. Tr. at 84:16-24. Moreover, DCSD has no mechanism to track whether schools actually deliver any training. *See* Ex. 16, Defs.' First Disc. Resp., Rog. 4 at 13 (noting that the District does

5

not maintain a central "list of the variety of school instructional resources that may have been given across individual schools").

13.     Deny. CRMS students never received any training on racial harassment, and teachers and administrators at CRMS did not talk to students about racism. *See* RSUMF 12 (multiple students testifying to no training). Moreover, Defendants' cited evidence does not support that DCHS implemented presentations on an annual basis. *See* ECF 53-2 at 12 (stating only that "DCHS implements District presentations addressing bullying, harassment, and discrimination to its students"); ECF 53-4 at 32:4-33:14, 34:9-15 (deposition testimony of the CRMS Principal Veit discussing training at CRMS, not DCHS).

14.     Admit with objections to vagueness. Admit DCHS started using the Second Step program "[s]everal years ago," but the District's factual allegation does not indicate as to whether it maintains the program was in use at DCHS during the events underlying this lawsuit.

15.     Admit with clarification. Admit that lessons were provided in advisement class at DCHS. Clarify that the programs do not address racial harassment. *See* RSUMF 8.

16.     Admitted in part and denied in part. Admit that DCHS may sometimes use restorative practices to address student conflict. Deny that DCHS uses restorative practices for all incidents of racial harassment. *See* Ex. 17, Incident Report dated 3/6/2024 at 1, 5 (restorative conversation not used when students "engaged in mutual racial epithets directed at each other").

17.     Admit with clarification. Admit CRMS has utilized Second Step and now Wayfinder. Clarify that CRMS' implementation of the Wayfinder program is after the incidents in this case. *See* Ex. 10, 30(b)(6) Depo. Tr. at 150:22-151:10 (noting that CRMS transitioned to the Wayfinder program in the 2024-2025 school year).

18.     Admit with clarification. Admit that restorative practices generally are meant to restore relationships between students when there is conflict. Clarify that CRMS does not use restorative practices for all incidents of racial harassment and CRMS failed to use such practices in any incident of discrimination alleged in Plaintiffs' Amended Complaint. Ex. 18, Streander Depo. Tr. at 53:21-54:8 (a "restorative conversation may not be utilized every time" when a student engages in racially offensive behavior [and] restorative options "are a tool that we utilize in some instances, but they are not mandatory."). The DCSD Incident Report Form specifically requests that the administrator indicate "what remedial or restorative action was implemented," *see* Ex. 19, Incident Report dated 11/10/2022 at 3, yet no restorative options are listed on many of the incident report forms for the Plaintiffs. *See, e.g., id.* at 2-3 (no restorative measure documented when a student took a photograph of C.M. on the toilet); Ex. 20, Incident Report dated 4/26/2023 at 2-3 (no restorative measure documented when a student called C.M. a "monkey" and said his "shirt is made from cotton"); Ex. 21, Incident Report dated 11/4/2022 at 2-3 (no restorative measure documented when S.B. said "We don't need another nigger in this class.").

19.     Admitted in part and denied in part. Admit that during the relevant time period students at CRMS received one brief lesson that addressed social and emotional learning, such as maintaining relationships and how to treat each other. Ex. 22, Loucks' Presentation at 1-3 (presentation discussing "rude" or "mean behavior" and the importance of creating "a positive, respectful, and kind school culture"). Deny that social and emotional learning was "regularly" addressed in advisement class. *See* Ex. 23, J.G. Depo. Tr. at 29:19-30:4 (the CRMS advisement class is a free period where students can "do work [or] read a book," but is not associated with any "core curriculum"); Ex 24, Email from Freeman dated 9/15/2023 (noting that Ms. Streander and Ms. Freeman talked with students "for a few minutes" about an "SEL Lesson" in  advisement

class). Deny that these lessons *ever* addressed racial harassment or racism. Ex. 1, Franklin Decl. at ¶ 43 (the "social emotional learning curriculum that CRMS provided to students did not address race or racism."); Ex. 25, Franklin Depo. Tr. at 144:13-18 ("in no place in the entire school did they teach anything about race, nor racism"); *see also* Ex. 3, Veit Depo. Tr. at 36:24-37:2 (Principal Veit's testimony that he was unaware of whether CRMS' social and emotional learning trainings discussed racism). Following J.G.'s April 20, 2023 report to Assistant Principal Russell Loucks that students used racial slurs in a Snapchat group, *see* RSUMF 123, DCSD Assistant Superintendent Danny Windsor acknowledged, in a May 21, 2023 Memo to Superintendent Kane and the Board that CRMS' curriculum was deficient in this respect and confirmed that the CRMS administration would research "a different Social Emotional Curriculum that includes . . . anti-racial behaviors." Ex. 26, Windsor Memo dated 5/21/2023 at 1.

20.    Admit.

21.    Admit.

### Facts Regarding Plaintiff N.G.

22.    Admit.

23.    Deny. The student did not just call N.G. "fat," during physical education class, but specifically called N.G. a "fat cotton picker."[1] Ex. 27, N.G. Depo. Tr. at 127:17-19, 131:13-14.

24.    Admitted in part and denied in part. Admit that a teacher heard the "fat cotton picker" remark, took the student to the office, and asked N.G. if she was okay. Ex. 27, N.G. Depo. Tr. at 25:14-24; 26:17-27:1. Nonetheless, N.G. testified that the "fat cotton picker" comment was

---

[1] Defendants disingenuously describe N.G. as merely being called "fat" by another student, which is disputed even by DCSD's own records. Defendants' records concede that, at the very least, N.G. was called a "fat bitch," which is not the same as merely being called "fat." *See* Ex. 28, N.G. Behavior Detail Report. At any rate, N.G. maintains that she was called a "fat cotton picker" and that she contemporaneously complained to the administration about being called a "fat cotton picker" at the time of the slur. *See* RSUMF 23, 25.

an example of a racial slur that Principal Veit did not take seriously. *Id*. at 131:4-14. However, to the extent Defendants' proffered factual allegation disputes whether the term "fat cotton picker" is "racial in nature," Plaintiffs deny this legal conclusion disguised as a "fact." Indeed, Defendants admitted that the term "cotton-picker" may be a "racially derogatory slur." Ex. 29, Def. Second Disc. Resp., RFA No. 1.

25.     Admit with clarification. Admit that N.G. met with Principal Veit and told him that she was "okay" after the student called her a "fat cotton picker." Ex. 27, N.G. Depo. Tr. at 27:13-28:14, 125:18-24. Clarify that her statements to Principal Veit did not in fact mean that N.G. was "okay" following this incident. N.G. testified that she felt "embarrassed," "hurt," and "upset that someone would even say something like that about me." *Id*. at 125:18-126:10. N.G. did not tell Principal Veit how she truly felt because "he did not take any other racial problems seriously" at CRMS. *Id*. at 126:11-17.

26.     Admit.

27.     Deny. The student who called N.G. a "fat cotton picker" also used other racially offensive language around N.G. at CRMS, including the "N-word."[2] *Id*. at 33:17-25, 35:1-22. Multiple CRMS students used the N-word around N.G. "[e]very day" whenever they saw N.G. in classes or in the hallway. *Id*. at 35:1-22, 37:22-38:11.

28.     Deny. Ms. Meyer, the gym teacher, overheard a student call N.G. a "fat cotton picker" in class and Ms. Meyer also overheard other racial slurs in gym class. *Id*. at 26:17-27:1, 36:16-25. N.G. testified that her math and science teachers may have heard students use the N-

---

[2] The N-word is the most "noxious racial epithet in the contemporary American lexicon." *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK*, 334 F.3d 928, 932 (10th Cir. 2003). During depositions, the Black minor Plaintiffs, as well as the attorneys, referred to this atrocious racial slur as the "N-word" instead of spelling the entire word out. However, there is no dispute that the Plaintiffs' testimony is that other students called them "nigger" at school, not just "N-word."

word. *Id*. at 37:9-21. N.G. also told Assistant Principal Loucks that students were using the N-word around her. *Id*. at 38:12-39:7. Moreover, other adults at CRMS and the District were aware of "racially offensive language" at CRMS, as well as the pervasive racially hostile environment. *See* Ex. 9, Ray Decl. at ¶ 73 ("In 2018, the student advisory group . . . reported an uptick in racial harassment"); *see also* ASF 8 (Principal Veit aware of an incident in 2020-2021 where a white student screamed "All Lives Matter" to a black student); RSUMF 108 (Principal Veit's admission that racial slurs are "a long project for us").

29.     Deny. In addition to telling Assistant Principal Loucks that students were using the N-word, N.G. also reported to Assistant Principal Loucks that a student at CRMS called her a "fat cotton picker." *See* Ex. 27, N.G. Depo. Tr. at 31:25-32:12, 38:12-39:7. When N.G. reported racial slurs to Mr. Loucks, he did not give her "any solutions" to address the racial harassment. *Id*. at 29:8-25. N.G. also discussed the "fat cotton picker" slur with Principal Veit. *See* RSUMF 25.

30.     Admit.

31.     Deny. N.G. told adults at DCHS that other students used racial slurs around her, which included students calling N.G. the N-word. Ex. 30, N.G. Errata Sheet; Ex. 27 N.G. Depo. Tr. at 41:4-19, 42:1-3; Ex. 31, Lacey Ganzy Depo. Tr. at 67:2-15. Additionally, other DCHS students reported "racially offensive language" to DCHS administrators and District officials. For example, in 2021, N.G.'s classmate Z wrote a letter to the school district about racism after she had experienced being called the "N-word," and published it on her personal Instagram account. Ex. 27, N.G. Depo. Tr. at 123:1-20. DCHS Principal Kappas told Z to take the letter off of Instagram. *Id*. On September 14, 2022, DCHS Assistant Principal Rob Peterson filed an incident report regarding student R.S.'s "racial animosity," including that R.S. "made a hat into KKK hood with N-word and showed it to [a] black female student;" made "jokes about school shootings;"

and had drawings in his backpack of a "burning cross, Stick figure of black person hanging from tree, klansman drawing, guy on horse whipping a black person, [and a] border patrol car with swastika on it." Ex. 32, Inquiry Report dated 9/14/2022 at 1-2; *see also* RSUMF 39 (2019 report to DCHS that a boy called N.G.'s older sister "the N-word over the megaphone several times in front of the administrators" at a basketball game).

32.    Admitted in part and denied in part. Admit that N.G. took U.S. History during the 2022-2023 school year. Deny Defendants' assertion that the in-class debate was merely about Jim Crow laws and that N.G. only expressed "discomfort" to her mother about the assignment. N.G.'s history teacher, Ms. Goldberg, assigned students to debate whether they "were for or against Jim Crow laws," and assigned the class's only Black student, N.G., to defend Jim Crow laws to her white peers. Ex. 27, N.G. Depo. Tr. at 9:1-7, 12:15-18; *see also* Ex. 33, U.S. History Class Roster (showing that N.G. was the only Black student in the class). N.G. told her mother that "she was very upset" by the assignment. Ex. 31, Lacey Ganzy Depo. Tr. at 82:24-83:10. N.G. was willing to fail the debate and "refused to speak" during the debate because she felt "really uncomfortable" as a Black girl having to defend Jim Crow laws in front of her white peers. Ex. 27, N.G. Depo. Tr. at 14:21-15:6.

33.    Admitted in part and denied in part. Admit that N.G. testified that she *felt* Ms. Ganzy did not think the debate was serious. Deny that Ms. Ganzy just told N.G. to do the debate and took no other action to support her daughter. Ms. Ganzy called Ms. Goldberg to inquire into the purpose of the debate and explained that the debate was "really making [N.G.] uncomfortable." Ex. 31, Lacey Ganzy Depo. Tr. at 84:19-85:5. Ms. Ganzy was "in shock and awe" that the teacher placed N.G. "on the side that is pro slavery." *Id*. at 83:16-23.

34.     Admitted in part and denied in part. Admit that N.G. received a good grade. Deny that the teacher simply allowed N.G. to switch sides and that she was not penalized. The day Ms. Goldberg assigned the debate, N.G. asked Ms. Goldberg if she could switch sides and argue against the need for Jim Crow laws, but Ms. Golberg refused and told N.G. "there was nothing she could do and that everyone still had to debate, and that [N.G.] had to say at least two things [in the debate] to get a grade." Ex. 27, N.G. Depo. Tr. at 14:10-20. Ms. Goldberg also refused to allow N.G. to switch sides after speaking with Ms. Ganzy days prior, informing Ms. Ganzy that the debate was going to move forward and "[i]f [N.G.] chose not to participate, it was a 30 percent mark on her grade for the semester." Ex. 31, Lacey Ganzy Depo. Tr. at 84:19-85:11. Ms. Goldberg eventually relented and let N.G. switch sides *during* the debate when N.G. refused to speak on the side of defending Jim Crow laws. Ex. 27, N.G. Depo. Tr. at 14:21-15:11. N.G. felt penalized because she "was put in a position where [she] had to switch the day of and [she] did not have time to prepare anything." *Id*. at 16:1-4. N.G.'s educational opportunities were impacted because she was very stressed and uncomfortable "being put in a position where [she had] to debate whether or not racism is wrong." *Id*. at 45:5-13. N.G. felt like the "whole time" she attended DCSD schools, no administrators or teachers ever took issues pertaining to race seriously. *Id*. at 44:17-45:18. N.G. left DCHS because of the Jim Crow debate and the pervasive racial harassment she experienced at the school. *Id*. at 45:19-46:8 ("[T]hat is not any environment that any student would feel comfortable going to school in.").

35.     Deny. Ms. Ganzy testified that when she was trying to withdraw N.G. from DCHS after the Jim Crow debate, "I went to the [DCHS] office. I yelled about Ms. Goldberg and her curriculum. I yelled about what [N.G.] was going through." Ex. 31, Lacey Ganzy Depo. Tr. at 102:15-17. On May 22, 2023, Ms. Goldberg also forwarded a copy of the Jim Crow "Socratic

12

seminar" to DCHS Assistant Principals Jessica Dickson and Robert Peterson. Ex. 34, Email from Goldberg at 1. Assistant Principal Jessica Dickson ratified the Jim Crow assignment by exclaiming "it looks great!" *Id.*

36.     Admit.

37.     Admit.

38.     Admit.

39.     Deny. Ms. Ganzy encouraged her children to raise issues with the administration and "go to the office," but she sometimes encouraged her children to "turn a cheek" to smaller things and encouraged N.G. and J.G. to "not give what the children were saying any energy." Ex. 31, Lacey Ganzy Depo. Tr. at 44:4-8, 46:3-9. Ms. Ganzy explained that "I remember always telling my children to -- I told them to not feed into the racism because if you gave it energy, you gave it life." *Id.* at 41:22-24. Ms. Ganzy also reported numerous incidents of racial harassment that her children experienced in DCSD schools. For example, in 2019, Ms. Ganzy reported to DCHS administrators that a boy at DCHS called her oldest daughter, Kaiya Griffin, "the N-word over the megaphone several times in front of the administrators" at a basketball game in the DCHS gymnasium. *Id.* at 50:10-52:8; *see also* RSUMF 35, 121-122.

## Facts Regarding Plaintiff C.M.

40.     Admit.

41.     Admitted in part and denied in part. Admit that, in October 2022, CRMS student K.O. took a photo of C.M. sitting on a toilet at school and then circulated the photo on social media. To the extent Defendants imply that the photo was only circulated via social media, deny. Assistant Principal Streander informed CRMS teachers via email on October 14, 2022 that the "picture was sent to the Morgaine/Gawain snapchat group, so there are many students who have

seen this picture. It was also airdropped here at school and on a bus route and through messenger." Ex. 35, Streander Email dated Oct. 14, 2022.[3] Additionally, two other students, L.H. and F.H., were present when K.O. took the photograph, so K.O. did not act alone. *See* Ex. 116, Plaintiffs' Rog. Responses, Rog. 22.

42.     Admitted in part and denied in part. Admit that Ms. Streander suspended K.O. for two and a half days. Defendants' cited evidence does not support that the suspension was an "out-of-school" suspension. *See* Ex. 53-7 at 80:4-11; Ex. 53-8 at 68:1-9.

43.     Admit.

44.     Admitted in part and denied in part. Admit that C.M. did not press criminal charges against K.O. Deny that the school affirmatively contacted C.M.'s parents to discuss the incident. Misty Martin, C.M.'s mother, said that no one from the school contacted her about the bathroom photograph. Ex. 36, Misty Martin Depo. Tr. at 56:5-19. C.M. told his mother about the photo and Ms. Martin then spoke with Assistant Principal Streander about the mass circulation of the photograph amongst the CRMS student body. *Id*. at 56:10-11, 56:20-57:8. To the extent Defendants' proffered fact implies that C.M. did not press charges because he was not harmed by the incident, deny. C.M. decided not to press charges against K.O because he was afraid of retaliatory harassment and "didn't want to give the rest of the people at school another reason to hate [him]." Ex. 37, C.M. Depo. Tr. at 68:10-13.

45.     Deny. Assistant Principal Streander and Principal Veit both knew that K.O. took the photograph in an attempt to capture the size of C.M.'s genitals, a racist sexualized stereotype, and that K.O.'s motive might have been racism. Ex. 19, Incident Report dated 11/10/2022 at 1-2 (Principal Veit reporting that K.O "took a picture with his phone over the bathroom stall wall of

---

[3] The Morgaine/Gawain Snapchat group is further described in RSUMF 61 and ASF 26-40.

14

another male student using the restroom. He said he was ***trying to see the size***. [C.M.'s] genitals would not be seen in the photo but you could see he was sitting on the toilet.") (emphasis added); Ex. 3, Veit Depo. Tr. at 123:19-124:2, 128:9-15, 133:3-15 (Assistant Principal Streander conducted the investigation and gave Principal Veit the information for the incident report). Principal Veit understood that photographing a black boy in the bathroom to "see his size" could be prompted by racist "stereotypes." *Id*. at 133:20-134:5; *see also* Ex. 13, Shaw Expert Report at 32. When Ms. Franklin learned about the photograph, it was objectively clear to her that it was motivated by race because the photograph depicted C.M. unclothed in the bathroom and C.M. told Ms. Franklin that K.O. took the photograph to "prove stereotypes." Ex. 25, Franklin Depo. Tr. at 29:13-19, 145:11-18. Additionally, there is evidence that CRMS administrators believed the incident was motivated by race when it happened because they reported the incident to the District's Compliance Office, which handles harassment based on a protected class and not generalized bullying. *See* RSUMF 43; Ex. 8, Kane Depo. Tr. at 44:3-12 (noting that the Compliance Office does not investigate "bullying that does not have a discriminatory component"). Furthermore, the photograph was objectively racially motivated because K.O. had a pattern of subjecting C.M. to racial slurs at CRMS, including calling C.M. the N-word. Ex. 37, C.M. Depo. Tr. at 51:25-52:4, 54:14-20. Finally, Assistant Principal Loucks told Ms. Ganzy that he was aware of a "white supremacy group" where white students had formed a group since Black History month, called themselves "skinheads," and were threatening to "lynch" black students; and Mr. Loucks said that C.M. and J.G. "were really the targets" of the racial slurs at CRMS. Ex. 31, Lacey Ganzy Depo. Tr. at 126:18-129:3, 131:7-18; Ex. 23, J.G. Depo. Tr. at 73:2-18.

46.     Deny. C.M. believed the photograph was "definitely racist," particularly when students started "adding memes" to the photograph. Ex. 37, C.M. Depo. Tr. at 182:12-23. For

15

example, students wrote racist monikers across the photo, such as "Monkey [M]." Ex. 36, Misty Martin Depo. Tr. at 57:12-21. Moreover, students altered the photo of C.M. to look like C.M. was behind "jail bars" and added the caption: "Monkey [M] finally behind bars." *See* RSUMF 157.

47.     Admitted in part and denied in part. Admit that on November 1, 2022, C.M. reported to Assistant Principal Loucks, Assistant Principal Streander, and his gym teacher that S.B. called him the N-word after he accidentally ran into her during gym glass. Ex. 37, C.M. Depo. Tr. at 30:9-31:19. Deny that C.M. ran into S.B. *intentionally* and that Defendants' factual allegation constitutes the entirety of C.M.'s report. *Id*. at 31:7-9; Ex. 21, Incident Report dated 11/4/2022 at 1-2 (Assistant Principal Loucks' conclusion that C.M. "accidentally knocked down" S.B. in gym class). In addition to reporting that S.B. called him the N-word, C.M. also reported that S.B. "said we already have one N-word in this class. Why do we need another one?" Ex. 37, C.M. Depo. Tr. at 91:8-10. C.M. also reported to Ms. Streander that "this wasn't the first time" S.B. had called him the N-word. Ex. 38, Email from Streander dated 11/8/2022.

48.     Admit with clarification. Admit that Mr. Loucks conducted an investigation and suspended S.B. for three days. Clarify that during Mr. Loucks' investigation, he also learned that S.B. "has been calling [C.M.] a monkey." Ex. 39, Email from Loucks dated 11/7/2022.

49.     Admit.

50.     Admit.

51.     Admit with clarification. Admit that notwithstanding an appeal, the suspension was upheld. Clarify that even after CRMS suspended S.B. for calling C.M. the N-word on November 1, 2022, S.B. continued with impunity calling black students racial slurs after that. CRMS administrators were aware that S.B. repeatedly called black students the N-word and monkey,

16

knew she stated "if there was a purge, I would not save the Black people," and knew she drew a swastika on a wooden car at school. *See* ASF 63.

52.     Deny. Defendants characterize this event as merely "an incident in the hallway." For purposes of the Court's analysis, during the first week in February 2023, two white CRMS students, N.B. and T.E., repeatedly physically pushed C.M. in the hallway. Ex. 37, C.M. Depo. Tr. at 94:21-95:6; Ex. 18, Streander Depo. Tr. at 84:3-24. During the assault, N.B. called C.M. racial slurs, including a "f***ing N-word." Ex. 37, C.M. Depo. Tr. at 95:25-96:3. C.M. tried to walk away twice, but the students blocked him and precluded him from doing so. Ex. 18, Streander Depo. Tr. at. 84:3-24.

53.     Admitted in part and denied in part. Admit that the students' written reports, which are a few sentences each, do not mention any racial slurs. Deny that C.M. never verbally told any CRMS administrators that N.B. and T.E. subjected him to racial slurs. C.M. told Mr. Loucks that T.E. and N.B. called him "racial slurs and tried to push" him. Ex. 37, C.M. Depo. Tr. at 99:12-100:12. C.M. also told Ms. Franklin that T.E. and N.B. were calling him the N-word. *Id.* at 51:21-52:4.

54.     Admit.

55.     Admit.

56.     Admitted in part and denied in part. Admit that Mr. Martin signed the no-contact contract. Deny that Mr. Martin agreed that C.M.'s no-contact contract with T.E. and N.B. was justifiable. Mr. Martin testified in his deposition that he believed a no-contact contract was justifiable. Ex. 40, Jon Martin Depo. Tr. at 60:14-17. He did so when Defendants presented Mr. Martin with an email from Ms. Streander – that he had never seen before – and asked him hypothetically if a no-contact was justifiable according to that email. In response, Mr. Martin

testified that "if what's mentioned in [Ms. Streander's email] is accurate, yeah, I believe it was justifiable." *Id*. at 59:2-6, 60:20-61:3. However, the email omitted any mention of the other students' use of racial slurs against his son. Ex. 41, Email from Streander dated 2/6/2023. Mr. Martin does not believe it was fair that CRMS placed other restrictions on C.M. including that C.M. "had to be escorted from classroom to classroom. He either had to leave earlier or later and be escorted to his next class, and wasn't allowed to have conversation or contact with people in the hallways." Ex. 40, Jon Martin Depo. Tr. at 59:25-60:10.

57.     Admit.

58.     Admit.

59.     Admitted in part and denied in part. Admit that Ms. Martin reported that a male student, whom Ms. Streander deduced was N.B., was threatening to fight C.M. because N.B.'s friend (who N.B. referred to as his sister) was suspended. Deny that this fact encompasses the entire incident or report of it. Ms. Martin reported to Assistant Principal Streander that N.B. "has been threatening to fight [C.M.] since his sister was suspended earlier this year for calling [C.M.] the N-word." Ex. 18, Streander Depo. Tr. at. 104:1-18, 112:2-10; Ex. 42, Streander's Handwritten Notes. Defendants omit that N.B.'s friend was, S.B., discussed *infra*. Ex. 18, Streander Depo. Tr. at 112:2-10. S.B. was suspended for calling C.M. the N-word. RSUMF 47-48.

60.     Admit with clarification. During this conversation, as with almost every conversation, Ms. Martin told Ms. Streander that students were calling C.M. racial slurs. *See* Ex. 36, Misty Martin at Depo. Tr. at 37:1-11, 40:16-20.

61.     Deny. During the 2022-2023 school year, C.M. reported racial slurs in the Morgaine/Gawain Snapchat group to Mr. Loucks and sent Mr. Loucks screenshots of the racial slurs via Airdrop. Ex. 37, C.M. Depo. Tr. at 70:17-71:17, 72:2-21, 73:12-14. The

Morgaine/Gawain Snapchat group was a Snapchat group consisting of CRMS students from both the Morgaine Pod and the Gawain Pod, *see id*. at 70:17-71:10, and had approximately 100 students in the Snapchat group. Ex. 5, O.M. Depo. Tr. at 19:9-24; Ex. 31, Lacey Ganzy Depo. Tr. at 129:17-22. C.M. was in the Morgaine/Gawain Snapchat group "[a]lmost all year" in eighth grade. Ex. 37, C.M. Depo Tr. at 71:8-10, 144:13-16. Furthermore, C.M. also reported a *different* Snapchat group called "Hating [C.M.]" to Assistant Principal Loucks and showed Mr. Loucks some of the racist messages posted by CRMS students, including (i) the bathroom photo of C.M. alongside comments like "watch the monkey at work," "resting in his natural habitat," and "he's going to throw it" with a monkey emoji (because a "monkey throws his poop"); (ii) "he's a monkey"; (iii) "why did we add so many Black kids?"; (iv) "We already have a few Black kids. There's no reason to have any more"; and (v) racist comments about C.M.'s physical appearance, including comments about his hair. Ex. 37, C.M. Depo. Tr. at 146:12-22, 147:5-11, 149:5-151:21. S.B. posted the comment about not wanting any more Black kids in the "Hating [C.M.]" Snapchat group. *Id*. at 149:25-150:4. C.M. was added to the "Hating [C.M.]" Snapchat group sometime after winter break during the 2022-2023 school year and showed Mr. Loucks the racist messages that same day, including the names of the students who posted racist messages. *Id*. at 147:19-148:20, 151:6-17. Mr. Loucks responded, "I'll take care of it," *id*. at 151:6-21, but there is no evidence that Defendants ever investigated the "Hating [C.M.]" Snapchat group or disciplined any of the participants. Furthermore, Ms. Streander told Ms. Martin, over the course of many phone conversations during the fall of 2022 and beginning of 2023, that "[Ms. Streander] was aware, the school was aware, the school had seen Snapchats, they had seen social media posts that [C.M.] was being bullied and called racial names." Ex. 36, Misty Martin Depo. Tr. at 35:2-24.

62.    Admit.

63.     Deny. Throughout the 2022-2023 school year, C.M. repeatedly reported to both CRMS administrators and staff that students were calling him racial slurs. Throughout November 2022, C.M. reported that he was experiencing "racial bullying and harassment" to the school social worker, Garcelle Franklin, *see* Ex. 43, C.M. Contact Log at 1, and Ms. Franklin reported the racial slurs to the assistant principals. Ex. 1, Franklin Decl. at ¶¶ 49-51. C.M. also reported many students using racial slurs towards him to Assistant Principals Loucks and Streander directly. *See, e.g.,* RSUMF 47 (November 1, 2022 report to Assistant Principals Loucks and Streander that S.B. called C.M. the N-word and said "we already have one N word in this class. Why do we need another one?"); RSUMF 61 (reports to Mr. Loucks about the Hating C.M. Snapchat group and the Morgaine/Gawain Snapchat group with racial slurs); RSUMF 74 (March 9, 2023 report that a student called C.M. a "monkey," "gorilla," and "chimpanzee," and told C.M. to "go back to the fields"); RSUMF 79-80 (April 19, 2023 report that a student called C.M. a "monkey" and made a slave cotton-picking comment).

64.     Admitted in part and denied in part. Admit that CRMS administrators may have reviewed video surveillance footage of this incident. Deny that CRMS administrators were unable to identify the girls from the basketball game. Defendants never produced the video footage from the basketball game to Plaintiffs in this litigation, so Plaintiffs deny that the identity of the girls was not ascertainable.

65.     Deny. C.M. does not recall being in Ms. Streander's office on February 22, 2023. Ex. 37, C.M. Depo. Tr. at 108:20-22.

66.     Admitted in part and denied in part. Admit that student E.S. logged into C.M.'s Snapchat account and posted "I'm gay" on C.M.'s Snapchat story. *Id*. at 109:1-110:5. Deny that C.M. does not recall any other physical altercations. C.M. recalls the incident where students

physically shoved him at CRMS while calling him the "f***ing N word." *See* RSUMF 52. C.M. also testified that, on another occasion, students pushed him, so he pushed them back. Ex. 37, C.M. Depo. Tr. at 112:24-113:10.

67.     Admit with clarification. Admit that, at this time in the Spring of 2023, C.M. was struggling with many different students. Clarify that he was struggling with other students because students were targeting him and calling him racial slurs. *Id*. at. 111:11-25. C.M. felt "tired of being pushed around and bullied and people calling me racial slurs. Like they called me Monkey [M], or they called me the N word to my face, or I could be in the halls and I'd get tripped." *Id*. at 17:11-15.

68.     Admitted in part and denied in part. Admit that C.M. sometimes insulted other students after the students called him racial slurs and that sometimes he "would stand [his] guard." *Id*. at 111:23-112:6. C.M. was "tired of people pushing [him] around and getting bullied every single day" and did not feel that it was fair that he had to "sit[] back and tak[e]" the daily "racial slurs." *Id*. at 183:11-184:12. Deny that C.M. always insulted other students or fought back when students called him racial slurs. In February 2023, C.M. tried walking away *twice* when N.B. and T.E. repeatedly physically pushed C.M. in the hallway and called him a "f***ing N-word." *See* RSUMF 52. C.M. also walked away when N.B. and T.E., in separate incidents, called C.M. racial slurs in the locker room and at lunch. Ex. 37, C.M. Depo. Tr. at 99:12-100:1. In April 2023, C.M. tried walking away when a student repeatedly called him "a monkey." *Id*. at 58:4-6, 58:24-59:6.

69.     Deny. After C.M.'s conversation with Assistant Principal Streander, C.M. told his parents "at home in an emotional moment . . . that he had continued to be -- he was continuing to be called names such as monkey, Monkey [M], the N-word, cotton picker, and that he was being target[ed] within the school. And that he didn't feel like he could report it anymore because the

aggression from the other students got worse." Ex. 36, Misty Martin Depo. Tr. at 67:1-8. Ms. Martin had "numerous conversations where [she] reported to Kristine Streander that [C.M.] was being racial[ly] bullied." *Id*. at 40:18-20. C.M. also continued reporting racial slurs to CRMS administrators throughout the Spring of 2023. RSUMF 74, 79-80.

70.     Admit with clarification. Ms. Streander asked C.M.'s teachers to hold him in class but did so only beginning February 22, 2023. *See* Ex. 18, Streander Depo. Tr. at 127:13-128:23, 131:20-21.

71.     Admit.

72.     Admit.[4]

73.     Admit with clarification. Admit that C.M. insulted L.A. with a reference to border jumping after L.A. first called C.M. a "monkey." *See* RSUMF 74.

74.     Deny. L.A. called C.M. a "monkey" prior to C.M. insulting L.A. Ex. 37, C.M. Depo. Tr. at 125:17-19. C.M.'s written incident report, dated March 9, 2023, reports various racial slurs that L.A. called C.M in the hallways including "monkey," "gorilla," and "chimpanzee." Ex. 44, Incident Report dated 3/9/2023; *see also* Ex. 37, C.M. Depo. Tr. at 124:20-21. On the incident report, submitted to CRMS administrators, C.M. also reported that L.A. previously told C.M. to "go back to the fields," a reference to slaves working in cotton fields. *Id*.

75.     Admit that CRMS did not discipline L.A. or C.M. The District has produced no evidence that they responded in any manner to C.M.'s March 9, 2023 incident report.

---

[4] The referenced "rumors" are both irrelevant to this case and were false accusations. *See* Defs' Ex. Q, C.M. Confidential Depo. Tr. at 122:1-6.

76.    Admitted in part and denied in part. Admit that C.M. was reported for a mean Snapchat post, but Defendants' cited evidence does not establish that it occurred in early April 2023. Ex. 37 C.M. Depo. Tr. at 155:1-7.

77.    Admit.

78.    Admit.

79.    Admit with clarification. Admit that C.M. pushed A.P. Clarify that C.M. did so after A.P. repeatedly called C.M. a "monkey" and asked "is my shirt made out of what you people make? . . . Oh yeah. It's made of cotton." Ex. 37, C.M. Depo. Tr. at 58:4-59:6.

80.    Admit with clarification. Admit C.M. reported the racial epithets. Clarify that C.M. reported the epithets to Assistant Principal Loucks, telling Mr. Loucks that A.P. repeatedly called C.M. a "monkey" and asked "is my shirt made out of what you people make? . . . Oh yeah. It's made of cotton" (a reference to cotton-picking on slave plantations). *Id*. at 58:4-59:11.

81.    Admit.

82.    Deny. J.G. gave Assistant Principal Loucks a straight answer. J.G. reported to Assistant Principal Loucks that "he heard people talking about stereotypes; racial slurs; slavery; white supremacy; monkey (derogatory intention)." Ex. 45, CRMS Notes at 1. J.G.'s report is memorialized in the District's own records. *Id*; Ex. 46, Windsor Memo dated 4/25/2023 at 1.

83.    Deny. C.M. reported to Assistant Principal Loucks that A.P. repeatedly called C.M. racist epithets and made fun of planation slavery. *See* RSUMF 80. These comments are objectively racial slurs, and Mr. Loucks understood the racial connotation of these slurs. *See* ASF 48 (Mr. Loucks' statement that students calling each other "monkeys" is the "biggest" issue he has struggled with in 2022-2023). In April 2023, Mr. Loucks told Ms. Martin that C.M "**was targeted because he was black** and that he -- they saw it. [CRMS administrators] knew about it." Ex. 36,

Misty Martin Depo. Tr. at 38:5-10 (emphasis added). Moreover, it is irrelevant under the District's policy whether racial comments are specifically "directed" at a student. Ex. 47, Nondiscrimination Policy at 3 ("harassment is any unwelcome, hostile and offensive verbal, written or physical conduct *based on or directed* at a person's race" (emphasis added)).

84.    Admit with clarification. Admit CRMS suspended C.M. for pushing A.P. Clarify that CRMS did not discipline A.P. for his racial misconduct. *See* Ex. 20, Incident Report dated 4/26/2023 at 3; Ex. 10, 30(b)(6) Depo. Tr. at 214:18-215:13, 216:24-217:5.

85.    Admit.

86.    Admit.

87.    Admit with clarification. Admit that Assistant Principal Streander put C.M on an escort plan. Clarify that Ms. Streander placed C.M. on an escort plan on April 26, 2023. Ex. 48, Streander Email dated 4/25/2023. Further clarify that Ms. Streander never placed other students who were subjecting C.M. to racial slurs and physical assaults, including N.B. or T.E., on an escort plan. Ex. 18, Streander Depo. Tr. at 100:10-18.

88.    Deny. Defendants' cited evidence, C.M.'s testimony, states only that CRMS administrators thought "it would be safer" to have the escort plan, which does not establish that administrators put the plan in place to keep C.M. safe. Ex. 37, C.M. Depo. Tr. at 137:25-138:5. C.M. felt he was being punished, not kept safe. He expressed that it was unfair that he, the victim of racial harassment, was segregated from his peers during passing periods and that administrators limited his movements, although no one else's, under the escort plan. *Id.* at 159:9-17.

89.    Admit.

90. Admit with clarification. Admit C.M. stopped attending school three weeks before the end of the school year. Clarify he did so because of the racial harassment. Ex. 36, Misty Martin Depo. Tr. at 97:7-19, 97:25-99:7.

91. Admit.

**Facts Regarding J.G.**

92. Admit.

93. Deny. CRMS students subjected J.G. to relentless racial slurs on a daily basis at school. Students (i) called J.G. the "N word," "cotton picker," "monkey," and the "whitest Black person I know"; (ii) threw cotton balls at J.G. in shop class while saying the N-word; (iii) students asked J.G. whether he "picked the cotton [his] shirt was spun from"; (iv) asked J.G. if he liked "fried chicken," "watermelon," or "Kool-Aid"; (v) asked J.G. why he was "brown," why he "wore [his] hair" in an afro, and frequently targeted J.G. for being "brown" or "dark"; (vi) asked J.G. why do "Black people need their own month at all"; (vii) approached J.G. at the end of Black History month and told him "your month is over . . . watch [your] back"; (viii) said "bring back slavery," "Black people shouldn't be free," and Black people "should go back to the field."  J.G. Depo. Tr. at 24:6-16, 26:24-28:4, 33:5-19, 34:2-7, 34:23-35:6, 44:20-46:24, 49:21-24, 50:20-51:17, 52:4-22, 57:9-22, 61:9-13. J.G. heard racial slurs "in many different places, particularly in [his] classes [and] the hallway . . . [J.G.] pretty much heard that kind of language no matter where [he] went" in school. *Id*. at 25:7-14. A CRMS parent reported to Principal Veit that her daughter, who had several classes with J.G., "overheard the racist slurs directed at him and other minority students while riding the bus to and from CRMS." Ex. 49, Email from M.A. at 1.  J.G. reported the racial slurs to his teachers, *see* RSUMF 94-98, and also submitted a written complaint to the District stating that he has "experienced many instances and suspicions of racial discrimination

from students and teachers," and that CRMS students use "racial slurs" every day. *See* RSUMF 105.

94.    Admit with clarification. Admit that J.G. reported the racial comments and comments about his skin color to his social studies teacher. Clarify that the teacher in question was Mary Murphy. Ex. 23, J.G. Depo. Tr. at 58:16-59:5.[5]

95.    Admit with clarification. Admit Ms. Murphy spoke to the class. Clarify that J.G. recalls Ms. Murphy talked with his social studies class about racial comments between one to two times during the 2022-2023 school year. *Id*. at 58:22-59:18.

96.    Admit with clarification. In addition to hearing students make racial comments to J.G. in class, Ms. Murphy also overheard students make racist comments in the hallways to J.G. *Id*. at 59:19-60:14. Although Ms. Murphy told students to stop using racist language towards J.G. in the classroom, *id*. at 59:23-60:3, there is no evidence she responded to the racial comments in the hallway.

97.    Admit with clarification. Admit the bus driver observed a student call J.G. the N-word and ask questions relying on stereotypes. *Id*. at 60:15-61:13. Clarify the bus driver's name was Mr. Guy. *Id*. at 60:15-17. This student used the N-word on the bus frequently around J.G. *Id*. at 61:10-13.

98.    Admit.

99.    Deny. J.G. discussed the racial slur with Mr. Guy, his bus driver. *Id*. at 60:15-62:9.

100.    Admit.

---

[5] Defendants frequently state that J.G. "allegedly" reported discrimination according to his testimony. *See, e.g.,* Facts 93-94. However, each time they do so, they fail to introduce any evidence that J.G.'s sworn testimony is not accurate. Thus, to the extent that Defendants state J.G. "alleges" or "allegedly" reported harassment, Plaintiffs deny the insinuation that it is only "alleged" and maintain that the report did take place.

101.    Deny. *See* RSUMF 39 (addressing identical fact).

102.    Admit with clarification. J.G. was also concerned that he would get in trouble for reporting racial harassment. Ex. 23, J.G. Depo. Tr. at 48:10-16.

103.    Admit with clarification. Admit that J.G. learned about the Morgaine/Gawain Snapchat group. Clarify that J.G. was added to the group in approximately January 2023 or February 2023. *See id*. at 71:6-19, 72:11-24 (testifying that he was in the Morgaine/Gawain Snapchat group for at least "two or three" months prior to showing the Snapchat messages to his mom and Mr. Loucks).

104.    Admit.

105.    Admitted in part and denied in part. Admit that on March 10, 2023, J.G. submitted a complaint of racial harassment and discrimination to the District via an online feedback form. Deny Defendants' characterization of the complaint as merely a "letter." J.G. reported pervasive racial discrimination and harassment in the complaint. Specifically, J.G. reported:

> **Hello, I am a student at Castle Rock Middle School[.] Recently, I have experienced many instances and suspicions of racial discrimination from students and teachers, and I feel it's starting to become a problem across the school district for me and many others. I have constantly been racially profiled and offended by students at CRMS. They often use racial slurs near me and many others thinking it's funny, and it makes me feel uncomfortable and unwanted in my school. I have asked multiple times for them stop to no avail. It comes from everyone, and I've been hearing slurs and stereotypes from other kids who go to schools in the area as well. It's a problem that the school is also aware of, as I've heard from teachers that a meeting was held on the subject. They still have yet to talk to students about it.** I raised suspicion today toward staff at a[n] assembly we held. We were holding a school competition, and many students had their phones out to record the event, including me. Someone next [to] me was scrolling through social media, and I was recording one of the contestants. This was put to a stop when a teacher angrily asked me to give them my phone. I complied, but I was shocked and confused as to why it was a problem that I was recording, just like the rest. Our school, along with many others, has a no cell phone policy, and I understand that and comply to those rules. But I don't understand why I was a problem when others were doing the same. I felt singled out. **It's no one in particular, it's everyone. It wasn't just today, it's everyday. There will even be times when staff will be in the area when such discrimination**

**takes place. Nothing is done about the matter. I obviously cant control what students say or do, as it is not in my power to obstruct their rights. But on school grounds, it is expected, as stated on your webpage, that "the Douglas County School District RE-1 does not unlawfully discriminate against otherwise qualified students, employees, applicants for employment, or members of the public on the basis of disability, race, creed, color, sex, sexual orientation, marital status, national origin, religion, ancestry, or need for special education services," and I feel students, and mainly students, should follow these rules at all times in school to make schools a safer and more welcoming environment for everyone.** I feel that our school, along with many others, could use some redirection on how we treat fellow students. **I'm just disappointed that this happens so often, and if it keeps coming from students,** it's paving a path for students in previous grades, and may never be fixed. **I just ask that hate speech be punished and taken more seriously in our district to make the environment more welcoming for students now, and in the future. Thank you.**

Ex. 50, J.G.'s Complaint dated 3/10/2023 (emphasis added).

106.    Admitted in part and denied in part. Admit that at the bottom of J.G.'s complaint, there is a field entitled "Contact Me" followed by the word "No." *Id*. Deny that J.G. did not want CRMS administrators to discuss the complaint with him. J.G. specifically provided his cell phone number and email in the complaint so that the school could follow up with him. *Id*.; *see also* Ex. 51, Text Message from J.G. ("I added my phone number and my school email as contact info" to the complaint). J.G. does not recall making any statement that he did not want the District to contact him. Ex. 23, J.G. Depo. Tr. at 118:21-24.

107.    Admit with clarification. Admit district communications staff forwarded the complaint to Principal Veit that same day. Clarify that this individual was Stacy Rader, the District's communications officer, and that she forwarded J.G.'s complaint to both Principal Veit *and* DCSD's Executive Director of Schools Erin McDonald. Ex. 50, J.G.'s Complaint dated 3/10/2023; *see also* Ex. 10, 30(b)(6) Depo. Tr. at 184:19 (identifying Ms. McDonald's title).

108.    Deny. Principal Veit's *deposition testimony* today is that he did not view J.G.'s submission as a complaint but rather viewed it as J.G. merely "sharing his experiences." Facially,

28

such an assertion is not credible given the objective language of J.G.'s report. *See* RSUMF 105. Moreover, other CRMS administrators and District officials referred to J.G.'s March 10, 2023 submission as a *"complaint."* Ex. 52, Loucks Depo. Tr. at 118:18-22; Ex. 8, Kane Depo. Tr. at 56:21-57:3, 59:1-7; Ex. 53, Kane Email to DCSD Board dated 5/11/2023 at 1 (noting that J.G.'s "complaint" was "promptly sent to the school principal"); Ex. 9, Ray Decl. at ¶¶ 77-79 (J.G. "sent a complaint through the District's Feedback Form describing the racial discrimination he was experiencing on a daily basis at CRMS").[6] Principal Veit's contemporaneous response to the complaint was: "Thank you for sharing this. **It is unfortunate to hear. We are working on this, but I have a feeling it will be a long project for us.** He did write very well in this. Kudos to him for taking the initiative to write it. We will follow up after break." Ex. 50, J.G.'s Complaint dated 3/10/2023 at 2 (emphasis added); *see also* Ex. 3, Veit Depo. Tr. at 220:6-19. This response evinces that Principal Veit knew J.G. was complaining about racial harassment. Furthermore, during his deposition, Principal Veit was unable to identify language that would distinguish between a "complaint of racial discrimination" and "sharing" discriminatory experiences. Ex. 3, Veit Depo. Tr. at 224:11-18 ("I don't know what language would need to be different on that [to make it a complaint].").

109.    Admitted in part and denied in part. Admit that Principal Veit did not open an investigation in response to J.G.'s complaint. Deny that Principal Veit did not have "any specific incident to be able to investigate" from the information in J.G.'s complaint. *See* RSUMF 105. J.G. reported hearing "racial slurs" every day at CRMS. *Id*. Moreover, whether J.G.'s complaint

---

[6] Nevertheless, District staff never contacted J.G. or his mother to discuss the complaint. Ex. 29, Defs. Second Disc. Resp., RFA No. 2 ("admitted that no District employee, including Veit, contacted J.G. or his mother to discuss the referenced written submission, though District employees did subsequently discuss it with J.G.'s mother after she asked about it.").

presented a "safety issue" is disputed. While Principal Veit in his *deposition testimony* stated that he did not view the complaint as a safety issue, J.G. reported that the racial slurs made him "feel uncomfortable and unwanted in my school" and he requested that students follow the District's anti-discrimination policies "at all times in school to **make schools a safer and more welcoming environment** for everyone." *Id.*

110.    Deny. Although Principal Veit testified that he talked to "[p]robably five" teachers, he could not recall any of their names and did not create any written report about his purported conversations with the teachers. Ex. 3, Veit Depo. Tr. at 229:4-21, 230:17-231:2. Moreover, Principal Veit could have identified the staff member who took J.G.'s phone if he had done an investigation.  Although CRMS had camera footage of the assembly, Principal Veit did not review the camera footage to identify which teacher spoke with J.G. *Id*. at 229:22-230:4. The staff member who confiscated J.G.'s phone also brought the phone to the receptionist's office, *see* Ex. 23, J.G. Depo. Tr. at 104:2-17, yet Principal Veit never spoke with the receptionist to identify the staff member's identity. *See* Ex. 3, Veit Depo Tr. at 229:8-10. Moreover, Principal Veit never spoke with J.G. or Ms. Ganzy about the complaint. *Id*. at 234:9-12, 241:24-242:1; Ex. 29, Defs. Second Disc. Resp., RFA No. 2.

111.    Admitted in part and denied in part. Admit that Principal Veit never contacted J.G. or his mother to discuss J.G.'s discrimination complaint and admit that Principal Veit briefly spoke with his boss Erin McDonald about J.G.'s complaint. Deny that Principal Veit's brief conversation with Ms. McDonald was a "consultation." *See* Ex. 3, Veit Depo. Tr. at 234:5-14. Deny that Principal Veit complied with District Policy with that brief conversation with Ms. McDonald. District Policy requires that "[a]ll reports received by teachers, counselors, principals or other district employees shall be promptly forwarded to the compliance officer." Ex. 2, AC-R-1 Policy

30

at 2. Principal Veit failed to do so. *See* Ex. 3, Veit Depo Tr. at 233:1-8. Furthermore, Ms. McDonald failed to report J.G.'s complaint to the compliance office either. *See* Ex. 54, Veit Email dated 5/22/2023 (noting that the Compliance Office was notified of J.G.'s experiences of racial harassment on April 25, 2023 after J.G. and his mother reported incidents to Mr. Loucks); Ex. 55, Email from Henderson dated 4/25/2023 ("It was brought to my attention that you feel students in this District have unlawfully discriminated against [J.G.]"). Furthermore, deny that Principal Veit did not investigate J.G.'s complaint out of respect for J.G.'s desire not to be contacted or that J.G.'s complaint indicated he did not want to be contacted. J.G. provided his cell phone number and email in the complaint. Ex. 50, J.G.'s Complaint dated 3/10/2023 at 1. In his contemporaneous email response, Principal Veit stated that he would "follow up after break," but he never did. *Id.* at 2. Principal Veit's contemporaneous email does not state anything about J.G.'s privacy or that "J.G. did not want to be contacted." *See generally id.*

112.    Deny.  There is no evidence that Principal Veit occasionally checked in on J.G. in common spaces or monitored J.G. to determine if he was experiencing any harassment. Instead, Principal Veit testified that he did not observe J.G. in class and did not "hover over him" in the hallways and therefore would have missed any racial harassment occurring in those locations of the school. Ex. 3, Veit Depo Tr. at 232:1-23. Principal Veit never asked Assistant Principals Loucks or Streander to help him "monitor" J.G. *Id.* at 244:14-16. Moreover, District policy requires that, if an investigation is "performed at the school level," the school administrator must document the investigation on an Inquiry Report Form, including any "supportive/remedial measures," and submit the form to the Compliance Office. *See* Ex. 117, Appendix A to AC-R-1 at 3. Principal Veit was aware of his obligations under the policy, *see* Ex. 3, Veit Depo. Tr. at 27:2-7, yet did not author a report about his purported supportive actions of "check[ing] on J.G. at

different times in common spaces." *See id*. at 230:25-231:6. J.G. believes that CRMS did nothing, and he did not observe staff take any steps to address his complaint of racial harassment. Ex. 23, J.G. Depo. Tr. at 120:16-25.

113.    Admit.

114.    Admit.

115.    Admitted with clarification. Admit that Assistant Principal Streander spoke with J.G. on April 13, 2023 about N.B.'s missing water bottle. Clarify that Defendants' characterization of the conversation as merely "confirm[ing] he had a similar water bottle" is incomplete.  Assistant Principal Streander instead called J.G. to the office to question him about where he got the water bottle, implying he might have stolen it. *Id*. at 64:12-66:12 (J.G. felt it was discriminatory that Ms. Streander accused him of stealing N.B.'s water bottle because of the "stereotypes that are correlated with African Americans and stealing."). When J.G. told Ms. Streander that he had a job and had purchased the water bottle with his own money at Walmart, she expressed skepticism and argued with J.G. that Walmart did not sell such water bottles. *Id*. at 64:20-25. Ultimately, J.G. had to pull up the Walmart website to prove to Assistant Principal Streander that Cirkul water bottles were sold at Walmart.  *Id*. at 64:25-65:3. After questioning J.G. about stealing the water bottle, Assistant Principal Streander never apologized to J.G. after she determined the accusation was unfounded and she never contacted J.G.'s mother about the allegations. Ex. 18, Streander Depo. Tr. at 220:18-221:2.

116.    Admit with clarification. Admit to an altercation and clarify that the altercation in question is the same one in which A.P. called C.M. a "monkey" and asked "is my shirt made out of what you people make? . . . Oh yeah. It's made of cotton," discussed *supra*. *See* RSUMF 79-80.

117.    Admit.

32

118.    Admit.

119.    Admitted in part and denied in part. Admit that Assistant Principal Loucks ended the conversation with J.G. when the bell rang. Ex. 52, Loucks Depo. Tr. at 177:22-178:23; Ex. 23, J.G. Depo Tr. at 110:10-14. Deny that the bell cut the meeting short, as there is no evidence that Assistant Principal Loucks could not have continued the conversation even after the bell rang.

120.    Admit.

121.    Admitted in part and denied in part. Admit that Ms. Ganzy and J.G. went to CRMS the next day, April 20, 2023, and Ms. Ganzy met with Mr. Loucks.[7] Deny that only Ms. Ganzy and J.G. went to CRMS the next day to meet with administrators because N.G. accompanied them as well. Ex. 31, Lacey Ganzy Depo. Tr. at 126:16-24.

122.    Admitted with clarification. Admit Mr. Loucks had not seen J.G.'s complaint of discrimination. Clarify that the letter was a complaint of discrimination. *See* RSUMF 105, 108.

123.    Admitted with clarification. Admit that J.G. entered the room and shared the racially derogatory Snapchat messages. Clarify that he showed the racially derogatory Snapchat messages in the Morgaine/Gawain Snapchat group to Assistant Principal Loucks. *See* Ex. 23, J.G. Depo. Tr. at 74:4-15; Ex. 31, Lacey Ganzy Depo. Tr. at 147:20-24.

124.    Admitted in part and denied in part. Admit that this was the first time Ms. Ganzy saw the racist Snapchat messages. Deny that Mr. Loucks had never previously seen or known about racially derogatory messages posted by CRMS students in Snapchat groups. C.M. previously reported racial slurs in the Morgaine/Gawain Snapchat group to Mr. Loucks. RSUMF 61. C.M. also previously reported a separate Snapchat group called "Hating [C.M.]" to Mr. Loucks

---

[7] Plaintiffs presume that Defendants' reference to a meeting on April 20, **2025** is a typographical error. If Defendants indeed claim the meeting occurred in 2025, deny. *See* Ex. 31, Lacey Ganzy Depo. Tr. at 122:22-23, 125:3-126:21.

sometime after winter break during the 2022-2023 school year and showed Mr. Loucks some of the racist messages posted by students. *Id*. Mr. Loucks also was aware of text messages between CRMS students containing racial epithets, such as "monkey," because he showed these messages to Ms. Ganzy during their April 20 meeting and told Ms. Ganzy that C.M. and J.G. "were really the targets" of the racial slurs at CRMS. Ex. 31, Lacey Ganzy Depo. Tr. at 131:7-18, 231:6-232:12.

125.    Admit.

126.    Admit.

127.    Deny. Principal Veit knew that students participated in Snapchat groups according to their school-assigned pods at least as early as November 2022, including the Morgaine/Gawain Snapchat group. On November 10, 2022, Principal Veit submitted an incident report for the bathroom photograph of C.M. nearly one month after the photograph was taken. *See* Ex. 56, Incident Report dated 11/10/2022 at 1-2. School administrators knew that the bathroom photograph was "sent to the Morgaine/Gawain snapchat group." Ex. 35, Streander Email dated 10/14/2022; *see also* Ex. 3, Veit Depo. Tr. at 131:7-22 (Principal Veit stating that he filled out the incident report based on information he received from Ms. Streander); *id*. at 123:19-20 ("there was a picture of [C.M.] on the toilet that got sent around school"). Moreover, Principal Veit was aware that students communicated via Snapchat because Principal Veit sent District officials screenshots on December 20, 2022 of "messages sent on snapchat from S.B. to another student." Ex. 57, Veit Email dated 12/20/2022. Additionally, Principal Veit is aware that bullying can occur on social media. Ex. 3, Veit Depo. Tr. at 245:18-20. Furthermore, Ms. Streander told Ms. Martin, over the course of many phone conversations during the fall of 2022 and beginning of 2023, that "the school was aware, the school had seen Snapchats, they had seen social media posts that [C.M.] was being bullied and called racial names."  Ex. 36, Misty Martin Depo. Tr. at 35:2-24.

34

128.   Admitted in part and denied in part. Admit that Principal Veit only learned about the *specific* Snapchat messages that J.G. showed Mr. Loucks on April 20, 2023. Deny that April 20, 2023 was the first time Mr. Veit learned about the existence of Snapchat groups at CRMS, and specifically amongst students in the Morgaine/Gawain Pods where racist comments and other harassment were taking place. *See* RSUMF 41, 45, 127.

129.   Deny. The District did not conduct an investigation into the Morgaine/Gawain Snapchat group or the Hating C.M. Snapchat group. When C.M. and his mother reported to the Assistant Principals that CRMS students continued to circulate the bathroom photograph of C.M. after winter break, *see* RSUMF 58 and 61, the District never disciplined any of those students. Ex. 29, Defs' Second Disc. Resp., Rog. 11. In fact, after CRMS became aware of the racially offensive messages on the Hating C.M. Snapchat group after winter break, administrators made no efforts to further investigate or preserve evidence of the Hating C.M. Snapchat group. RSUMF 61. And after J.G. disclosed additional racist messages on the Morgaine/Gawain Snapchat group on April 20, 2023, CRMS still took no action to investigate the Snapchat messages, or to preserve them for an investigation. To the contrary, some CRMS officials instructed students to destroy the evidence. On April 20, 2023, Assistant Principal Loucks, for example, entered T.E.'s classroom, one of the participants in the Morgaine/Gawain Snapchat group. Ex. 4, T.E. Depo. Tr. at 19:17-25, 69:15-70:13. Mr. Loucks did not ask to look at T.E.'s phone or the messages on the Morgaine/Gawain Snapchat group. *Id*. at 70:17-19, 71:3-4. Instead, Mr. Loucks approached T.E.'s table and instructed the students to leave the Morgaine/Gawain Snapchat group. *Id*. at 70:1-13 (Mr. Loucks "saw that we were all in the group chat and then saw us active on it and then told us to leave."). When a student leaves a Snapchat group, the student's past messages are no longer accessible to anyone in the group. Ex. 5, O.M. Depo. Tr. at 38:25-39:5. Right before T.E. left the

Morgaine/Gawain Snapchat group, he saw that students in the group were "spam deleting their messages" to avoid consequences. Ex. 4, T.E. Depo. Tr. at 69:5-10, 85:2-10. Moreover, the District never conducted a thorough investigation to determine who participated in the Morgaine/Gawain Snapchat and whether there were other racist posts in the group. The District and CRMS only spoke with three students who were members of the Morgaine/Gawain Snapchat group, including H.A., S.T., and L.B., *see* Ex. 10, 30(b)(6) Depo. Tr. at 225:18-226:13, despite the fact that approximately 100 students participated in the Morgaine/Gawain Snapchat group. *See* RSUMF 61. In these short conversations, Principal Veit and/or Assistant Principal Loucks told H.A. and S.T. that they were suspended. Ex. 58, H.A. Depo. Tr. at 45:4-17; Ex. 6, S.T. Depo. Tr. at 70:7-14. School administrators did not try to identify or interview any of the other 100 members of the Morgaine/Gawain Snapchat group; did not investigate who else was in the group; and did not ask H.A., S.T., or L.B. whether they could identify any of the other members. Ex. 10, 30(b)(6) Depo. Tr. at 226:1-227:3, 227:21-228:1. CRMS never asked H.A., S.T., or L.B. to show additional racist messages on the Morgaine/Gawain Snapchat group. *Id*. at 227:9-15. There are also no written notes or documentation of any formal interviews conducted with H.A., S.T., and L.B. *Id*. at 227:16-20. Despite the fact that Mr. Loucks led the purported investigation, *see* Ex. 3, Veit Depo. Tr. at 247:19-23, Mr. Loucks could not recall any details about his investigation into the Morgaine/Gawain Snapchat group. *See, e.g*., Ex. 52, Loucks Depo. Tr. at 195:24-196:3 (could not recall anything he discussed with Principal Veit or Assistant Principal Streander); *id*. at 196:23-197:2 (could not recall anything he did after meeting with the other administrators), *id*. at 200:12-16 (could not recall any steps he took in the investigation). Mr. Loucks and Principal Veit never interviewed J.G. about the Morgaine/Gawain Snapchat posts. *Id*. at 184:6-7; Ex. 3, Veit Depo. Tr. at 249:22-24. CRMS conducted no investigation to identify which Black students saw the racist

messages in the Morgaine/Gawain Snapchat group. *Id*. at 263:5-8. Superintendent Erin Kane never spoke with any CRMS administrators about the purported investigation. Ex. 8, Kane Depo. Tr. at 56:13-57:3.

130.    Admitted in part and denied in part. Admit that Snapchat posts were reported to law enforcement. Deny that the District or CRMS sent the Snapchat posts to law enforcement. On April 20, 2023, Ms. Ganzy called the police after she left the District offices, *see* Ex. 31, Lacey Ganzy Depo. Tr. at 175:10-23, and sent some of the Morgaine/Gawain Snapchat posts to the School Resource Officer David Knight via text message. Ex. 59, Text to Officer Knight dated 4/20/2023.

131.    Admit with clarification. Admit that CRMS administrators notified the District's Compliance Office about the Morgaine/Gawain Snapchat group. Clarify that Ms. Ganzy and J.G. met with Mr. Loucks on April 20, 2023 in the morning, but Principal Veit did not notify the compliance officer Aaron Henderson of the Morgaine/Gawain Snapchat group until April 25, 2023, *see* Ex. 54, Veit Email dated 5/22/2023, notwithstanding knowledge of the communications prior to this time. *See* RSUMF 61, 124, 127.

132.    Admitted in part and denied in part. Admit that S.T. and H.A. posted racial slurs and death threats on the Morgaine/Gawain Snapchat group, and that H.A. was suspended for three days. Deny that S.T. was suspended for a full week. S.T. was suspended for four days for posting racial slurs on the Morgaine/Gawain Snapchat group. Ex. 60, S.T. Behavior Detail Report at 1. Deny that S.T. and H.A. were the only students who posted racially derogatory messages on the Morgaine/Gawain Snapchat group. *See* ASF 34-37, 40. Defendants made no effort to investigate or identify the other students who posted racially derogatory messages in the Morgaine/Gawain Snapchat group. *See* RSUMF 129.

133.     Admit with clarification. Admit that the only punishment L.B. received – despite posting a meme in the Morgaine/Gawain Snapchat group depicting a brown Piglet from Winnie the Pooh with the caption "Niglet", *see* ASF 34 – was a brief educational assignment where he had to reflect on the "impact of [his] comments." Ex. 10, 30(b)(6) Depo. Tr. at 193:8-24. Despite posting this racist message in the Morgaine/Gawain Snapchat group, the District claims that L.B. was only "indirectly involved" in the Snapchat group. *Id*. at 193:8-12.

134.     Admitted in part and denied in part. Admit that S.T. was suspended for three days for posting additional messages in a Snapchat group. Deny that S.T.'s suspension was an "out-of-school" suspension. S.T. received "in school" suspension. Ex. 60, S.T. Behavior Detail Report at 1; Ex. 6, S.T. Depo. Tr. at 91:8-12. Deny that S.T.'s messages were only about the Morgaine/Gawain Snapchat group being reported. School records acknowledge S.T.'s statements "created a text thread that incited more attention to the victim." Ex. 60, S.T. Behavior Detail Report at 1. After J.G. reported the Morgaine/Gawain Snapchat group to Mr. Loucks on April 20, 2023, students renamed the Morgaine/Gawain Snapchat group to "Free [S.T.]." Ex. 6, S.T. Depo. Tr. at 60:22-62:9 (noting that the "Free [S.T.]" Snapchat group was the "same group chat" as the Morgaine/Gawain Snapchat group). S.T. posted in the chat, "Whoever the fuck sent those screenshots to the school . . . fuck you. I have nothing . . . the FUCKING SCREENSHOTS OF ALL THE RACIAL SLURS." *Id*. at 62:10-15, 63:2-16. S.T. wrote "my blood is on your hands." Ex. 60, S.T. Behavior Detail Report at 1. Student T, then exclaimed "it's [J.G.]" and student H.A. responded "wtf [J.G.] that's fucked up." Ex. 58, H.A. Depo. Tr. at 40:8-21; *see also* Ex. 61, Video of Snapchats at 0:00-0:42. O.M. then posted "#free[S.T.]" and student T. posted "[J.G.] don't [die]" with a skull emoji. Ex. 61, Video of Snapchats at 0:00-0:42.

135.     Admitted with clarification. Admit Mr. Loucks had the SRO Officer meet with S.T. Clarify that this meeting took place on April 28, 2023. Ex. 62, Email from Loucks dated 1/8/2025.

136.     Deny. Principal Veit did not offer Ms. Ganzy support for J.G. to return to CRMS. Principal Veit merely told Ms. Ganzy that J.G. could transfer to Mesa Middle School or Principal Veit could "walk[] J.G. to and from class" at CRMS. Ex. 31, Lacey Ganzy Depo. Tr. at 160:16-161:21, 163:9-16. Ms. Ganzy was "deeply concerned about [her] son [J.G.'s] safety. He [was] fearful [of] returning to school due to potential persecution by his peers." *Id*. at 166:8-10. No safety plan was ever discussed with Lacey Ganzy or J.G. *Id*. at 160:16-161:21, 163:9-16, 173:8-13; Ex. 23, J.G. Depo. Tr. at 130:3-5.

137.     Deny. Principal Veit only allegedly drafted no-contact contracts for H.A. and S.T. *after* J.G. stopped attending CRMS. On April 20, 2023, Ms. Ganzy told the school over the phone that J.G. would not return to CRMS. Ex. 31, Lacey Ganzy Depo. Tr. at 174:18-175:12. On April 26, 2023, Ms. Ganzy emailed Principal Veit informing him that J.G. would not be returning to CRMS due to the racial harassment and ongoing safety concerns at the school. Ex. 63, Email from Lacey Ganzy dated 4/26/2023 at 1. Defendants never produced a copy of S.T.'s purported no contact contract in discovery and have produced no evidence that S.T.'s no contact contract was created prior to J.G. leaving CRMS.  H.A.'s no contact contract was signed by H.A., his parent, and Principal Veit on April 28, 2023 – eight days after J.G. already withdrew from CRMS and two days after Ms. Ganzy emailed Principal Veit about the withdrawal. Ex. 64, H.A. Signed No Contact Contract dated 4/28/2023. Deny that Principal Veit examined H.A., S.T., and J.G.'s schedules to ensure J.G.'s safety. Principal Veit changed H.A.'s schedule because H.A's "mom did not want [H.A.] in class any longer with [S.T.] and so [H.A.'s] schedule changed so that they were no longer in any shared classes together." Ex. 3, Veit Depo. Tr. at 252:8-12. Furthermore, no one ever spoke

with Ms. Ganzy or J.G. about a no-contact contract. Ex. 31, Lacey Ganzy Depo. Tr. at 140:7-10; Ex. 23, J.G. Depo. Tr. at 126:3-19.

138.    Admit with clarification. Admit that Ms. Ganzy decided J.G. would not return to CRMS. Clarify that she did so on April 20, 2023 and communicated her decision to the school over the phone that same day. Ex. 31, Lacey Ganzy Depo. Tr. at 174:18-175:12, 177:14-15.

139.    Deny. Principal Veit did not voluntarily assist in J.G.'s transition to the online program. J.G.'s attorneys had to contact the school in order to get J.G. enrolled online because CRMS "did not make that transition . . . easy." *Id*. at 168:25-170:20.

140.    Deny. S.T. did not believe his discipline for the racial death threats on the Morgaine/Gawain Snapchat group was fair in comparison to previous discipline he received at CRMS for other issues, such as marijuana possession. S.T. testified that "it doesn't seem right" that CRMS suspended S.T. longer for marijuana possession (5-day suspension) earlier in the year than for the racial threats on Snapchat (4-day suspension) because "harassment . . . is more serious than the marijuana." Ex. 6, S.T. Depo. Tr. at 75:18-77:7. Further, S.T. understood that possessing marijuana did not harm other CRMS students, *id*. at 34:17-19, whereas his Snapchat posts "most definitely would be threatening and violent." *Id*. at 52:1-6.

141.    Admitted in part and denied in part. Admit that S.T. was generally taught those concepts throughout his childhood education but deny that CRMS specifically taught S.T. about racial harassment. S.T. did not receive any instruction or classes about racism after posting the racial threats on Snapchat. *Id*. at 78:2-15. S.T. did not receive any training or education at CRMS about racism, discrimination, or bias. *Id*. at 84:16-24. S.T. knows he was taught that demeaning people because of their race was wrong but cannot recall where he learned it, much less recall receiving such instruction at CRMS. *Id*. at 78:2-15.

**Facts Regarding D.C.**

142.    Admit.

143.    Admitted in part and denied in part. Admit that on March 10, 2023, D.C. told his math teacher that another student, C.B., called him "monkey boy." Deny that this statement encompasses the entirety of D.C.'s report. D.C. submitted a written incident report to CRMS administrators stating that C.B. called him "monkey boy" in the hallway at school, D.C. asked her to stop, and C.B. then said "by[e] monkey boy." Ex. 65, D.C. Incident Report dated 3/10/2023. D.C. also reported on the incident report that, "I talked to her before, and she referred to [C.M.] as 'monkey [M]' and said that he turns into a monkey at night." *Id*.

144.    Admit.

145.    Admit.

146.    Admit.

147.    Admitted with clarification. Admit Mr. Loucks disciplined C.B. for calling D.C. a "monkey boy." Ex. 10, 30(b)(6) Depo. Tr. at 218:14-20. Clarify that there is no evidence that the District ever disciplined C.B. for referring to C.M. as "monkey [M]" or saying that C.M. "turns into a monkey at night," despite having knowledge of those racial slurs. *See* RSUMF 143 (D.C.'s report about multiple incidents involving C.B.).

148.    Admitted in part and denied in part. Admit that the school counselor held a meeting with D.C. and C.B. where C.B. apologized, but deny that the meeting was restorative in nature. D.C. told the counselor that the situation "made me feel like super uncomfortable, because I don't even really know [C.B.], and she just like started saying racist stuff to me, and it made me feel like I had to put my guard up anytime I saw her." Ex. 66, D.C. Depo. Tr. at 19:22-21:2. D.C. felt like

C.B.'s apology in the meeting was not "genuine" because she was simply trying to end the meeting. *Id*. at 21:6-22.

149.    Admit.

150.    Deny. On March 10, 2023, D.C. reported to CRMS administrators that C.B. had previously called C.M. "monkey [M]" and said that C.M. "turns into a monkey at night." *See* RSUMF 143. Approximately a week later, another student K. made a "racist comment" to D.C., and D.C. reported K's comment to Principal Veit near the front door of the school. Ex. 66, D.C. Depo. Tr. at 70:4-71:25, 75:7-17. Additionally, that Spring, at a pod meeting with teachers and Mr. Veit present, D.C. talked about how students made comments that because he is mixed race, he is not "black enough" or "white enough." *Id*. at 44:4-19, 48:5-15; Ex. 3, Veit Depo. Tr. at 263:22-265:20. Specifically, D.C. said that other students called him "white man" which made him "super uncomfortable." Ex. 66, D.C. Depo. Tr. at 48:5-15.

151.    Admit with clarification. Admit that D.C. could not identify any adults who might have witnessed students using racially offensive language. Clarify that to the extent that Defendants ask the Court to ignore other evidence, aside from D.C.'s personal subjective knowledge, of adults at CRMS who witnessed or learned of racially offensive language, Defendants ignore the complete record. *See* RSUMF 41, 45-48, 52-53, 61, 63, 69, 73-74, 80, 83, 94, 96-97, 105, 118, 123-124; *see also* ASF 8, 10, 13-14, 25, 43-54, 58, 61-63, 71, 78, 87.

152.    Admit.

153.    Admit with clarification. Admit that when D.C. was in the seventh grade, Ms. Clark asked her son if he wanted to report students using racial slurs to his teachers. Clarify that D.C. did not merely say he did not want to speak to a teacher. D.C. told Ms. Clark that he was sure that

the teachers had already heard the racial slurs and he was afraid of stirring up trouble. Ex. 67, Alexis Clark Depo. Tr. at 48:17-49:6.

154.   Admitted in part and denied in part. Admit that Ms. Clark did not report any incidents to CRMS. Deny that Ms. Clark did not feel that D.C. was under any threat or subjected to harassment during his time at CRMS. After incidents of discrimination in the seventh grade and eighth grade, D.C. began "heavily talking" to his mother about racist slurs "every day and every morning." *Id*. at 48:9-16. Ms. Clark could tell the harassment was making D.C. "uncomfortable to a point where he was no longer wanting to either sit with those certain peers that were within those groups," and she observed "it was really affecting him." *Id*. Ms. Clark believed that CRMS put her son in a situation "that's not a safe environment" when they forced D.C. to have a meeting with C.B. *Id*. at 77:3-20.

155.   Admitted in part and denied in part. Admit that D.C. did not have a cell phone in 2022-2023. Deny that D.C. did not see racist messages. Defendants' cited evidence does not support that D.C. never saw any offensive group chat messages. *See* Ex. 66, D.C. Depo. Tr. at 38:19-39:1 (stating that he did not know about a Morgaine group chat). In fact, D.C. personally saw racially offensive memes about C.M. that students were posting on social media. *See* RSUMF 157.

156.   Admit.

157.   Admitted in part and denied in part. Admit that a student, K., showed D.C. a picture of C.M. with the caption "Monkey [M]" and that no adults were present and that D.C. did not tell anyone. Deny that Defendants' characterization of the photo caption is accurate. The student showed D.C. a photo of C.M. "standing behind a staircase so it looked like jail bars" and the

43

caption was "Monkey [M] finally behind bars." *Id*. at 35:22-36:4, 37:10-15. This photo of C.M. was posted on a social media site by student K. *Id*. at 36:11-17.

158. Admit.

159. Admitted in part and denied in part. Admit that Ms. Clark did not consider pulling D.C. out of school at CRMS. Deny that Ms. Clark was not concerned about his safety or well-being. After she learned about the Morgaine/Gawain Snapchat feed, Ms. Clark became more worried about D.C.'s safety, and called CRMS to make a larger issue out of the harassment. Ex. 67, Alexis Clark Depo. Tr. at 145:6-13.

**Additional Facts Regarding DCSD and CRMS**

160. Admitted in part and denied in part. Admit that CRMS administrators met with District staff in January 2023 and March 2023. Deny that these meetings addressed school-wide practices to combat bullying or harassment in so much as Defendants imply this meeting had anything to do with racism or racial harassment or bullying. In January 2023, CRMS staff met with district personnel to discuss tier one social-emotional learning lessons to work only on "empathy and understanding." Ex. 18, Streander Depo. Tr. at 199:3-6, 170:21-171:1. Defendants have produced no evidence that these meetings addressed racial harassment.

161. Admit with clarification. Admit that it is Assistant Principal Loucks' regular practice to reiterate the code of conduct with students on an annual basis. Clarify that this practice did not include instruction on discrimination or racial harassment. CRMS students received no training on racial harassment and bullying, and teachers and administrators at CRMS did not talk to students about racism. Ex. 4, T.E. Depo. Tr. at 21:14-22:1; Ex. 5, O.M. Depo. Tr. at 42:23-25; Ex. 6, S.T. Depo. Tr. at 84:16-24; *see also* Ex. 68, S.B. Depo. Tr. at 37:3-38:22 (testifying that

44

first time any administrator came to her class to talk about racism was during the pod meeting after the Morgaine/Gawain Snapchat group was exposed).

162. Admitted in part and denied in part. Admit that Assistant Principal Loucks developed a presentation for students in the Spring of 2023. Deny that the presentation addressed the "negative impacts of racially derogatory language." Mr. Loucks' presentation discussed "rude" or "mean behavior" and the importance of creating "a positive, respectful, and kind school culture"; the presentation did not address racism or racial harassment. Ex. 22, Loucks' Presentation at 1-3; *see also* Ex. 53-2 at 7, Response to Rog. 4 (identifying DCSD 000095–000111 as the "class-by-class materials" which were "developed and conducted by Loucks"). Moreover, teachers and administrators at CRMS did not talk to students about racism, nor did they provide any training on racial harassment to students. *See* RSUMF 161.

163. Deny. The Student Research Reflection Racial Sensitivity Exercise was not created after the meeting with District staff in January 2023 but was created in 2022. Ex. 10, 30(b)(6) Depo. Tr. at 153:1-4. CRMS also did not consistently use the Student Reflection Racial Sensitivity Exercise during the 2022-2023 school year. *See* Ex. 18, Streander Depo. Tr. at 54:12-55:16, 57:12-20 (maybe used the exercise twice, and certainly not in "every circumstance" of racial harassment). Students who posted threats on the Morgaine/Gawain Snapchat group to "remove blacks from this planet" and "get me a buckshot and shoot me a nigger" were not required to complete the exercise, including S.T. and H.A. *See* Ex. 10, 30(b)(6) Depo. Tr. at 192:15-193:13 (noting that the discipline that S.T. and H.A. received was suspension); *see* ASF 26-33 (S.T. and H.A.'s Snapchat posts).

164. Admit.

165. Admit with clarification. Admit that Principal Veit attended the pod meeting. Clarify that Mr. Veit did not organize the meeting, play any part in facilitating the meeting, and

could not recall whether he even spoke to the students. Ex. 3, Veit Depo. Tr. at 264:14-20, 265:19-224 (the students on the "school leadership" team organized the pod meeting); *see also id*. at 270:16-20.

166.    Admit.

167.    Admit with clarification. Admit that District Deputy Superintendent Danelle Hiatt met with students at CRMS on May 16, 2023 to hear their experiences regarding the general learning environment. Clarify that Deputy Superintendent Hiatt did not meet with multiple Black students at CRMS. She met with only one Black student. *Id*. at 287:6-10.

168.    Deny. Admit that Defendants quoted Principal Veit's declaration accurately. Deny his good faith in exercising his duties. Principal Veit was aware of pervasive racial harassment at CRMS and failed to take action when he could have prevented the harassment. *See* RSUMF 105, 107, 109 (e.g., failed to open any investigation when J.G. submitted a complaint of racial harassment); ASF 26-40, 59-79, 94. Moreover, Principal Veit treated white students who experienced harassment differently than Black students who experienced the same. *Compare* RSUMF 111 (declining to speak with J.G., a black student, about his racial harassment complaint) *with* ASF 102-103 (promptly attempting to contact a white student who was allegedly called a "cracker").

169.    Deny. The Board of Education's newly elected majority did not seek greater input from the community to improve the Educational Equity policy. To the contrary, the Board majority wanted to rescind District Policy ADB: Educational Equity (the "Equity Policy") in an effort to eliminate what they deemed to be "critical race theory" from the District's educational programing. Ex. 9, Ray Decl. at ¶¶ 32-33, 36-37. The new Board Members had campaigned on core issues of rescinding the Equity Policy and eliminating Diversity Equity and Inclusion ("DEI") from DCSD

46

policies, emphasizing that the "Board should not be talking about race" and questioning "the need for a separate policy addressing protected groups." *Id*. at ¶¶ 32-33, 36-37; *see also* Ex. 13, Shaw Report at 40-41.[8]

170.    Deny. The Board majority wanted to rescind the Equity Policy. *See* RSUMF 169. The Board received significant pushback from community members about rescinding the Equity Policy and therefore decided to revise the policy instead. Ex. 9, Ray Decl. at ¶ 38. Furthermore, the Board majority did not seek to revise the Equity Policy in response to *any* of the racial harassment that Plaintiffs endured. Ex. 8, Kane Depo. Tr. at 87:5-15 (Equity Policy not changed in response to any "particular incident" of harassment); Ex. 10, 30(b)(6) Depo. Tr. at 95:24-96:3 (changes to the Equity Policy were "prompted" by "the transition of the board"); *see also* Ex. 3, Veit Depo. Tr. at 42:11-12.

171.    Admit with clarification. Admit the District partnered with Hanover Research. Clarify that the District did not do so *in response* to any of the racial harassment that Plaintiffs endured and made no changes to their policies in response to the events detailed in this case. *See* Ex. 10, 30(b)(6) Depo. Tr. at 90:14-91:21 (the board hired Hanover Research to seek "stakeholder input" for the Board's goals regarding the Equity Policy); *see also* RSUMF 2, 169-170.

172.    Admit with clarification. Admit that Hanover presented its findings to the Board and other follow-up occurred. Clarify that Superintendent Kane's monitoring report, presented to

---

[8] For example, Director Mike Peterson lamented that DCSD "brought in consultants for $37K to push CRT on our teachers. They [the consultants] defined 'the system' as racist and 'White, male, able, Christian, and straight'…set[ting] up the false oppressor/victims paradigm based solely on race and urged collective action against the system." *See Corey Wise on Discrimination Charge against Dougco Schools, Four Boardmembers*, WESTWORD, https://www.westword.com/news/corey-wise-discrimination-charges-douglas-county-school-board-update-13876680/ (last accessed Jan. 14, 2026). Director Peterson also complained about the previous board's "race-based policies that are discriminatory and will only set our kids up for failure" and contended that critical race theory "would teach his own children that their father…is an oppressor based on historical actions of others and [that] two of them are permanent victims that cannot improve their station in life." *Id*.

the Board on May 23, 2023, only contained "student data . . . from the fall of 2021" and did not contain any data from the 2022-2023 school year when Plaintiffs J.G., C.M., and D.C. experienced racial harassment at CRMS. *See* Ex. 69, Board Meeting Minutes dated 5/23/2023 at 9.

173.    Admitted in part and denied in part. Admit that the Board expanded the definition of "diversity" to include "cognitive" and "instrumental" diversity in the Equity Policy and adopted the revised version in May 2023. Deny that the revised policy includes "learning preference." *See* Ex. 70, Equity Policies.

174.    Admitted in part and denied in part. Admit that the revised policy states as a goal to increase "a sense of belonging" and that "belonging" is defined as "when all students feel appreciated, validated, accepted, and valued as part of an inclusive learning environment." *Id*. at 1-2. Deny that the Equity Policy set a goal of increasing all students' sense of belonging, particularly with respect to students of color. Ex. 10, 30(b)(6) Depo. Tr. at 98:14-23 (declining to specifically answer what the District's official position is on the motives for the changes to the Equity Policy, and instead answering "each board member shared what they felt on record of their own individual position"); Ex. 9, Ray Decl. at ¶ 42 (during their campaign, the new Board Members "capitalized on the public frustration with the term 'equity'" framing the issue "as one that taught White students to feel 'guilty' for their race"); *id*. at ¶¶ 47-48 (the Board members consulted with a group called FAIR which "advocates for the elimination of what it perceives as reverse discrimination" and advocates against DEI programs); *id*. at ¶ 54 ("We repeatedly warned the [Board majority] that their revisions [to the Equity Policy] would harm students of color in the District.").

175.    Deny. The 2023 Equity Policy contained many substantive changes. The 2023 Equity Policy "placed the Equity Advisory Council under the Superintendent's control,

compromising its independence," which could "subject the council to political influence." *Id*. at ¶ 59. The 2023 Equity Policy also "eradicated the previous policy's definition of 'diversity.' It created ostensibly neutral distinctions between 'identity diversity,' 'cognitive diversity,' and 'instrumental diversity.'" Ex. 13, Shaw Expert Report at 40. The Board's dilution of the Equity Policy allowed racism to flourish in DCSD schools. *See* Ex. 9, Ray Decl. at ¶ 50-51 (noting that when Board Member Ray visited a classroom, "the teacher appeared visibly uncomfortable and nervous teaching about the horrors of slavery and the conditions on slave ships. She expressed fear that discussing slavery could result in disciplinary action against her."); *see also id*. at ¶ 61 ("After the Board revised the Educational Equity policy, the culture shifted dramatically in the District, leaving school leaders uncertain about their responsibilities. I believe this confusion still persists in the District, particularly around how principals should address racial harassment and hate speech.").

### ADDITIONAL STATEMENT OF FACTS (ASF)

1.    Plaintiffs J.G., C.M., N.G., and D.C., are Black and biracial students. Ex. 31, Lacey Ganzy Depo. Tr., 55:11-19; Ex. 71, Person Summary Report; Ex. 66, D.C. Depo. Tr., 48:7-13.

2.    In the 2022–2023 school year, CRMS enrolled only six Black students in seventh and eighth grade out of 747 total students; DCHS enrolled 38 Black students out of 601 total students.  Ex. 72, Enrollment Summary Report; Ex. 73, Douglas County Student Enrollment Summary Report.

### Douglas County School District's Racially Hostile Educational Environment

3.    In November 2021, a slate of four Board candidates—Christy Williams, Becky Myers, Mike Peterson, and Kaylee Winegar—were elected after running a joint campaign that

prioritized "parental rights," "eliminating CRT," and "removing divisive curriculum." Ex. 9, Ray Decl. ¶ 14.

4.    Just months after taking office, Board members criticized the District's equity and inclusion efforts as being "divisive" and then fired Superintendent Corey Wise in January of 2022 because he continued the District's equity and inclusion efforts. The new majority fired him without cause in February 2022. *Id*. at ¶¶ 19-20.

5.    In 2022, the Board dissolved the District's "Educational Equity Policy," eliminated its Equity Advisory Council, and reassigned or removed staff with equity-related roles. *Id*. at ¶¶ 21-22.

6.    The Board directed staff not to use terms like "microaggression," "systemic racism," or "White privilege," and ignored student and teacher concerns about racism at school board meetings. *Id*. at ¶¶ 24-26.

7.    The 2023 revisions to the Educational Equity Policy significantly weakened its substance by eliminating the prior definition of diversity as "identity like the races, colors, ancestries, creeds, sexes, genders," replacing it with vague categories such as "Identity Diversity," "Cognitive Diversity," and "Instrumental Diversity," and removing the District's commitment to "culturally relevant, responsive, and sustaining learning environments," which was replaced with the general term "empowered." Ex. 74, Policy ADB Redline.

<strong>Additional Facts of Harassment of N.G.</strong>

8.    In addition to being called a "fat cotton picker" and the "N-word" at CRMS, *see* RSUMF 23–24, 27,  N.G. was subjected to other acts of racial harassment. For example, in the 2020-21 school year at CRMS, a white student screamed "All Lives Matter" directly in the face of N.G.'s Black friend while N.G. stood directly with her. "All Lives Matter" is commonly used to

undermine and dismiss the concerns raised by the Black Lives Matter movement. Ex. 27, N.G. Depo. Tr., 127:20-128:8. Principal Veit was aware that the student screamed "All Lives Matter" to a Black student. *Id*. at 132:4-13.

9.    During that same school year, the front desk secretary, Roberta [LNU] required N.G. to change out of her shorts during gym class, confiscated the shorts, and placed them in a drawer, even though white female students were wearing similar or shorter shorts without discipline. *Id*. at 58:1-59:16.

10.    When N.G.'s mother, Lacey Ganzy, came to the office and questioned the racist disparity, specifically complaining about racism, Ms. Roberta stated that N.G. had a "different" body than the white student so only N.G. had to take her shorts off. Ex. 31, Lacey Ganzy Depo. Tr., 42:16-43:13; Ex. 27, N.G. Depo. Tr., 58:1-59:16. Ms. Ganzy spoke with Ms. Roberta and Mr. Loucks about this incident. *Id*. at 62:25-63:14.

11.    Students called N.G. a "monkey" nearly every day at CRMS. Ex. 31, Lacey Ganzy Depo. Tr. 43:18-44:12.

12.    CRMS students also called N.G. "Ethiopian" and "dirty-skinned," and told her to "go back to her country." Ex. 31, *Id.* at 45:1-17.

**Additional Instances of Racial Discrimination Suffered by C.M., J.G., and D.C.**

13.    As admitted by Defendants above, while C.M. attended CRMS, students called him the N-word and "Monkey M." *See* RSUMF 45; *See* RSUMF 46. Additionally, on November 4, 2022, a student submitted an incident report to CRMS reporting that, in addition to S.B. calling C.M. the N-word during gym class on November 1, 2022, S.B. has also called C.M. the N-word "many times" throughout the 2022-23 school year and called him a "monkey". Ex. 75, Incident Report dated 11/4/22; Ex. 37, C.M. Depo., 27:15-23.

51

14.     Even after CRMS suspended S.B. from school for three days for calling C.M. the N-word on November 1, 2022, Assistant Principal Loucks heard S.B. call C.M. a "monkey" the Friday after she was suspended. Ex. 76, DCSD 001144; *see also* RSUMF 51.

15.     During the 2022-23 school year, White students at CRMS, including N.B. and T.E., repeatedly asked C.M. and D.C for "N-word" passes, allowing them to freely use the "N-word" around students because Black and biracial students supposedly had given them the free pass to do so. Ex. 66, D.C. Depo. Tr., 28:19–29:1; Ex. 37, C.M. Depo. Tr. 37:7-20.

16.     As admitted by Defendants above, while D.C. attended CRMS, students called him "Monkey Boy." *See* RSUMF 147. Additionally, throughout 2022-2023 school year, many students called D.C. a "monkey" and made monkey noises around him in the hallways. Ex. 66, D.C. Depo. Tr. at 26:5-27:12, 28:1-12.

17.     Students also called D.C. a "cotton picker." *Id*. at 29:17-24.

18.     One student, T.E., heard other students use the N-word at school roughly **fifty times per day**, in classes, in the hallways, and at lunch. Ex. 4, T.E. Depo. Tr. at 42:20-43:7, 43:22-44:5. For example, student S.T. used the N-word at school "every other sentence." *Id*. at 43:17-21. At CRMS, "almost every" student said the N-word frequently. *Id*. at 43:13-16.

19.     T.E. overheard other white students, including S.T., call C.M. and J.G. the N-word to their faces at least every week. *Id*. at 44:18-45:4, 46:8-24.

20.     Principal Veit admitted that the escort plan implemented for C.M. could be "isolating" for a student who was "outgoing and social" like C.M., acknowledging the emotional and social impact the plan might have had on him. Ex. 3, Veit Depo. Tr., 214:11–215:14.

52

21.     As admitted by Defendants above, while J.G. attended CRMS, he submitted a complaint of racial harassment and discrimination to the District via an online feedback form. *See* RSUMF 105.

22.     Students laughed while throwing cotton balls at the back of J.G.'s head, calling J.G. the N-word and saying "I bet he likes fried chicken. I bet he likes watermelon," and waited for him "to pick up the cotton."  Ex. 23, J.G. Depo. Tr., 47:11–25; see also RSUMF 93.

23.     During a school assembly, staff confiscated J.G.'s phone, while allowing numerous White students who were near J.G. to continue using their phones to record the assembly or scroll through social media. *Id*. at 97:14–22, 99:4-17, 101:11-102:1.

24.     J.G. learned of the Morgaine/Gawain Snapchat group sometime in the spring of 2023 when M.B. invited him to join the group. *Id*. at 31:9-32:1, 71:6-13.

25.     At the April 20, 2023, meeting, Mr. Loucks told Ms. Ganzy that he was aware of students who shaved their heads and called themselves skinheads, threatened to lynch Black students, and formed a "white supremacist group" at CRMS. Ex. 31, Lacey Ganzy Depo. Tr., 127:1-11; *Id*. at 62:16-25.

26.     One screenshot from the Morgaine/Gawain Snapchat group showed S.T. writing, "I hate niggers." Ex. 77, 2023.04.20 Snapchat Screenshots at 3.

27.     Another screenshot from the Morgaine/Gawain Snapchat group showed S.T. writing, "Who wants to rob a vape store" along with an image where a Black male is seen masturbating. *Id*. at 4.

28.     Another screenshot from the Morgaine/Gawain Snapchat group showed S.T. writing, "n to the i to g to g to the e to the r." *Id*. at 5.

53

29.    Another screenshot from the Morgaine/Gawain Snapchat group showed ST stating, "I hate niggers" right below a photo of the back of J.G.'s head, evincing that S.T. was directly targeting J.G. in the Snapchat group. Ex. 78, Snapchat Picture of Chat; Ex. 23, J.G. Depo. Tr. at 32:3-19.

30.    Another screenshot from the Morgaine/Gawain Snapchat group showed S.T. writing, "I love nigges" followed by "fym," which stands for "fuck you mean." Ex. 23, J.G. Dep. 82:2–14; Ex. 77, 2023.04.20 Snapchat Screenshots at 6.

31.    Student S.T. posted a message stating, "we should j[ust] remove Blacks from this planet bring back [the] Holocaust [for real]." Ex. 77, 2023.04.20 Snapchat Screenshots at 1.

32.    H.A. responded to S.T.'s message about removing blacks from the planet by posting an image captioned "cool bananas" that depicted a Black person wearing a red shirt inside a banana peel with the statement "kys" (an acronym for "kill yourself"). Ex. 23, J.G. Depo. Tr., 78:13–79:5; Ex. 77, 2023.04.20 Snapchat Screenshots at 1.

33.    Then, H.A. posted "I'm a big truck driver trump supporter get me a buckshot and shoot me a nigger." *Id*. at 8.

34.    Students continued sharing racist memes in the Morgaine/Gawain Snapchat group, including L.B. sharing a meme depicting Piglet from Winnie the Pooh edited to have brown skin, with the caption altered to say "Niglet." Ex. 23, J.G. Depo. Tr., 83:4–13; Ex. 79, Snapchat Post.

35.    Beneath the edited Winnie the Pooh post, M.R. tagged J.G. indicating that the image was directed at and meant to be seen by J.G. *Id*.; Ex. 23, J.G. Depo. Tr. at 38:5-6 (identifying J.G.'s social media name on Snapchat).

36.    Another student named K also posted the slur, "Niglet." Ex. 79, Snapchat Post.

37.     In the Morgaine/Gawain Snapchat group, J.G. saw other racist comments, including "bring back slavery," "Black people shouldn't be free," and Black people should "go back to the field." Ex. 23, J.G. Depo. Tr. at 52:8-12.

38.     Student T.E. logged into the Morgaine/Gawain Snapchat group multiple times per day and saw students post the N-word nearly "every time" he logged into the chat. Ex. 4, T.E. Depo. Tr. at 25:19-26:9.

39.     On the Morgaine/Gawain Snapchat group, S.T. called J.G. a "monkey" several times because "Black people are black, so are monkeys." *Id*. at 26:10-27:20.

40.     After S.T. posted in the Morgaine/Gawain Snapchat group "we should [just] remove blacks from this planet bring back the holocaust," T.E. stated "its funny cuz were all white." Ex. 80, Additional Snapchat Posts; Ex. 4, TE Depo. Tr. at 295-25.

41.     Mr. and Mrs. Middleton, whose son D.M. is a Black student at CRMS, reached out and met with Principal Veit for forty-five minutes to an hour following the exposure of the Snapchat messages, stating they "wanted to know that their kid would be safe in school." Ex. 3, Veit Depo. Tr., 279:22–280:12.

42.     C.M., as part of the Morgaine Pod, saw the racist messages in the Morgaine/Gawain Snapchat and he also received some racist screenshots of the group via Airdrop. Ex. 37, C.M. Depo. Tr., 71:8-17, 72:2-4, 152:25-153:22.

**Additional Facts Demonstrating Defendants' Knowledge of Racial Harassment**

43.     Since 2021, Assistant Principal Loucks has received multiple reports involving students using the N-word. Ex. 81, Loucks email N Word; Ex. 82, Loucks email N Word 2; Ex. 83, Loucks email N Word 3.

44.     On October 13, 2022, a parent reported via email to her child's teacher that a student made racist comments in her class, including that he "hates Blacks" while "making gun noises" and gesturing as if he had a gun. The teacher forwarded the parent's email to Assistant Principals Loucks and Streander. Ex. 84, Loucks Emails Racism.

45.     Around November of 2022, Assistant Principal Loucks admits that he received a report from a Black female student that another student had repeatedly called her the N-word over Snapchat. Loucks confirmed the racial harassment and suspended the offending student for three days. Ex. 52, Loucks Depo. Tr., 113:8-19, 116:17-117:4, 133:7-134:4.

46.     On February 7, 2023, a teacher reported to Assistant Principal Streander that a student directed a racist comment toward a Black student in class, telling them to "go eat bananas." Ex. 85, Streander Emails.

47.     Also on February 10, 2023, C.M.'s mother, Misty Martin, left a voicemail for Assistant Principal Streander reporting that the bathroom photograph of C.M. was still circulating on the Morgaine/Gawain group Snapchat.  Ex. 86, Misty-Streander Email; Ex. 87, Plaintiffs' First Supp. to First Interrogatories at 6; *see also* Ex. 36, Misty Martin Depo. Tr. at 35:20-24.

48.     On March 29, 2023, Assistant Principal Loucks told Sara Curto, a principal at Sierra Middle School in Douglas County, "Besides the 'N' word, which is not the biggest issue, students have been calling students 'monkeys'. . .This is the biggest issue this year that I've struggled with the most."  Ex. 52, Loucks Dep. 235:2-7; 237:22; Ex. 88, Loucks Emails Racism 2. Assistant Principal Loucks felt like he didn't have a "strong way to approach" the racial slurs. *Id*. at 2.

49.     Assistant Principal Loucks knew on March 29, 2023, that a student said to another, "Pick up that mess faster or I'll whip you like a slave," an incident reported by four different students. *Id*.; Ex. 52, Loucks Dep. 235:12-236:20.

50.     Assistant Principal Loucks heard white students saying the N-word with C.M. present and did nothing about it. Ex. 37, C.M. Depo. Tr., 41:6–16. For example, one day, Mr. Loucks overheard students call C.M. the N-word, Mr. Loucks pulled C.M. aside, and C.M. reported that they said the N-word "a lot." *Id.* at 40:10-42:15. There is no evidence that the District ever disciplined any of these students or investigated the matter any further.

51.     After C.M. reported being called "Monkey [M]" to Assistant Principal Loucks, the harassment did not stop. *Id.* at 46:10–21.

52.     C.M. reported experiencing racial harassment to at least five different staff members at CRMS: Assistant Principals Loucks and Streander, guidance counselor Franklin, P.E. teacher Pilone, and math teacher Ms. Riant. *Id.* at 22:19–25, 48:15-17, 50:7-22, 88:22-89:90:2.

53.     On March 23, 2023, a teacher emailed Assistant Principal Loucks to report that, a few days earlier in class, a student shouted, "Black people are monkeys," causing several students to gasp in shock at the remark. Ex. 89, Loucks Email Chat.

54.     It is undisputed that on April 12, 2023, Principal Veit was informed by a student's parents that their child, R., had been repeatedly called "rice-eater" and "dog eater" by another student (A.) throughout the Spring 2023 semester. Ex. 90, Allegation of Discrimination and Harassment dated 4/12/23.

55.     During the April 20, 2023, meeting between Assistant Principal Loucks and Ms. Ganzy, J.G. showed Mr. Loucks a series of Snapchat messages containing the racist messages by S.T. and H.A and other students. J.G. scrolled through the messages on his phone and highlighted each one that involved racial or general discrimination. His mother took a photograph of J.G.'s phone screen to document the messages. Ex. 23, J.G. Depo. Tr., 74:4–75:1.

56.    On April 25, 2023, the Ganzy family attended the DCSD School Board meeting and informed the Board of the racial harassment the Ganzy family endured in Douglas County schools. Ex. 91, Board of Education Minutes.

57.    Throughout her employment at CRMS from February 2022 to December 2022, Ms. Franklin, the school social worker, told the Assistant Principals that CRMS should provide more training on racism to students and staff, and offered to provide that training. Ex. 1, Franklin Decl. at ¶¶ 8-40-41; Ex. 25, Franklin Depo. Tr. at 138:12-139:23. The Assistant Principals merely responded "we will have to see if the District agrees" with more training. Ex. 1, Franklin Decl. at ¶ 41; *see also* Ex. 25, Franklin Depo. Tr. at 139:20-23. Ms. Franklin never observed CRMS administrators provide any additional training on racism. Ex. 1, Franklin Decl. at ¶ 42.

58.    It is undisputed that on April 27, 2023, Assistant Principal Streander admitted to a parent that CRMS "teachers have heard the n-word in some classes and do address it, but they can't be certain what students are saying it. I will say this is something we seem to be hearing from students more and more." Ex. 92, Streander Emails 2.

**Principal Veit Demonstrates Deliberate Indifference and Failure to Intervene in the Students' Conspiracy to Deprive Black Students of an Equal Education**

59.    Mr. Veit was Principal of CRMS during the 2022-23 school year with authority to discipline students and ensure a safe environment. Ex. 93, Grounds for Suspension and Expulsion.

60.    Disciplinary decisions at CRMS were made collectively by the leadership team, including Principal Veit. He stated that "like all of our conversations," the decision to discipline a student would be "a team decision as we work through that." Ex. 3, Veit Depo. Tr., 127:12-15; Ex. 52, Loucks Depo. Tr., 131:18-23 ("any time an incident happens" the CRMS leadership team "sit[s] down" as a team to review the incident).

61.     On June 29, 2022, Principal Veit received an email reporting that another student, B.P., had called someone the N-word while a group of white classmates laughed, stating that the incident harmed the school's reputation and made students of color feel "less than." Ex. 94, Veit Email, Racism in School dated 6/29/22.

62.     Despite knowing that a student took a photograph with the intent to see C.M.'s genitals, see RSUMF 45, Veit failed to meaningfully investigate the racial intent. Ex. 3, Veit Depo. Tr. 133:9-134:10.

63.     It is undisputed that Principal Veit knew that S.B. called C.M. the N-word on November 1, 2022, *see* RSUMF 51, and even after S.B. was suspended out of school for three days for calling C.M. the N-word, *see* RSUMF 51, Principal Veit knew that on December 16, 2022, S.B. stated to S, another Black student, "If there was a purge, I would not save the Black students." Ex. 95, Allegation of Discrimination and Harassment dated 12/16/22. It is undisputed that Principal Veit knew S.B. continued to engage in further racial harassment incidents. Principal Veit knew that S.B. referred to C.M. as "monkey."  Ex. 3, Veit Depo. Tr. at 187:1-7. On December 16, 2022, Principal Veit knew that S.B. drew swastikas and the phrase "Nazi bus" on a wooden car at school. Ex. 96, Veit Email dated 12/16/22.; Ex. 3, Veit. Depo. Tr., 146:17–148:11. On February 24, 2023, Principal Veit learned that S.B. drew a picture of a monkey on a table in class. Ex. 97, Veit Text Message to Loucks and Streander.

64.     Following J.G.'s March 10, 2023, discrimination complaint, Principal Veit never prepared a written investigation report, explaining that "because it didn't really come with any other information, I didn't write one up." Ex. 3, Veit Depo. Tr. 230:25–231:6.

65.     It is undisputed that Principal Veit did not offer any counseling to J.G. after receiving his detailed written complaint of racial harassment. *Id*. at 234:15–19.

59

66.     It is undisputed that Principal Veit did not immediately share J.G.'s written complaint with his administrative team (Assistant Principals Loucks and Streander) or the superintendent. *Id*. at 233:1–234:6.

67.     It is undisputed that Principal Veit did not forward J.G.'s complaint of discrimination to the District's Compliance Officer. *Id*. at 29:14-24; 233:1-13; 235:13-15.

68.     Principal Veit also knew that C.B called D.C. a "monkey boy" because D.C. reported this incident to him on March 10, 2023. Ex. 66, D.C. Depo. Tr., 16:8-17:7; *see* RSUMF 147.

69.     In late March 2023, D.C. also reported to Principal Veit racist comments made to him by a White student named K. Ex. 66, D.C. Depo. Tr., 70:4-71:25, 75:7-17. Principal Veit told D.C. that he would "take care of it," *id*. at 71:7-9; but Defendants produced no evidence that Principal Veit ever investigated this incident, disciplined K., or provided any supportive measures to D.C.

70.     During a Spring 2023 school visit, Principal Veit told DCSD School Board member David Ray "racial discrimination and vaping were the two most frequent concerns he had to address as Principal." Ex. 9, Ray Decl. ¶ 74.

71.     Principal Veit was aware that his disciplinary decisions for racial harassment incidents at CRMS were not working. On April 3, 2023, Principal Veit texted his supervisor, Erin McDonald: "to tip today off we had a 7th grader use the n word. He's one that was already addressed for using monkey as a racial slur." Ex. 98, Text from Veit dated 4/3/2023.

72.     Although over 100 students participated in the racist Snapchat group, *see* RSUMF 61, Principal Veit despite having full discretion to discipline additional students chose to only discipline three students. Ex. 10, 30(b)(6)  Depo. Tr., 192:24-193:13.

73.     Principal Veit did not discipline these students until after Ms. Ganzy threatened to report the Snapchat incident to the media. Ex. 99, Messages - Danny Winsor & Erin McDonald & Amanda Thompson & Danelle Hiatt.

74.     Despite the severity of the Morgaine/Gawain Snapchat threats, Principal Veit did not speak with or interview any Black students.  Ex. 3, Veit Depo. Tr. 263:5–8.

75.     He also did not contact the mother of D.C., Ex. 3, Veit Depo. Tr. 262:16–25, nor did he contact C.M.'s mother to inform them of these racist Morgaine/Gawaine Snapchat messages. *Id*. at 263:1–4.

76.     It is undisputed that Principal Veit knew about and attended the pod meeting arranged by students at CRMS where students admitted making racist jokes, remarks, and comments. *Id*. at 264:5-15; Ex. 66, D.C. Depo. Tr., 50:5-10.

77.     It is undisputed that Principal Veit and no other administrator at CRMS helped organize or plan the meeting or provide guidance on the instruction. Ex. 3, Veit Depo. Tr., 264:11-19, 265:21-24.

**DCSD and Principal Veit's Further Deliberate Indifference to Racial Discrimination**

78.     On December 19, 2022, School Resource Officer David Knight emailed Principal Veit and Assistant Principals Loucks and Streander to raise concerns about a "heartbreaking uptick of what I couldn't define as other than hateful behaviors by some of our students." Ex. 3, Veit Dep. 167:24–168:13; Ex. 100, David Knight Email.

79.     Officer Knight explicitly acknowledged the district's legal obligations under federal civil rights law, stating in an email: under "Title VI" CRMS "cannot maintain an environment where a person feels like they can't attend school because they are of a protected class." *Id*.

61

80.     Despite receiving this warning from SRO David Knight, Assistant Principal Streander did not share Knight's Title VI email with staff and did not meet with school counselors or teachers to prepare support measures for Black students. *Id*.; Ex. 18, Streander Depo. Tr., 200:6–201:3.

81.     Following SRO David Knight's warning about the school's legal obligations under Title VI, Assistant Principal Streander admitted that racially hostile incidents continued to occur. *Id*. at 208:19–22.

82.     In response to racial discrimination or the racially hostile culture at CRMS, on April 20, 2023, Assistant Principal Loucks told Ms. Ganzy, "his hands were tied because there was nothing for him to go on to implement a punishment."  Ex. 31, Ganzy Depo. Tr., 136:6–10.

83.     Throughout the fall of 2022 and the first part of 2023, Assistant Principals Loucks and Streander spoke with Ms. Martin by phone multiple times stating that they were aware C.M. was experiencing racial harassment, but that "their hands were tied because of the policy at the district level." Ex. 36, Misty Martin Depo. Tr. at 35:2-36:6.

84.     In 2022, Assistant Principal Streander instructed school counselor Franklin to be "vague" when documenting racial incidents "in order to prevent a lawsuit against the school". Ex. 1, Franklin Decl. at ¶¶ 33, 56–58.

85.     On January 24, 2023, Assistant Principal Streander categorized an incident in which a student used the N-word in class as "behavior inappropriate," rather than identifying or documenting it as racial harassment. Ex. 101, Streander Emails 3.

86.     Assistant Principals Loucks and Streander expressed reluctance to confront or discipline white students at CRMS for racial bullying due to concern about backlash from their parents if their students were disciplined for racial bullying. Ex. 1, Franklin Decl. at ¶ 35.

87.     Throughout the 2022-23 school year, Counselor Franklin reported students using racial slurs in school to Assistant Principal Streander. Streander took no action in response to these reports and instead dismissed Franklin by telling her, "life is life." *Id*. at ¶¶ 31-32.

88.     Despite knowing that C.M. had to visit the emergency room due to the emotional toll of bullying and racial harassment at school, it is undisputed that Assistant Principal Streander never informed anyone else in the administration about the incident or the underlying causes, demonstrating a troubling lack of concern and urgency from a senior school official. Ex. 18, Streander Depo. Tr., 109:7–14.

89.     J.G. reported various racial slurs to his bus driver, Mr. Guy, and social studies teacher, Ms. Murphy, *see* RSUMF 94 and 97, but no evidence shows that Mr. Guy or Ms. Murphy ever reported these incidents to the administration or to the compliance office.  Ex. 23, J.G. Depo. Tr., 58:16-59:5.

90.     J.G. was frequently targeted in class with teachers present. *Id*. at 28:5-29:3 (science), 30:16-31:16 (advisement), 42:14-44:13 (English), 44:18-45:12 (shop), 59:19-25.

91.     It is undisputed that during an April 20, 2023, meeting with Ms. Ganzy, Assistant Principal Loucks acknowledged on video that he "does not know what to do" in response to racial discrimination or the racially hostile culture at CRMS. Ex. 102, Ganzy-Loucks Video Recording; *see also* Ex. 1, Franklin Decl. at ¶ 34.

92.     It is undisputed that Assistant Principal Loucks further acknowledged in this video recorded meeting that his job is not to bring the levels of racism down in the school but to eradicate it completely, yet did not provide Ms. Ganzy with any concrete steps he intended to take to do so. *Id*. at 9:30-9:50.

93.     CRMS administrators did not provide additional staff training on racial harassment after the Morgaine/Gawain Snapchat messages became public. Assistant Principal Loucks confirmed he had no conversations with the Superintendent, Assistant Superintendent, or school board members about the racist Snapchat messages. Ex. 52, Loucks Depo. Tr. 223:18–225:1; 228:10–20; 229:7–11.

94.     Principal Veit and Assistant Principal Streander repeatedly blamed C.M. rather than protect him. For example:

a.      Ms. Streander wrote that C.M. had an "underlying problem that we can't seem to get to the root of" suggesting a fundamental personal issue rather than acknowledging peer harassment. Ex. 103, Streander 2/22/23 Email ; Ex. 18, Streander Depo. Tr., 127:21–128:5.

b.      When C.M. said he was "tired of getting pushed around and tired of walking away," it is undisputed that Ms. Streander did not consider this a "cry for help" and so did nothing. *Id*. at 137:5–9.

c.      Principal Veit and Assistant Principal Streander wrote that C.M. was "stirring the pot" and needed to "get out of all the drama." *Id*. at 191:18–25; Ex. 3, Veit Dep. Tr., 208:10; 210:6–13.

d.      Assistant Principal Streander described C.M. as not forthcoming and accused him of "bartering information," when he told her he did not want to be "a snitch," and that "he would deal with things." Ex. 18, Streander Depo. Tr., 185:15–187:1; 194:4–6.

e.      Assistant Principal Streander further attributed C.M.'s difficulties to what she described as his "need to be involved in everything." *Id*. at 191:18–22.

95.     After the Morgaine/Gawain group chat was leaked, students deleted messages to avoid consequences.  Ex. 4, T.E. Depo. Tr., 69:5–10; 85:2-10. For example, S.T. deleted all his text messages and Snapchat messages. Ex. 6, S.T. Depo. Tr., 21:19-22:17.

96.     Following the leaked Snapchat messages, CRMS administrators never asked to see S.T.'s phone or his Snapchat and text messages to uncover any other potentially threatening messages. *Id*. at 24:2-5.

97.     Despite T.E's involvement in the racist Morgaine/Gawain Snapchat messages, none of the school's administrators—Principal Veit, Assistant Principal Loucks, or Assistant Principal Streander—ever spoke with T.E. individually about the group or the incident. Ex. 4, T.E. Depo. Tr., 72:11–73:2.

98.     Although S.T. was suspended longer for possessing marijuana than for posting racial death threats in the Morgaine/Gawain Snapchat group, *see* RSUMF 140, Principal Veit defended the disparity in discipline, stating: "I think we handled the incidents appropriately." Ex. 3, Veit Depo. Tr. 274:5–275:21.

99.     In late April or May 2023, students decided to hold a meeting for the Morgaine Pod. During the meeting, Ms. Murphy "called up all the African American students in the pod" and had white students admit what they said and explain why they said it in front of Black students. Ex. 23, J.G. Depo. Tr., 104:19-105:13.

100.    During the Morgaine Pod meeting, "the main four people who did the most racial bullying in school" were allowed to speak and present themselves as "nice and kind." Ex. 37, C.M. Dep. Tr.,160:1–20. N.B. participated in the Pod Meeting despite being widely known for his racist behavior. *Id*.

101.    CRMS students never received any training on racial harassment or bullying, and teachers and administrators at CRMS did not talk to students about racism. *See* RSUMF 12 (multiple students testifying to no training); *see also* Ex. 3, Veit Depo. Tr. at 36:24-37:2 (Principal Veit's testimony that he was unaware of whether CRMS' social and emotional learning trainings discussed racism).

102.    Principal Veit admitted that no counselors, psychologists, or restorative justice professionals were involved in planning or overseeing the Morgaine Pod meeting. Ex. 3, Veit Depo. Tr., at 268:6-12

**District's Treatment of White Students who Complain of Racial Harassment**

103.    On November 22, 2022, Principal Veit knew about a report that student C.M. allegedly used the slur "cracker" toward a white student named O.A. and had also allegedly used the "N-word" in front of friends. Ex. 104, Henderson Email to Principal Veit.

104.    On November 22, 2022, Compliance Officer Aaron Henderson emailed Principal Veit asking if he had followed up. Veit responded, "We have not revisited any specific conversations with O [A] yet regarding this." Henderson replied that a follow-up was needed to avoid the appearance of "deliberate indifference." *Id*. Principal Veit said he would contact O.A. *Id*.

105.    The District conducted a thorough investigation into an incident where a White student, S.B., alleged that a Black student, C.M., called her a "cracker." Unlike the District's minimal response to multiple well-documented instances of racial harassment against C.M., this complaint prompted a comprehensive review by school administrators. Ex. 105, Assessment of Allegations dated 12/6/22.

66

**Documented Pattern of Racial Harassment Known to School District Officials
and their Lack of Response**

106.    At a Board Meeting on June 9, 2020, a student from Thunder Ridge High School expressed to the Board her outrage at the "ongoing racial injustices occurring in our country" and informed the Board that "our community's lack of racial diversity often limits the perspectives that students develop in the classroom and contributes to racial hostilities and microaggressions." She implored the Board to take action to dismantle "overt and covert racism in our community." In particular, she requested that the Board mandate that "teachers and administrators address issues of racism and systemic injustice on a regular basis," including through the curriculum and assemblies. *See     Board     of     Education     Meeting*,     June     9,     2020: https://www.youtube.com/watch?v=ymj3PGpmtQ&list=PLyjVvMhp58liz3QmZQeX7QUKKhY fNu4Rb&index=145.[9]

107.    DCSD officials knew that J.G. submitted a feedback form on March 10, 2023, at 5:38 p.m. that included allegations of racism, harassment, discrimination, and bullying. However, the District did nothing in response, claiming it was not a "complaint." Ex. 10, 30(b)(6) Depo. Tr., 198:21–199:25; 199:14–200:2; Ex. 50 J.G.'s Complaint dated 3/10/2023.

108.    On April 20, 2023, Lacey Ganzy and her son J.G. reported racist Snapchat messages in person to Deputy Superintendent Danelle Hiatt and Chief Human Resources Officer Amanda Thompson at the district office. Ex. 10, 30(b)(6) Depo. Tr. 181:19–182:17.

109.    It is undisputed that the District had only been "in the process of creating monitoring reports over probably the last close to two years," meaning any effort to systematically

---

[9] The Court may take judicial notice of comments made "during [a] school board meeting." *Bointy v. Oklahoma ex rel. Oklahoma State Dep't of Educ.*, 2024 WL 2965650, at *2 (W.D. Okla. June 12, 2024).

monitor compliance with nondiscrimination obligations did not begin until approximately 2023. *Id*. 36:6–12.

110.    Superintendent Kane admitted that she oversees all schools in Douglas County and is responsible for the District's compliance with antidiscrimination laws and equal education opportunity law. Ex. 8, Kane Depo. Tr., 15:6-13.

111.    Superintendent Kane admitted to having no personal knowledge of multiple discrimination complaints sent directly to her email, including serious incidents at various schools. *Id*. 50:9–51:1; 91:15-92:2; 94:3-10.

112.    Notwithstanding the fact that she is in charge of compliance with Title VI and other non-discrimination laws, Superintendent Kane is "not familiar" with the requirements for documenting discrimination complaints. *Id*. at 48:1–12. When presented with multiple specific discrimination complaints sent to her personal email account, she repeatedly testified that she had "no personal knowledge" of any of them and did not know if the District investigated, followed up, or took remedial measures. *Id*. at 92:24–94:10; 96:2–6; 97:10–98:12.

113.    Superintendent Kane admitted that she did not know about the March 10, 2023, complaint that J.G. had submitted to the district website and admitted "the first I heard of it was when Lacey Ganzy came to public comment -- I do not recall the date -- and spoke about discrimination". *Id*. at 51:2-8.

114.    The day after the board meeting, Superintendent Kane asked Assistant Superintendent Winsor to look into J.G.'s complaint to inform her "what the circumstances were." *Id*. at 51:24-52:8

68

115.    On April 25, 2023, Superintendent Kane received a memorandum from Assistant Superintendent Winsor about the Morgaine/Gawain Snapchat group, but she never had a follow up conversation with Winsor. Ex. 106, Depo. Ex. 93; Ex. 8, Kane Depo. Tr., 55:8-11.

116.    Douglas County School District relied on education assignments, limited conversations, restorative apologies, and no-contact contracts in response to racism that isolated victims. Ex. 13, Shaw Report at 41.

117.    While the discriminatory acts underlying this lawsuit were taking place, other schools across the District were also suffering from increasingly frequent racist attacks. For example, in February 2023, a parent withdrew her child from Sagewood Middle School after repeated racial harassment and the school's inadequate response. The student was called the "effing N-word" by at least fourteen students, was told to "kill yourself," and was repeatedly asked how she felt about the slur immediately before it was used. The parent reported her daughter was "convulsing as she cried so hard on the way to school" due to the ongoing bullying, much of which occurred "behind the scenes in the hallways." Ex. 107, February 14th Email.

118.    On May 16, 2023, a Sagewood Middle School student made whipping motions toward another student, prompting a physical altercation. A witness reported that the aggressor said: "We are taking you back to 1930 when they whipped Black people," and repeatedly used racial slurs like "Blackie" and "Blackson." The victim reported this had been happening for over a month. Ex. 108, DCSD School Racism Reports.

119.    On December 19, 2023, even after the widespread discrimination described by Plaintiffs and know to CRMS, another CRMS student reported repeated racist harassment, including slurs like: "Go back where you came from," "Get your Black ass outta here," "Thanks for the shirt, cotton picker," and "Don't make him mad because he has a gun." Students also

mocked his food (e.g., watermelon, chicken sandwich, grape Kool-Aid) and made whipping noises. Ex. 109, DCSD School Racism Reports 2.

120.    A month later, on January 18, 2024, a Black CRMS student posted on social media: "I've been called the N-word every day at school. I don't feel safe there anymore. I want to move." *Id*.

121.    On April 11, 2024, a student at CRMS made Nazi salutes and laughed with peers about the Nazis. Despite being asked twice by an adult to stop, he continued making the gestures. Ex. 110, DCSD School Racism Reports 3.

**Emotional Damage to Black Students and Loss of Educational Opportunities**

122.    After a student took a photo of him over a bathroom stall, C.M. stopped using the school restroom altogether. Ex. 37, C.M. Depo. Tr.., 17:2–10.

123.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

124.    ███████████████████████████████████████████████████████████████████████████████████

125.    ███████████████████████████████████████████████████████

70

126.    Starting on April 26, 2023, C.M. was placed on an "escort plan" by school administrators. Ex. 48, Streander Email dated 4/25/2023. Under this plan, he was not permitted to leave class without an adult escort, including during passing periods and class time. C.M. was required to wait in the office for a security guard to escort him to his next class or to lunch, significantly restricting his mobility within the school. Ex. 40, Jon Martin Depo. Tr., 60:6-10.

127.    C.M left in-person school because "in school was getting hard, and people were just being bullies," and because he "didn't feel safe in school anymore. . . I was tired of being pushed around and bullied and people calling me racial slurs." Ex. 37, C.M. Depo. Tr., 17:1–5.

128.    █████████████████████████████████████████████████████████████████████

129.    █████████████████████████████████████████████████████████████████████

130.    In spring 2023, J.G. transferred from CRMS to an online program provided by the Douglas County School District to complete 8th grade. *Id*. at 16:6-21. Although J.G. had "always had a passion for school," it has "been hard to feel comfortable there with how people address me." *Id*. at 10:24-11:3.

131.    N.G. felt humiliated, dehumanized, and targeted when school staff treated her body differently than her white peers. This moment left N.G. feeling deeply singled out, ashamed, and physically scrutinized in a way her white peers were not. Ex. 27, N.G. Depo. Tr ., 58:1-59:16.

132.    N.G. witnessed a White student scream "All Lives Matter" into her friend's face and was deeply upset by this incident. *Id*. at 127:20-128:8.

133.    N.G. did not cry at school because she felt that no one genuinely cared about her distress or would comfort her. She felt isolated and emotionally unsupported, believing that others judged and mistreated her based on stereotypes rather than knowing her as a person. *Id*. at 127:1-12.

134.    ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

135.    N.G. left DCHS primarily because of racial discrimination and an uncomfortable debate incident—not because of academic or attendance issues. Ex. 27, N.G. Depo. Tr., 45:19-46:8.

136.    During the pod meeting, D.C. spoke up about students calling him "white man," explaining: "people would call me 'white man,' which kind of made me super uncomfortable, because I'm mixed, so some people say that I'm not black enough or I'm not white enough, so anytime anybody mentions that, it just makes me uncomfortable." Ex. 66, D.C. Depo. Tr., 48:7-13.

137.    During eighth grade, D.C. began eating alone in the library to avoid peers who made racist comments. Ms. Clark noticed that D.C. "started eating his lunch in the library instead of being the social kid that he usually is," and that he told her, "That's when I go to the library," as a way to isolate himself from racist peers. Ex. 67, Alexis Clark Depo. Tr., 57:4–13; 61:12–23.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict

for the nonmoving party,' and a fact is material when it 'might affect the outcome of the suit under the governing [substantive] law.'" *Johnson v. Sanders*, 121 F.4th 80, 88 (10th Cir. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The usual practice is that factual disputes regarding the merits of a legal claim go to the jury[.]" *Perttu v. Richards*, 605 U.S. 460, 468 (2025) (discussing the right to a jury trial on exhaustion when intertwined with the merits).

In evaluating a motion for summary judgment, the Court starts by resolving all factual disputes in favor of the nonmoving party as well as "constru[ing] all . . . reasonable inferences in the light most favorable to the nonmoving party." *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023). The Court may grant summary judgment only if after crediting evidence favorable to the nonmoving party and drawing all inferences in their favor, the nonmoving party has failed to put forth any evidence on the challenged element of their claims. *Id*. At summary judgment, the Court does not weigh competing evidence, assess the credibility of witnesses, or resolve factual disputes; those determinations are reserved for the jury. *Id.* (citing *Anderson*, 477 U.S. at 255); *see Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) ("[I]t is for the trier of fact to decide which story is to be believed.").

## LEGAL ARGUMENT

Defendants move for summary judgment on each of Plaintiffs' claims. Because there are genuine disputes as to material facts for each claim, the Court should deny Defendants' motion in its entirety.

## I.    PLAINTIFFS' TITLE VI CLAIM SHOULD PROCEED TO TRIAL

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin in programs or activities that receive federal financial assistance, including schools. 42 U.S.C. § 2000d, *et seq*. A school district's deliberate indifference to known student-

on-student racial harassment constitutes discrimination against students in violation of Title VI. *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK*, 334 F.3d 928, 933 (10th Cir. 2003) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Thus, a school district violates Title VI when (1) racial harassment is so severe, pervasive, and objectively offensive that it, (2) deprived the victim of access to educational benefits or opportunities, and (3) a school with actual knowledge of the harassment, (4) was deliberately indifferent. *Bryant*, 334 F. 3d. at 934 (citing *Murrell v. Sch. Dist. No. 1*, 186 F. 3d 1238, 1247 (10th Cir. 1999)).[10] This framework applies to both peer-on-peer and staff-on-student harassment. *See, e.g.*, *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006). Although its argument is not clearly delineated in terms of elements, Defendant DCSD appears to challenge only the first, third, and fourth elements.

A.    **Element One: Severe, Pervasive, Objectively Offensive Racial Harassment**

Plaintiffs have presented extensive evidence that they experienced pervasive, and objectively offensive racial harassment. The Tenth Circuit has recognized a racially hostile environment where, as here, Black students are "being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon [and] being shamed and humiliated on the basis of one's race." *See Bryant*, 334 F.3d at 932 (quoting *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998)).

Defendant DCSD has a history of allowing students to racially harass Black students. *See, e.g.*, RSUMF 28. Plaintiffs' experience was no different. The voluminous fact section details harassment that is quintessentially and unquestionably based on race. *See Bryant*, 334 F.3d at 932 (finding racial harassment where students carved offensive racial slurs, epithets, swastikas, and

---

[10] In the argument below, Plaintiffs cite to cases analyzing sexual harassment claims under Title IX of the Education Amendments of 1972 because courts apply the same standard to Title VI claims. *Bryant*, 334 F.3d at 934 (directing district court to apply Title IX's deliberate indifference standard to Title VI claim).

"KKK" on school furniture and placed notes with the same in Black students' lockers), *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 664, 666–67 (2d Cir. 2012) (finding racial harassment where students regularly "taunted, harassed, menaced, and physically assaulted" Black student and "made frequent pejorative references to his skin tone, calling him a[n 'N-word'] nearly every day).

A non-exhaustive list of examples from the fact section above:

- Students called each Plaintiff a "nigger" **repeatedly**.[11]

- Students assaulted C.M. while calling him the N-word. RSUMF 52.

- Students called J.G., C.M., D.C., and N.G. monkeys **repeatedly**.[12]

- Students made **frequent** comments to each Plaintiff expressing reverence for slavery, such as "bring slavery back," "cotton picker," "go back to the fields."[13]

- Seeking to prove the size of C.M.'s genitalia, K.O. photographed C.M. while he used the bathroom and sent the photo to other students.[14]

- Students circulated the photo for months, at times with racist comments, like "watch the monkey at work," on the Morgaine/Gawain and "Hating C.M." Snapchat groups, which included over 100 students, and via airdrop. RSUMF 45, 61, 127, 129; ASF 121.

- Students threatened C.M. and J.G. with physical violence for reporting that students called them him racial slurs.[15]

- Students drew racist graffiti on school property, including swastikas and "Nazi." RSUMF 51; ASF 63.

- On the Morgaine/Gawain Snapchat group, students used the N-word; called Black students monkeys; proclaimed, "bring back slavery" and "go back to the field;" called

---

[11] *See, e.g.*, RSUMF 18, 27–29, 31, 39, 45, 47, 51–53, 68, 69, 97, 163; ASF 8, 13, 14, 18, 19, 22, 38, 63.

[12] *See, e.g.*, RSUMF 18, 46, 48, 51, 61, 63, 67–69, 73, 74, 79, 80, 82, 83, 93, 116, 124, 142, 147, 150, 157; ASF 11, 13, 14, 16, 39, 48, 51, 53, 63, 68.

[13] *See, e.g.*, RSUMF 23–25, 27–29, 63, 69, 74, 93; ASF 8, 17, 37, 118.

[14] *See, e.g.*, RSUMF 18, 41, 44, 45, 45, 61, 127, 129; ASF 121.

[15] *See, e.g.*, RSUMF 41, 47, 61, 129. *See Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1310 (10th Cir. 2020) ("An allegation that the plaintiff was harassed for reporting misconduct can therefore suffice to state a claim for discrimination on the basis of sex if the misconduct reported is itself sex discrimination.").

for a return of the Holocaust for Black students; and threatened to shoot Black students and eradicate them from "the planet."[16]

- Students made fun of J.G. and N.G. for being "dark" and C.M. for wearing his hair in an afro. RSUMF 90.

Defendant DCSD does not contest that C.M.[17] and J.G. experienced racial harassment that was severe, pervasive, and objectively offensive. However, Defendant DCSD argues that N.G. and D.C. presented only "a few isolated incidents of racial enmity [that] are insufficient to survive summary judgment." ECF No. 53 at 25, 30 (citing *Silva v. St. Anne Catholic Sch.*, 595 F. Supp. 2d 1171, 1186 (D. Kan. 2009)). *Silva* is readily distinguishable as the plaintiffs in that case presented only two stray statements as evidence of a hostile environment: "our country, not yours" and "we [aren't] in Mexico." 595 F. Supp. 2d at 1177. The racial hostility here is substantially more severe. In addition to calling her a "fat cotton picker,"[18] students, on a daily basis, called N.G. a "monkey," called her the N-word, called her "Ethiopian" and "dark skinned" and told her to "go back to her country" even though she was born here. ASF 9, 12-13. Students likewise called D.C. "monkey," made monkey noises around him in the hallways, and asked him multiple times a day for an "N-

---

[16] *See, e.g.*, RSUMF 41, 61, 63, 103, 123, 124, 127–134, 140, 155, 159, 161, 163; ASF 24, 26-30, 34, 37–40, 42, 47, 74, 72, 93, 95, 97–99, 114.

[17] While Defendant DCSD does not challenge that C.M. experienced severe, pervasive, and objectively offensive harassment, the District suggests that some incidents C.M. experienced were not "racial." ECF No. 53 at 27. The facts of these incidents, however, are hotly contested. For example, Defendant DCSD claims the photograph of C.M. using the bathroom "was not considered to be a racial incident." *Id.* This claim is belied by Defendant Veit, who affirmed that a photo that was taken in order to assess the size of a Black male's genitalia was based on racial stereotypes. XX. Likewise, Plaintiffs maintain that two students called C.M. the N-word while they repeatedly pushed him. RSUMF 52–53. Though there was no overtly racist language used in the other two incidents, it is reasonable to infer from the timing and overall environment that they were based at least in part on C.M.'s race.

[18] Defendant DCSD claims that the student called N.G. a "fat bitch," not a "cotton picker." Plaintiffs dispute this contention and this Court should resolve this fact in Plaintiffs' favor. *See Forth*, 85 F. 4th at 1052. Moreover, Defendants say nothing of N.G.'s allegation that the student who called her a "fat cotton picker" also called her the N-word, as did his friends. And there is no doubt that repeated use of the N-word is racial harassment. *Cf. Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a mere offensive utterance, the [N-word] is pure anathema to African–Americans.") (internal quotation marks omitted).

word Pass," which white students claimed gave them to right say the N-word with impunity. RSUMF 143, ASF 16. Students also commented on D.C.'s mixed race, claiming he was not "black enough" or not "white enough." RSUMF 150. Both N.G. and D.C. also attended schools where they witnessed their Black peers experience similar racial harassment. *See Bryant,* 334 F.3d at 931 (considering "the presence of offensive racial slurs, epithets, swastikas" in determining there was a racially hostile environment). For example, N.G. saw a white student scream "All lives matter" in her Black friend's face. ASF 9. Students depicted C.M. as a monkey to D.C. RSUMF 150, 154. These facts "raise[] a question of severe harassment going beyond simple teasing and name-calling." *DiStiso v. Cook,* 691 F.3d 226, 242–43 (2d Cir. 2012) (Defendants cannot dispute that calling a Black child the "the reviled epithet 'nigger,'" "blackie," and commenting that his "skin remained dirty even after washing" was severe).

N.G. and J.G. also experienced racial harassment at the hands of school staff. Specifically, N.G.'s teacher assigned N.G., over her protests, to defend Jim Crow laws in a class debate. Asking a Black student to engage in a debate in which one side defended (and therefore legitimized) racial segregation, which was enforced through police and vigilante violence including lynchings, contributed to the hostile educational environment. Another adult singled N.G. out for wearing shorts and made her change, then justified not asking the same of a white student because N.G. had a "different" body. ASF 11. Assistant Principal Streander falsely accused J.G. of stealing a water bottle and another teacher confiscated J.G.'s phone during an assembly even though multiple white students were also using their phones. RSUMF 105, 110, 115; ASF 23.

"[T]he severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1312 (10th Cir. 2020). A jury should be allowed to determine whether

77

N.G. and D.C., along with C.M. and J.G., experienced severe, persistent, and objectively offensive harassment.

### B.    Element Two: Plaintiffs Lost Educational Benefits or Opportunities

As noted above, Defendant DCSD does not appear to challenge this element. At most, Defendant raises this issue with respect to N.G. by arguing, "N.G.'s discomfort . . . is insufficient because the teacher allowed N.G. to switch sides without penalty and gave her a good grade." ECF No. 53 at 26.  Here, there can be no question that N.G. lost educational benefits or opportunities as she unenrolled from the District because of the intolerable harassment. *See Murrell*, 186 F.3d at 1249 (plaintiff who withdrew from school was "totally deprived [of the school's] educational benefits"); *Doe,* 970 F.3d at 1312–13 (finding harassment deprived plaintiff of educational benefits, even where a student maintained good grades, because she stopped attending classes); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 667 (2d Cir. 2012) ("Where, as here, the decision to withdraw was motivated by a racially hostile educational environment, a strong nexus between the harassment and the deprivation of educational benefits is evident.").

### C.    Element Three: Defendant DCSD Knew Black Students Experienced Racial Harassment

The third element requires Plaintiffs to show that Defendant DCSD had actual knowledge of racial harassment. *See Forth*, 85 F.4th at 1054. Actual notice does not require that a school district receive a "clearly credible" report of racial harassment, *Forth*, 85 F.4th at 1054. Instead, courts "examine the reports provided to relevant officials in totality, not in isolation" to determine whether a school district knew of racial harassment. *Id.* Defendant DCSD does not contest that school administrators are appropriate persons for notice purposes. *See generally* ECF No. 53 (asserting no arguments that administrators, such as principals and vice principals, are appropriate persons).

78

Even taking Defendant DCSD's proffered facts as undisputed, the District was on notice that Black students, including Plaintiffs, experienced a racially hostile environment in its schools. This conclusion becomes even more stark when considering additional evidence that Plaintiffs have presented.

The District does not, or cannot dispute the following notice points:

- During the 2020-21 school year, a student called N.G. a "fat cotton picker."[19]

- During the 2020-21 school year, N.G. reported to Assistant Principal Loucks that students routinely used the N-word around her at CRMS. RSUMF 28.[20]

- Since 2021, Defendant Veit and Assistant Principals Loucks and Streander received numerous reports that students used the N-word in school. ASF 44.

- On October 13, 2022, a parent reported via email received by Assistant Principals Loucks and Streander that a student made racist comments in class, including that he "hates Blacks" while making "gun noises" and gestures. RSUMF 41.

- In October 2022, Defendant Veit and Assistant Principal Streander knew that K.O. photographed C.M. in the bathroom to ascertain the size of C.M.'s genitalia, then shared the image with other students who continued to circulate the image, sometimes with racist captions, for months. ASF 44.

- On November 1, 2022, Defendant Veit and Assistant Principal Loucks knew that S.B. called C.M. the N-word in gym class, as she had many times, along with "monkey" and proclaimed "we already have one N-word in this class. Why do we need another one?" RSUMF 47, 48, 51, 63, ASF 13.

- One week later, Mr. Loucks heard S.B. call C.M. a "monkey" *again*. ASF 14, 63.

- On December 16, 2022, Defendant Veit learned that S.B. called yet another Black student the N-word, declared, "If there was a purge, I would not save the Black students," drew swastikas and wrote "Nazi" on school property. RSUMF 61, ASF 63.

- On December 19, 2022, School Resource Officer David Knight emailed Principal Veit and Assistant Principals Loucks and Streander to remind them of their Title VI

---

[19] RSUMF 23–25, 27–29; ASF 8, 24. Defendant DCSD contests that the student called N.G. a "cotton picker" but does not contest that they knew of the incident.

[20] *See supra* note 11.

obligations and raise concerns about a "heartbreaking uptick of . . . hateful behaviors by some of our students." ASF 18.

- During the year, J.G. reported to Ms. Murphy and Mr. Guy[21] that students were calling him racial slurs, including the N-word. ASF 89.

- On February 7, 2023, Assistant Principal Streander learned that a student told a Black student to "go eat bananas" in class. ASF 46.

- On February 9, 2023, C.M.'s mother told Assistant Principal Streander that S.B.'s "brother," N.B., threatened to fight C.M. because S.B. was suspended for calling C.M. the N-word. Later that month S.B. drew racist graffiti—a monkey—on her desk in class. ASF 63.

- On March 9, 2023, C.M. reported that L.A. called him a "monkey," "gorilla," "chimpanzee," and told him to "go back to the fields." RSUMF 63, 74.

- On March 10, 2023, J.G. submitted a detailed complaint of discrimination to the District reporting that students were using racial slurs "everyday," often directly in front of CRMS staff. RSUMF 105.

- On March 10, 2023, D.C. reported to a teacher, Assistant Principal Loucks, and Defendant Veit that C.B. called him "monkey boy" and that D.C. had previously heard C.B. refer to C.M. as "Monkey [M]" and that "he turns into a monkey at night." RSUMF 143, 147; ASF 16, 68.

- On March 23, 2023, Assistant Principal Loucks learned that a student shouted in class "Black people are monkeys." ASF 53.

- On March 29, 2023, Assistant Principal Loucks admitted that the "biggest issue" he has been struggling with the most, aside from the N-word, is that students have been calling each other "monkeys." ASF 48.

- On March 29, 2023, Assistant Principal Loucks knew that a student said "Pick up that mess faster or I'll whip you like a slave." ASF 49.

- On April 19, 2023, C.M. reported that A.P. called him "monkey" and made racist comments referring to slave plantations. RSUMF 80.

- On April 19, 2023, J.G. reported to Assistant Principal Loucks that he heard students talk about stereotypes, racial slurs, slavery, and white supremacy. RSUMF 82.

---

[21] *See Doe by & through Roe v. Fulton Cnty. Sch. Dist.*, No. 1:20-CV-00975-AT, 2021 WL 1105617, at *6 (N.D. Ga. Mar. 23, 2021) (finding that a bus driver was "vested with supervisory and safety management responsibility for the students during their transportation" find therefore notice to the driver may be imputed to the school district for deliberate-indifference purposes).

- On April 20, 2023, J.G. showed Assistant Principal Loucks racist messages in the Morgaine/Gawain Snapchat group, including threats to "get me a buckshot and shoot me a nigger" and "bring back the Holocaust" against Black students. ASF 31, 40.

In addition to these undisputed facts, Plaintiffs and other students reported other specific incidents to CRMS and DCHS administration.[22]  For example:

- In the 2020-2021 school year, Defendant Veit was aware that a white student screamed "All Lives Matter" in N.G.'s Black friend's face with N.G. present. RSUMF 28; ASF 8, 131.

- That same year, Ms. Ganzy reported to Assistant Principal Loucks that a CRMS staff member subjected N.G., but not her white peers, to discriminatory discipline for dress code violations. ASF 9.

- N.G.'s mother reported the Jim Crow debate to the DCHS office when she withdrew N.G. from DCHS in the Fall of 2022. RSUMF 34–35.

- Throughout November 2022, C.M. reported that he was experiencing racial bullying to Ms. Franklin, who reported the racial slurs to the assistant principals. RSUMF 45, 53, 63.

- Around November of 2022, Assistant Principal Loucks admits that he received a report from a Black female student that another student had repeatedly called her the N-word over Snapchat. ASF 45.

- Throughout the fall of 2022 and the beginning of 2023, Assistant Principals Loucks and Streander admitted to C.M.'s mother that they were aware C.M. was experiencing racial bullying both in person and on Snapchat. RSUMF 44.

- In February 2023, C.M. told Assistant Principal Loucks that N.B. and T.E. pushed C.M. while calling him racial slurs. RSUMF 53.

- After winter break, C.M. reported the Hating C.M. Snapchat group to Assistant Principal Loucks and showed him some of the racist messages in the group, including the bathroom photo of C.M. with comments like "watch the monkey at work" and "resting in his natural habitat," as well as racist comments about not wanting any more Black kids in class. RSSUMF 61.

- C.M. also reported the Morgaine/Gawain Snapchat group to Assistant Principal Loucks and shared some of the racist messages in the group. *Id.*; ASF 51.

---

[22] Defendant DCSD may or may not dispute these facts, but such disputes must be resolved in Plaintiffs' favor at this stage.

- During the school year, Assistant Principal Loucks directly heard students call C.M. the N-word. ASF 50.

- In the Spring of 2023, Defendant Veit admitted to Board Member David Ray that "racial discrimination" was a frequent problem at CRMS. ASF 70.

- In March 2023, D.C. told Defendant Veit near the entrance to the school that K. made a racist comment to him. ASF 69.

- On April 3, 2023, Defendant Veit knew that a student used the N-word after previously using other racial slurs, including monkey. ASF 71.

- On April 20, 2023, Assistant Principal Loucks told Ms. Ganzy that white students had formed a "white supremacy group" since Black History month, called themselves "skinheads," and threatened to "lynch" Black students. RSUMF 45.

In the face of this overwhelming evidence that it knew its schools were infected with severe and pervasive racial hostility, Defendant DCSD resort to blaming Plaintiffs—both the children and their parents—for the egregious racism of others. For example, Defendant DCSD appears to fault Ms. Ganzy for encouraging N.G. to try to ignore the race-based harassment and Ms. Martin for not providing screenshots to administrators. *See* ECF No. 53 at 26-27. Similarly, Defendant DCSD seems to disclaim its responsibility to address racism because N.G. told Principal Veit she was "okay." RSUMF XX. Finally, Defendant DCSD nitpicks at J.G.'s March 10, 2023 complaint for various reasons, claiming that it was not specific enough, submitted online at the District level, and J.G. indicated he did not want to be contacted. ECF No. 53 at 30. Thus, the District argues that "it was not clearly unreasonable to treat J.G.'s March 10, 2023 complaint as something other than a complaint."[23] *Id.*

---

[23] This conflates two distinct legal inquiries—actual notice and deliberate indifference—and suggests they are both subject to a reasonableness standard. They are not. *See Forth*, 85 F. 4th at 1060 (explaining the Tenth Circuit has not required "a clearly credible report" of harassment; instead "the analytical focus should be on whether the evidence—viewed in its totality—could be said to have given a school district actual notice"). Moreover, Plaintiffs disagree that J.G.'s letter could be reasonably viewed as anything other than a complaint and Defendant DCSD does not cite any legal authority for the proposition that notice must come in the form of a "complaint." To the contrary, Tenth Circuit authority instructs that notice can come in many different forms and is a totality of the circumstances assessment. *See Forth*, 85 F. 4th at 1060 (even verbal reports may provide notice so long as they, in their totality, put the school district on notice of

These arguments border on irrelevant as it was not Plaintiffs' or their parents' responsibility to provide notice in a form preferred by Defendant DCSD. Rather, the only pertinent legal question is whether DCSD had adequate notice of racial harassment in its schools. To the extent that parents attempted to protect their children from emotional harm, a child outwardly expressed emotional resiliency, or a student did not provide enough specifics in one communication for Defendant DCSD's liking does not overshadow the overwhelming evidence of notice discussed above. *See Forth*, 85 F. 4th at 1060.

In addition to above examples of undisputed notice, Plaintiffs maintain that they were called the N-word or monkeys in classrooms, hallways, and, importantly, in front of adults, on a daily basis. RSUMF 74, 96, ASF 16, 18. Other students confirmed they heard the N-word in their schools up to 50 times per day. RSUMF 18. Defendant DCSD's argument that teachers are not appropriate persons for notice purposes misses the point. *See* ECF No. 53 at 29. Evidence that racial slurs were ubiquitous makes it reasonable to infer that administrators, who were just as present as teachers in the halls of Defendant DCSD's schools, also heard them. Indeed, Assistant Principal Loucks confirmed that the N-word and students calling other students "monkeys" are "the biggest issue" he delt with that school year. ASF 48; *see also* ASF 58 (Assistant Principal Streander confirmed that teachers have heard the N-word in class).

The parties dispute many of the facts relating to actual notice. Ultimately, the jury should decide the credibility of the Plaintiffs or Defendant DCSD's account. *See Forth*, 85 F.4th at 1052 (at summary judgment the court does not weigh competing evidence, assess the credibility of witnesses, or resolve factual disputes).

---

harassment). Nor do DCSD's other critiques make much sense. For example, it is undisputed that at least three high-level administrators, including Defendant Veit, received the complaint demonstrating J.G.'s submission method was effective and he provided his phone number and email.

**D.      Element Four: Defendant DCSD Was Deliberately Indifferent**

Once a school district is aware of alleged harassment, it must respond in a manner that is not clearly unreasonable by taking timely and appropriate action to investigate or otherwise determine what occurred. *See Murrell*, 186 F. 3d at 1247; *see also Forth*, 85 F.4th at 1059. If an investigation reveals that discriminatory harassment has occurred, the school must respond in a manner that is not clearly unreasonable to address the harassment and hostile environment. *See, e.g., Murrell*, 186 F. 3d at 1247–48. When a school knows "what they had been doing (if anything) had not sufficed[, f]ailure . . . to try something else can show deliberate indifference." *See Doe*, 970 F.3d at 1314. When a school district's employees, particularly its building leaders, choose to take no action when confronted with a racially hostile environment, they are deliberately indifferent to it. *Bryant*, 334 F.3d at 933. Moreover, a

> minimalist response is not within the contemplation of a reasonable response and deliberate indifference may be indicated where the school fails to meaningfully and appropriately discipline the student-harasser or where the harasser and other students are left to believe that the harassing behavior has the tacit approval of the school.

*Spencer*, 2016 WL 10592223, at *4 (citation modified).

Despite this clear mandate, Defendant DCSD did nothing to respond to several incidents of known racial harassment. For example, Defendant DCSD did not investigate which students shared the photo that K.O. took of C.M. in the bathroom to assess his genitalia in October 2022 in the Morgaine/Gawain Snapchat group, nor did they investigate students who created the "Hating C.M." snapchat group, wherein they continued to circulate C.M.'s photo, now with captions declaring he was a monkey. *See Murrell*, 186 F.3d at 1247–48 (no investigation is clearly unreasonable). As discussed further below, with no response from Defendant DCSD, the racist attacks on Black students, including C.M. and J.G., continued on the Morgaine/Gawain Snapchat

group, and culminated with threats to "shoot me a nigger" and "bring back the Holocaust" against Black students.

Defendant DCSD has likewise provided no evidence of its response to the following complaints of racial harassment:

- C.M.'s verbal complaint to Assistant Principal Loucks that N.B., who called C.B. a "f---ing N-word" at the beginning of February, and N.B.'s friends continued to push and trip C.M. in the hallways. RSUMF 67–69.

- C.M.'s written complaint, submitted on March 9, 2023, that a student called him "monkey," "gorilla," and "chimpanzee" in the hallways and told him to "go back to the fields." RSUMF 63.

- J.G.'s written complaint, submitted to the District on March 10, 2023, discussing staff-on-student targeting and daily student-on-student racial harassment "across the school district for me and many others." RSUMF 105; ASF 68.

- D.C.'s verbal complaint to Defendant Veit that another student made a "racist comment" to D.C. ASF 69.

Even adults working in CRMS raised concerns about widespread harassment with administrators, only to have their complaints ignored. *See, e.g.*, ASF 80 (SRO David Knight), 85 (Garcelle Franklin).

In April 2023, C.M. reported that yet another student called him a monkey and commented on his cotton shirt as a callback to slavery. Defendant DCSD justifies its decision to not discipline the student, claiming administrators could not determine whether racist comments were "directed at" C.M. and thus refused to discipline the accused student. ECF No. 53 at 28. The District's policy, however, does not require racial harassment to be "directed at" another student to be actionable. RSUMF 83 ("harassment is any unwelcome, hostile and offensive verbal, written or physical conduct **based on** or directed at a person's race) (emphasis added). Thus, this misapplication of their own policy provides no excuse for Defendant DCSD's inaction. Instead, the only student Defendant DCSD suspended was C.M., the victim, for fighting back.

In addition to experiencing relentless hostility from their fellow students, staff also targeted N.G. and J.G. because they are Black. To this day, Defendants have offered no evidence that they addressed the Jim Crow debate teacher's actions; instead, DCHS administrators reviewed the debate materials in May 2023 and told the teacher that the assignment was "great!" RSUMF 35. Nor have they addressed the staff member who made N.G. change out of her shorts because her body was "different" than a while girl's body. ASF 9–10. No one has investigated whether Assistant Principal Streander employed racist stereotypes when she falsely accused J.G. of stealing another students' water bottle, despite him explaining that he had purchased the water bottle from a store. RSUMF 115. Defendant Veit's "investigation" into the teacher who confiscated J.G.'s phone, if believed, was woefully inadequate in light of the known circumstances because he never bothered to ask J.G. for the teacher's identity or review video footage of the incident. Tenth Circuit case law is clear: doing nothing is clearly unreasonable. *See Murrell*, 186 F. 3d at 1247.

Often, even when Defendant DCSD disciplined a student for racial harassment, they failed to identify and discipline other involved students. Defendant DCSD offers no evidence they disciplined each of the students who called N.G. the N-word and retaliated against her after their friend was disciplined for calling N.G. a "fat cotton picker." RSUMF 23–24. Likewise, there's no evidence that administrators disciplined each of the students who called D.C., J.G., and C.M. "monkeys," equated them with slaves, or otherwise targeted them because they are Black. RSUMF 50, 61. Instead, Defendant DCSD relies an out-of-circuit district court case for the proposition that, "Plaintiffs are not entitled to have every instance of harassment remedied and every offending student punished." ECF No. 53 at 31 (citing *M.R. v. Burlington Area Sch. Dist.*, No. 21-CV-1284-JPS, 2023 WL 3510642 (E.D. Wis. May 17, 2023)). However, *M.R.* itself affirms that, once on notice, a district must at least investigate racial harassment. *See* 2023 WL 3510642, at *24

86

("Summary judgment should be precluded where the school made no effort to stop harassment.") (citation modified). When administrators discipline some, but not all involved students, the school district's response is clearly unreasonable. *See Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136 (9th Cir.) (principal who investigated some, but not all students accused of harassment was deliberately indifferent). This is particularly so when students allege they are being called the N-word. *See Spriggs*, 242 F.3d at 185 ("Far more than a mere offensive utterance, the word 'nigger' is pure anathema to African–Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger.'").

Defendant DCSD's whack-a-mole approach to the racially hostile environment was so deficient, the harassment continued undisturbed. Yet, Defendant DCSD continued to use discipline it knew was ineffective. *See Doe*, 970 F.3d at 1314 (when a school knows their response was ineffective, it may be deliberately indifferent to not try something different). For example, after CMRS administrators disciplined S.B. for calling C.M. a monkey and the N-word repeatedly with a three-day suspension. But just one month later, she called another Black student the N-word and declared, "If there was a purge, I would not save the Black students." ASF 14. Defendants responded by again suspending S.B. for exactly three days, even though that punishment had already proven ineffective the first time. *See Zeno*, 702 F.3d at 669 (when discipline does not deter the harassment, it is deliberately indifferent to proceed with that same response and not more). Undeterred, S.B. continued to terrorize her Black peers. *See* ASF 14, 63 (S.B. drew swastikas and a monkey, and carved "Nazi" on school property), RSUMF 59 (S.B.'s "brother" threatened C.M. because he reported that S.B. had called him racial slurs).

87

When two students attacked C.M. by pushing him while calling him a "f---ing N-word, Defendant DCSD gave the students a half-day, in-school suspension. A jury should be able to determine whether this response signaled to the school community that such behavior was acceptable as the punishment was so minor. *Spencer*, 2016 WL 10592223, at *4 (citation modified). Within the week, one of the students threatened C.M. because C.M. reported the student's "sister" called C.M. the N-word. *See Doe*, 970 F.3d at 1310 (retaliation for reporting sexual harassment supports a claim for sex discrimination). That same student and his friends continued to push and trip C.M. in the hallways, demonstrating the ineffectiveness of the District's meager punishment.

Defendant DCSD also claims certain responses were "effective" even though they perpetuated the harm to Black students or penalized them. *See A.C. as next friend S.T.C. v. Jefferson Cnty. R-1 Sch. Dist.*, 721 F. Supp. 3d 1162, 1188 (D. Colo. 2024) (schedule change that burdened the harassment victim may constitute a discriminatory response). For example,

- Defendant DCSD said they facilitated a "restorative" meeting between D.C. and a student who called D.C. "monkey boy" on March 10, 2023, and had called C.M. "Monkey [M]," among other dehumanizing names in the past. RSUMF __. D.C. was uncomfortable with the meeting and believed the student's apology was not genuine. Besides, there is no evidence this meeting with D.C. somehow addressed the student's racial harassment of C.M. RSUMF 143, 147; ASF 16, 68.

- Students, not the District, planned a Morgaine[24] Pod meeting, during which Ms. Murphy, who had no training on facilitating such conversations, "called up all the African American students in the pod" and had white students admit what they said and explain why they said it in front of Black students, which caused the Black students to feel humiliated. ASF 99, 100.

- In April 2023, Defendant DCSD suspended C.M. for fighting back against a student who called him a monkey and made references to him being a slave, yet did not discipline the other student. RSUMF 84.

---

[24] This meeting did not include the Gawain Pod, whose students were also in the Snapchat group.

- Also in April, Defendant DCSD placed C.M. on a passing period hold, then an escort plan. Both caused C.M. to miss valuable instruction time and restricted C.M.'s freedom of movement and ability to socialize in school. The escort plan, in particular, visibly identified C.M. as more dangerous and in need of control than his peers who repeatedly called him the N-word and monkey and attacked him in the hallways, leading to even more stigmatization. RSUMF 88; ASF 125.

This ongoing, widespread harassment went unchecked, culminating in multiple students taking to the Morgaine/Gawain snapchat group to proclaim:

- "I hate niggers" (one of which included a photo of the back of J.G.'s head) RSUMF 29;

- variations of the N-word, including "Niglet" and "N to the I to the G to the G to the E to the R" RSUMF 133; ASF 28, 34, 36;

- an image of Winnie the Pooh's Piglet with brown skin and the caption "Niglet" and J.G. tagged so he was associated with the photo RSUMF 133; ASF 34;

- an image of a Black person wearing a red shirt inside a banana peel with an acronym for "kill yourself" ASF 32, 116;

- "we should j[ust] remove Blacks from this planet bring back the Holocaust [for real]" RSUMF 163; ASF 31, 40;

- "I'm a big truck driver Trump supporter get me a buckshot and shoot me a nigger" ASF 33.

Appalled by Defendant DCSD's inaction in response to racial harassment of both N.G. and J.G, Ms. Ganzy threatened to tell the media. ASF 73. Ultimately, it was Ms. Ganzy, not CRMS administrators, who reported the group to law enforcement. RSUMF 130.

Regardless, Defendant DCSD still had an obligation to conduct its own investigation. *See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 (10th Cir. 2008). Yet, in the face of relentless and escalating racial harassment of Black students, CRMS administration spoke with *only three* out of approximately 100 students on the chat and took no notes. *See Doe*, 970 F.3d at 1314 ("administrators' refusal to take [harassment] complaints seriously is reflected in their failure to document them"). Rather than gather, much less preserve the messages, Mr. Loucks told students who made the racist posts to leave the

group, which automatically made those students' prior messages inaccessible. RSUMF 129. Effectively, by instructing students to leave the group, Mr. Loucks facilitated the destruction of evidence. *See Murrell*, 186 F.3d at 1248 (teacher's failure to remedy harassment and act of concealing the harassment was evidence of deliberate indifference). CRMS administration disciplined three students, but not all students who posted racist comments, including some directed at J.G. specifically. RSUMF 132; *see also* ASF 72.

No one investigated which students of color (or Jewish students) saw the thread, though other Black students, including C.M., saw the posts. No one checked in with these students to see how the racist threats from their peers affected them or offered them supportive measures to ensure they could enjoy equal access to their education.[25] Curiously, Principal Veit created no-contact contracts prohibiting contact between J.G. and two students who threatened him only *after* J.G. left CRMS. This timing suggests that Principal Veit's response was a post-hoc attempt to insulate the school from liability rather than a genuine attempt to keep J.G. safe. Given these facts, a jury could infer that Defendant DCSD's response was prompted by the threat of media attention, not a desire to uncover what happened and take appropriate remedial steps. *See Doe v. Los Angeles Unified Sch. Dist.*, 2:16-cv-00305, 2017 WL 797152, at *13 (C.D. Cal. Feb. 27, 2017) (denying summary judgment where a jury could infer based on "the sequence of events . . . that defendants initially pursued disciplinary action . . . because of media attention").

Moreover, there are genuine questions of material fact regarding whether discipline given was appropriate even when it was infrequently meted out. *See Spencer*, 2016 WL 10592223, at

---

[25] Defendants claim they supported J.G.'s withdrawal from CRMS, but this is disputed. RSUMF 140. Regardless, having to unenroll from school because of an unaddressed racially hostile environment is the ultimate denial of educational benefits and this Court should not credit Defendants facilitating J.G.'s withdrawal after his attorney intervened as evidence of a reasonable response.

*4. Posts that called for bringing back the Holocaust and threatening Black students with gun violence were met with *less severe* discipline than other incidents that did not harm students, such as marijuana possession. *See* RSUMF 140. Indeed, even after he was suspended for threatening to "remove Blacks from this planet [and] bring back the Holocaust," S.T. continued to retaliate against the student who reported his racist threats, who another student explicitly identified as J.G. RSUMF 134. Defendant Veit saw fit to address this additional conduct with an even lesser consequence—three days of in-school suspension. *Id.* The Morgaine/Gawain snapchat group persisted as a forum for retaliation even after students' racist tirade on April 20, 2023, demonstrating that Defendant DCSD's response was ineffective and unreasonable. *See* RSUMF 133–34; *Davis*, 526 U.S. at 645 (finding a school district may be liable for peer-on-peer harassment when its deliberate indifference makes students vulnerable to continued harassment).

As the Second Circuit recognized,

> In some circumstances, prompt disciplinary action against a student's identifiable harassers may show that a school district was not deliberately indifferent. The sufficiency of a response, however, must be considered in light of the known circumstances, and as the "known circumstances" change, the sufficiency of a response may also have to evolve.

*Zeno,* 702 F.3d at 668 (when disciplining harassers does not deter others, a school district must employ other measures). Defendant DCSD claims to have implemented certain school-wide practices meant to address racial harassment.[26] These efforts, however, were not specific to racial

---

[26] Ironically, Defendants both claim that Principal Veit implemented these changes in response to the hostile environment, and that he is entitled to qualified immunity because he did not know of racial harassment. *See* ECF No. 53 at 37 ("The question here . . . is whether Mr. Veit was on notice [for qualified immunity purposes] that he could be liable for student-on-student racial harassment that occurred in his school **even though he did not have knowledge of it**.") (emphasis added). Not only are these positions inconsistent, Defendants also ignore Veit's testimony that he meets with his administrative team and they discuss disciplinary decisions, as well as important happenings in school. RSUMF XX. A reasonable inference from this testimony is that he knew of each allegation of racial harassment, assuming he and his administration took them seriously. At minimum, he knew of any incident that resulted in discipline. *See Forth*, 85 F. 4th at 1052.

harassment and instead focused on generalized bullying and social-emotional learning.[27] *See id.* ("half-hearted measures" including optional programs that are not specific to racism may show deliberate indifference); *DiStiso*, 691 F.3d at 244–45 (reasonable jury deliberate indifference where teacher "offered no evidence that she ever spoke to a kindergarten student about *racial* name-calling") (emphasis in original). Particularly telling, is Defendant DCSD's decision to use these nonspecific trainings when its own social worker offered to develop and deliver training specific to the issue at hand: *racial* harassment. *See Zeno*, 702 F.3d at 671 (district's decision to use training not specific to racism and discrimination when an alternative training that did address racism was available showed deliberate indifference). What's more, despite Defendants' claims, students reported that they never received these alleged supports and trainings, including Mr. Loucks' presentation, presenting a material dispute of fact as to whether it happened, and if it did, whether it was effective. RSUMF 1, 13, 161; ASF 101. Defendants abdicate their responsibility for creating and maintaining a safe educational environment free from discrimination by decrying that, "CRMS's administration cannot be faulted for the 'impossible' task of anticipating new harassers." ECF No. 53 at 28 (citing *Malick v. Croswell-Lexington Dist. Schs.*, 148 F.4th 855, 867 (6th Cir. 2025)). But Defendant DCSD must show it did something in light of the increasingly hostile environment. *See Zeno,* 702 F.3d at 668 (jury could have found that "greater action was required" where racial harassment was persistent and committed by many students).

---

[27] *See, e.g.,* RSUMF 160–163. The only intervention that remotely, on its face discusses racism or race is the reflection exercise. There's no evidence, however, that Defendants used this exercise until April 2023 and with only one student L.B. who posted a photo of Winnie the Poo's Piglet manipulated to have brown skin and with the caption, "Niglet." RSUMF 133, 163.

Despite Defendants' characterization, this is not a case about seeking a "particular response or specific form of discipline." *See* ECF No. 53 at 31. Instead, it's a case about whether a school district fulfills its mandate to provide its students with an education free from discrimination when it allows racial harassment and the hostile environment it created to fester until Black students feel so unwelcome they have no choice but to withdraw. *See Bryant*, 334 F.3d at 933. A jury should resolve any factual disputes and weigh the sufficiency of Defendant DCSD's response.

## II.  PLAINTIFFS' EQUAL PROTECTION CLAIMS SHOULD PROCEED TO TRIAL

Plaintiffs bring Equal Protection Claims against Defendant DCSD as an entity and Principal Veit as an individual. The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983. *Murrell,* 186 F.3d at 1249. Both claims require a showing that a defendant was deliberately indifferent to known racial harassment, which is the same standard as Title VI. *See Murrell,* 186 F.3d at 1250 (recognizing that a governmental official or supervisory employee may be held individually liable under section 1983 upon a showing of deliberate indifference to harassment); *Wilkinson v. Oklahoma Hous. Fin. Agency*, 2025 WL 3488291, at *2 (W.D. Okla. Dec. 4, 2025) ("Title VI and the Equal Protection Clause are generally in lockstep—a violation of one is sufficient to demonstrate a violation of the other.").  Defendants challenge both of Plaintiffs' equal protection claims, but as with the Title VI claims, there are genuine issues of material fact that preclude summary judgment on both claims.

A. **Plaintiffs' Municipal Liability Claim Should Go To a Jury**

To establish municipal liability under the Fourteenth Amendment, a plaintiff must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority. *Id.* "[A] municipal policy must be a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers.'" *See Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658 (1978). The Tenth Circuit has instructed:

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Plaintiffs have produced sufficient evidence to prevail on the second, third, fourth, and fifth theories of municipal liability.

First, Defendant DCSD had a custom of minimizing or ignoring Black students' claims of racial harassment. As discussed supra, Plaintiffs repeatedly reported racial harassment to various Defendant DCSD administrators who either did not investigate the allegations at all or took only minimal, ineffective steps to respond. *See Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (explaining that the existence of a custom, which is a question of fact, is "most commonly" proved by showing "that similarly situated individuals were mistreated [] in a similar way"). Plaintiffs' peers showered them with racist epithets, degrading comments, threats, and even targeted them with physical violence and humiliating photos. Defendant DCSD either ignored Plaintiffs' concerns outright or conducted informal, haphazard inquiries that lacked

94

documentation and any explanation of findings and reasoning. *See Doe*, 970 F.3d at 1314 (school district was deliberately indifferent where administrator conducted no investigation, did not document complaints, said "he could not do anything about it," and the harassment continued despite repeated reports). Conversely, when a white student alleged that a Black student called her a "cracker," Defendant Veit elevated her complaint to the District's Compliance Officer, who conducted a formal investigation complete with a detailed report and findings. ASF 103–105.

Defendant DCSD claims it is entitled to summary judgment because, "Plaintiffs fail to raise evidence of a District policy or custom leading to a violation of their constitutional statutory rights." ECF No. 53 at 34. Not so. Absent such an official policy, a municipality may also be held liable if the discriminatory practice is so permanent and well settled as to constitute a custom or usage with the force of law." *Murrell*, 186 F.3d at 1250 (citation modified). Indeed, "[a]cts that do not rise to the level of official policy may nonetheless create liability if they are sufficiently widespread and pervasive so as to constitute a custom." *Id.* (citation modified). A reasonable jury could find Defendants have an informal custom of minimizing or ignoring racial harassment of Black students.

Second, not only did Defendant DCSD's final policymakers fail to investigate Black students' allegations of racial harassment, they ratified their subordinates' failure to conduct investigations.[28] If an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes." *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995). To determine whether an official is a "final policymaker," the Court considers three factors: "(1)

---

[28] Defendant DCSD does not address this theory in their brief and have therefore waived this argument. *See Nunez v. Heimgartner*, 2018 WL 1427953, at *8 (D. Kan. Mar. 22, 2018) (holding that a party generally waives issues and arguments not raised in its motion for summary judgment).

whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Id.* at 448 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (quotation marks omitted); *see also Calderon v. City & Cty. of Denver*, No. 18-CV-00756-PAB-MEH, 2023 WL 5348396, at *11 (D. Colo. Aug. 21, 2023). Whether an individual "possessed such 'final authority' is a question of state law." *Jantz v. Muci*, 976 F.2d 623, 630 (10th Cir. 1992) (quoting *Ware v. Unified Sch. Dist. No. 492*, 902 F.2d 815, 817 (10th Cir. 1990)).

The District vests school principals with the power to make final student disciplinary decisions. School principals have unreviewable authority to address student misconduct through interventions including detention, in-school suspension, counseling, restorative justice practices, or other non-exclusionary approaches, or out-of-school suspensions for up to five school days. ASF 59; *see also* Colo. Rev. Stat. 22-33-105(2)(a) (allowing the board of education to "[d]elegate to any school principal within the school district . . . the power to suspend a pupil in his school for not more than five school days"). Principals' disciplinary decisions are final and not subject to other's review. *Id.* Here, Principal Veit chose not to discipline (or even investigate) students who called N.G. the N-word, circulated C.M.'s photo from October 2022 to April 2023, and called C.M., D.C., and J.G. racist epithets. Thus, each of the factors show that Principal Veit was a final policymaker with respect to student discipline.[29] His decision not to discipline all students who racially harassed Black children was a final municipal policy for Section 1983 purposes. This

---

[29] Even if this Court determines Principal Veit is not a final decisionmaker, higher up district officials knew of his decision to not discipline these students. For example, Director of Equal Education and Employment Opportunity Aaron Henderson knew about the photo of C.M. and Executive Director of Schools Erin McDonald knew about J.G.'s March 10, 2023 written complaint. Taking Defendants' statement of undisputed material facts as true, these officials knew of and ratified Defendant Veit's decision to limit discipline to the photographer, K.O., and not to investigate J.G.'s claims or discipline any involved students.

failure allowed students to use the N-word, monkey, and other derogatory racial slurs creating a hostile environment for Black students that culminated in death threats and other grotesque expressions of racism on the Morgaine/Gawain snapchat group. *See Bryson*, 627 F.3d at 788 (plaintiff must allege "a direct causal link between the policy or custom and the injury alleged").

Third, the District failed to train and supervise its employees in how to appropriately respond to racial harassment. A policy or custom may take the form of . . . failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Nation v. Piedmont Indep. Sch. Dist. No. 22*, No. 21-6123, 2022 WL 4075595, at \*4 (10th Cir. Sept. 6, 2022) (citing *Bryson*, 627 F.3d at 788) (internal quotation marks omitted). Deliberate indifference exists when a municipal actor "disregarded a known or obvious consequence of [their] action." *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). When "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," the policymakers' failure to train or supervise "may fairly be said to represent a policy for which the [municipality] is responsible." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Contrary to Defendant DCSD's assertion, there is evidence of a pattern of similar unconstitutional violations by untrained employees, and a pattern of incidents in prior school years that put the District on notice that additional training was necessary. *See supra* Section I. The only facts Defendants assert to show there was no need for additional training are disputed. *See* RSUMF 141; 160-62. Moreover, the District's employees received no training on topics vital to recognizing, reporting, and addressing racial harassment. RSUMF 1, 3, 6. Students also reported hearing other students use the N-word in front of teachers who did not stop the

97

behavior or report it to school administrators. *See, e.g.*, RSUMF 28, 47, 93, 94, 105; ASF 89, 90. Moreover, CRMS's school social worker, Garcelle Franklin told CMRS administrators that training specific to racial harassment was necessary and offered to provide such training, yet administrators denied her request. ASF 57; *see Zeno*, 702 F.3d at 671 (district's decision to use training not specific to racism and discrimination when an alternative training that did address racism was available showed deliberate indifference). Thus, there are genuine issues of material fact as to whether the District failed to train its employees in how to identify, report, and respond to racial harassment and discrimination in its schools.

Separately, the District also failed to supervise its employees. Although the District has a compliance officer who oversees its response to harassment and discrimination, this officer, nor anyone else in the District, ensured that the teachers and administrators at DCHS and CRMS promptly and appropriately investigated allegations of racial harassment. In fact, taking Principal Veit's account as true, he discussed J.G.'s letter with his boss, Erin McDonald, who ratified Veit's decision not to investigate. Defendant DCSD continues to excuse Veit and his supervisor's decision with their post-hoc claims that J.G.'s letter was not a "complaint" despite it unequivocally informing Defendants that he and others experienced racial harassment. Veit also knew of and allowed his assistant principals to not investigate racial harassment, facilitate the destruction of evidence, and institute punitive measures against victims. As a result, Black students were forced to attend school in a racially hostile environment and ultimately only found reprieve when they withdrew from their schools.

Defendant DCSD has not met its burden of showing it is entitled to summary judgment on Plaintiff's municipal liability claim.

**B.**      <u>**The Equal Protection Claim Against Defendant Veit Should Go to the Jury**</u>

The Tenth Circuit has recognized that a governmental official or supervisory employee may be held individually liable under section 1983 upon a showing of deliberate indifference to harassment. *Murrell*, 186 F.3d at 1250. Courts employ the same standard for individual equal protection claims as Title VI. *Bryant*, 334 F.3d at 934.

Defendant Veit argues that the equal protection claim against him fails because Plaintiffs have not established that he violated Title VI. But just as there are genuine disputes of material fact as to that claim, there also are with regard to this equal protection claim.

Defendant Veit further argues that he is entitled to qualified immunity. As this Court has recognized,

> When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion. The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity.

*Robitaille v. Spitzer*, 175 F. Supp. 3d 1299, 1303 (D. Colo. 2016) (citing *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) (quoting *Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir. 2009)). To satisfy the clearly established prong of the test, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (quoting *Clark v. Wilson,* 625 F.3d 686, 690 (10th Cir.2010). "Ultimately, the relevant inquiry is whether the law put officials on fair notice that the described conduct was unconstitutional." *Id*. (citations and alterations omitted); *see also Ganzy on behalf of J.G. v. Douglas Cty. Sch. Dist. RE-1*, 744 F. Supp. 3d 1187, 1191 (D. Colo. 2024). "When the public official's conduct is egregious, even a general precedent would apply with obvious clarity." *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017). When a defendant claims

qualified immunity at the summary judgment stage, the plaintiff must show that a reasonable jury could find facts supporting a constitutional violation. *Works v. Byers*, 128 F.4th 1156, 1162 (10th Cir. 2025).

As noted above, a reasonable jury could find that Defendant Veit was deliberately indifferent to known racial harassment. Since 1999, it has been clearly established in the Tenth Circuit that principals who are deliberately indifferent to known student-on-student harassment are not entitled to qualified immunity. *See Murrell*, 186 F.3d at 1251–52. Defendant Veit fails to cite, much less distinguish, the on-point *Murrell* holding.

Instead, Defendant Veit claims that he was not "on notice that he could be liable for student-on-student harassment that occurred at his school even though he did not have actual knowledge of it." ECF 53 at 37.  But this is not Plaintiffs' argument; rather, Plaintiffs contend that a principal is on notice that he can be liable for student-on-student harassment that occurred at his school *when he has actual knowledge of it*.

Consistent with *Murrell*, Plaintiffs have evidence that Defendant Veit knew of racial harassment at his school and was deliberately indifferent to it. This longstanding right is clearly established and a reasonable jury could find that Defendant Veit violated Plaintiffs' constitutional rights. *See Murrell*, 186 F.3d at 1251–52; *see also Sturdivant v. Fine*, 22 F.4th 930, 938 (10th Cir. 2022) (denying qualified immunity to a high school employee on an equal protection claim "[g]iven the long-standing recognition of an African-American student's right to equal treatment").

Defendant Veit also claims there is "no basis for a reasonable jury to find [he had a] discriminatory intent." ECF 53 at 39. The Tenth Circuit has long recognized that a plaintiff may show discriminatory intent by proving deliberate indifference. *Bryant*, 334 F.3d at

932. Here, Plaintiffs have produced ample evidence that Defendant Veit was deliberately indifferent to known racial harassment. As discussed in detail above, Defendant Veit personally received multiple complaints of racial harassment from Black students that he did not investigate or respond to reasonably. His administrative team, who reports to him and makes decisions subject to his approval, received additional complaints that Defendant Veit knew about and was deliberately indifferent to. *See Murrell*, 186 F.3d at 1251 (plaintiff's claim that principal was deliberately indifferent to known harassment and "acquiesced in that conduct by refusing to respond to it"). The equal protection claims against Principal Veit are not barred by qualified immunity.

**III.    DEFENDANT VEIT IS NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' § 1986 CONSPIRACY CLAIM**

Finally, Defendants ask for summary judgment on Plaintiffs' conspiracy claim by attempting to relitigate issues this Court already decided at the motion to dismiss stage. For the same reasons Defendants' arguments were unpersuasive then, this Court should deny summary judgment now. *See Ganzy on behalf of J.G. v. Douglas Cty. Sch. Dist. RE-1*, 744 F. Supp. 3d 1187 (D. Colo. 2024).

As to the first prong, Defendant Veit argues he is entitled to qualified immunity because he did not violate Plaintiffs' constitutional rights. This Court has already aptly stated the legal requirements of this claim:

> To succeed on their § 1986 claim against Mr. Veit, Plaintiffs must establish a conspiracy to interfere with civil rights as described in § 1985. *See, e.g.*, *Santistevan v. Loveridge*, 732 F.2d 116, 118 (10th Cir. 1984). ("[T]here can be no valid claim under § 1986 of neglect to prevent a known conspiracy, in the absence of a conspiracy under § 1985.").
>
> . . .
>
> The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in

furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Additionally, § 1985(3) applies "only to conspiracies motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Id.* (quoting *Griffin*, 403 U.S. at 101-02, 91 S.Ct. 1790).

. . .

Along with establishing a § 1985 conspiracy, a plaintiff asserting a § 1986 claim must show (1) the defendant had knowledge of the conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a violation of § 1985, (3) the defendant neglected or refused to prevent the violation, and (4) a violation of § 1985 occurred. 42 U.S.C. § 1986.

*Ganzy*, 744 F. Supp. 3d at 1192–93. The Court's legal conclusions are law of the case. *See E. Tunneling Corp. v. Southgate Sanitation Dist., Arapahoe Cty., Colo.*, 487 F. Supp. 109, 116 (D. Colo. 1979) ("While summary judgment was not deemed appropriate at the time of the previous motion . . . , I did discuss the applicable law, which is now the law of the case.").

In one conclusory sentence, Defendant Veit once again employs the kitchen sink approach, claiming, "Plaintiffs cannot prove their peers entered into an agreement to harass them on the basis of race to the point that they were deprived of their rights and then took action in furtherance of that agreement." ECF No. 53 at 41–42. Defendant Veit recycles this exact argument from his motion to dismiss. *See Ganzy*, 744 F. Supp. 3d 1187 at 1193 ("[T]he Amended Complaint is devoid of any allegation that Plaintiffs' peers *entered into an agreement* to harass them to the point that they were deprived of their rights and then *took action in furtherance of that agreement.*"). This Court should affirm its determination that Veit's argument is "meritless." *Id.* at 1192.

First, there was a conspiracy to deprive Plaintiffs of their equal protection rights.[30] As this Court has already determined, no express agreement is required under the law and regardless, "the

_____

[30] Veit claims "there is no evidence of a violation under the Equal Protection Clause." ECF No. 53 at 39. Plaintiffs incorporate our arguments in Section II of this Response.

102

concerted message from students was clear: J.G., C.M., and D.C.[31]  were not welcome to receive the same education at CRMS." *Id.* at 1195.

Moreover, this is not a case of "parallel action" insufficient to indicate an agreement to act in concert, as Defendant Veit argues. ECF No. 53 at 42. C.M., J.G., and D.C. all experienced the same hostile environment where they were called racial slurs daily. The harassment was relentless and escalated to physical assaults. *See, e.g.*, RSUMF 52, 53, 66–68; ASF 98, 127. Students took to social media to further announce that Black students were not welcome in their schools. They posted and reposted photos of C.M. and J.G., at times with racist monikers attached to their images, to the Mongraine/Gawain snapchat group. *See, e.g.*, RSUMF 41, 61, 103, 127–134, ASF 24, 26–42, 47, 95. Students engaged with each other's posts, tagging Plaintiffs to identify precisely who they were targeting. *Id.* Students confronted C.M. and J.G. about reporting to adults that other students called them racial slurs. *See, e.g.*, RSUMF 52, 53, 134 Students affirmed and supported each other's threats of violence against Black students. These facts and more show there was a conspiracy among the students, and that they took steps in furtherance of that conspiracy. *Ganzy*, 744 F. Supp. 3d 1187 at 1195.

A reasonable jury may find that students harassed Plaintiffs because of their race, particularly given the relentless use of racial slurs and disparaging remarks about Black people. *See Bryant*, 334 F.3d at 932; *DiStiso*, 691 F.3d at 242–43. Defendant Veit mistakenly places himself as the focal point, arguing "there is nothing from which racial animus on the part of Mr. Veit could be found." ECF No. 53 at 41. Section 1985(3) claims, however, look at whether the *conspiracy* was motivated by some racial animus, not whether the person who neglected to prevent the conspiracy was so motivated. *See Ganzy*, 744 F. Supp. 3d at 1192. But even if Plaintiffs must

---

[31] N.G. does not bring a section 1986 claim against Defendant Veit.

prove Defendant Veit's intent, that inference can be made by his deliberate indifference. *Bryant*, 334 F.3d at 933 (principal's decision to do nothing in response to known racial harassment demonstrates discriminatory intent).

Finally, J.G., C.M., and D.C. experienced an injury and deprivation of rights. The conspirators' harassment had created a hostile learning environment and J.G. and C.M.'s parents removed them from school because of the violent and racist harassment. *See Zeno*, 702 F.3d at 667 (Black student "was deprived of a supportive, scholastic environment free of racism and harassment"). The Court should decline Defendants' attempts to relitigate these issues related to the underlying Section 1985 allegations.

As to the Section 1986 claim itself, Defendant Veit argues, "Plaintiffs cannot prove [he] had knowledge of any conspiracy, or that he neglected or refused to prevent overt acts in furtherance of such a conspiracy."[32] ECF No. 53 at 42. A reasonable jury may find that Defendant Veit knew of the conspiracy. Plaintiffs have ample evidence that Veit knew of the ongoing student-on-student harassment, which this Court has determined evidences a conspiracy. *See Ganzy*, 744 F. Supp. 3d 1187 at 1195. Veit knew about the photo of C.M. in the bathroom, taken to see the size of his genitals, then circulated on the Morgaine Pod snapchat[33] and via airdrop by students at school in October 2022. RSUMF 41–46. Veit knew that a student in C.M.'s gym class called him

---

[32] Defendant Veit also says he's entitled to qualified immunity because there's no evidence of his racial animus. This argument conflates Section 1985(3)'s requirement that the students' conspiracy was motivated by racial animus with Section 1986. There's no such additional requirement, but if there were, Veit's deliberate indifference to known student-on-student harassment shows discriminatory intent, as the Tenth Circuit has held. *See Bryant*, 334 F.3d at 932.

[33] Defendants fixate on whether Veit knew of the snapchats themselves, but the operative question is whether Veit knew the students conspired to deprive Plaintiffs of their rights, not the specific mode of communication they used to do so. Indeed, CRMS students used many modes of communication in furtherance of their conspiracy, including online and in-person communications. Veit knew of both, and neglected or refused to prevent over acts in furtherance of the conspiracy via both.

the N-word repeatedly, as well as other slurs, and that she continued to harass other Black students. RSUMF 47–51, ASF 13, 14, 63. Veit knew that students continued to call C.M. the N-word, monkey, chimpanzee, gorilla, and other slurs; trip and push him in the hallways; and continued to circulate the photo of him in the bathroom, including with racist captions. RSUMF 52–70, ASF 47. Veit received J.G.'s March 10, 2023 complaint detailing the daily racial harassment he and his Black peers experienced, including that staff "will be in the area . . . [yet] nothing is done . . . ."[34] RSUMF 105. In response, Veit confirmed he understood racial harassment to be an ongoing "long" problem at the school. RSUMF 28. Many of these facts are the very allegations this Court relied on at the motion to dismiss stage to conclude Plaintiffs' pleaded Veit's knowledge of the conspiracy. *See Ganzy*, 744 F. Supp. 3d 1187 at 1195–96. Veit has given this Court no evidentiary reason to revisit that decision now.

Likewise, a reasonable jury may find that Defendant Veit neglected or refused to prevent overt acts in furtherance of the conspiracy—that is, students' ongoing racial harassment of Plaintiffs. Defendant Veit restates many of the facts Plaintiffs dispute and have discussed in detail with respect to his deliberate indifference. Rather than restate those arguments here, Plaintiffs incorporate those arguments by reference. As with Plaintiffs' underlying claims showing deliberate indifference, this Court should decline to grant summary judgment on Plaintiffs' Section 1986 claim and instead submit the disputed facts to a jury.

Finally, Defendants argue, "there was no clearly established law . . . that could have put Mr. Veit on notice that he could be liable for a purported conspiracy amongst students to engage

---

[34] It is worth repeating here that in late April 2023, after CRMS administration finally looked into these allegations, teachers themselves confirmed J.G.'s allegations. *See* RSUMF 58 ("His teachers have heard the N-word in some classes and do address it, but they cannot be certain what students are saying it. I will say this is something we seem to be hearing from students more and more . . . .")

105

in student-on-student harassment **that he knew nothing about**." ECF No. 53 at 42 (emphasis added). This Court should reject Defendants attempt to misstate the law and the facts. As this Court pointed out in its order rejecting Defendants' qualified immunity defense previously, the focus is on whether the law clearly established Plaintiffs' rights, "not whether an official would have understood exactly how he could be held liable for that violation." *Ganzy*, 744 F. Supp. 3d 1187 at 1196–97. Thus, "Section 1986 demands . . . that a plaintiff show the defendant **had knowledge** that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed." *Id*. at 1196 (emphasis added).

To be sure, "[e]ven when no precedent involves facts materially similar to ours, the right can be clearly established if a precedent applies with obvious clarity." *Lowe*, 864 F.3d at 1210 (cleaned up). "General statements of the law are not inherently incapable of giving fair and clear warning to [officials] that their conduct violates a constitutional right, and that such statements provide the required notice when the unlawfulness of their conduct is apparent from the pre-existing law." *A.N. by & through Ponder v. Syling*, 928 F.3d 1191, 1198 (10th Cir. 2019) (cleaned up). There is no shortage of statutes and case law that entrenches students' right to attend school free from discriminatory harassment. *See, e.g.*, Title VI, 42 U.S.C. § 2000d; Colorado Safe Schools Act, Colo. Rev. Stat. § 22-32-109.1(2)(b)(IV); *Bryant*, 334 F. 3d at 932; *Murrell*, 186 F.3d at 124. Thus, the general rule—that Defendant Veit had a legal duty to address known student-on-student racial harassment—makes it apparent that he would violate the law if that harassment were perpetuated by an individual student, or, as relevant here, by a group of students who conspire together. *See A.N. by & through Ponder*, 928 F.3d at 1199. Defendant Veit is not entitled to qualified immunity.

106

**CONCLUSION**

Most, if not all, of the *material* facts Defendants rely on in their motion are disputed. Even many of their inconsequential facts are still disputed. Defendants have not met their burden and their motion should be denied in its entirety.

DATED: January 16, 2026.

RATHOD | MOHAMEDBHAI LLC

s/Iris Halpern
Iris Halpern
Crist Whitney
Katie Wiese Valiant
Aria S. Vaughan
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
ih@rmlawyers.com
cw@rmlawyers.com
kw@rmlawyers.com
av@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS